UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SCF WAXLER MARINE LLC, d/b/a/
SCF LIQUIDS

VERSUS

M/V ARIS T, a bulk carrier ship, IMO
No. 9343895, MMSI No. 2406260000,
her engines, tackle, apparel, and other
appurtenances, *in rem*, in admiralty

CIVIL ACTION

NO. 16-902 c/w 16-959,
16-1022, 16-1060, 16-1134 &
16-1614

SECTION M (1)

*Applies to All Cases*

## FINDINGS OF FACT & CONCLUSIONS OF LAW

This matter involves a maritime accident that occurred on January 31, 2016, on the Mississippi River near Hahnville, Louisiana, when the ocean-going bulk carrier *M/V Aris T* ("*Aris T*") struck three marine terminals – one owned by Valero Refining - New Orleans, L.L.C. ("VRNO") and two owned by Shell Chemical, L.P. ("Shell") and Motiva Enterprises LLC ("Motiva") (collectively "Shell/Motiva") – along with some vessels and barges that were either moored to, or underway near, the docks and owned by SCF Waxler Marine LLC ("SCF Waxler") or Kirby Inland Marine ("Kirby").

On February 2, 2016, SCF Waxler sued the *Aris T*, *in rem*, in this Court seeking redress for damages sustained by its towboat and barges (C/A No. 16-902).[1] Over the next few days, VRNO and Shell/Motiva filed suit against the *Aris T*, *in rem*, and its owner, ARIS T ENE, and manager, Marmaras Navigation, Ltd. ("Marmaras"), *in personam* (collectively, the "*Aris T* interests") (C/A Nos. 16-959, 16-1022 & 16-1060). On February 5, 2016, the *Aris T* interests filed a complaint under the Limitation of Liability Act, 46 U.S.C. §§ 30501, *et seq.*, asserting

---

[1] This consolidated action was originally assigned to another section of this Court and was reassigned to this section upon confirmation of the undersigned. R. Docs. 4 & 236.

that the *Aris T* was not at fault for the accident and alleging that the post-accident value of the vessel and its pending freight was $8,722,400 (C/A No. 16-1134).[2] On February 26, 2016, Cenac Marine Services, LLC ("Cenac") filed a complaint in limitation contending that its vessel, the *Loretta G. Cenac*, was not at fault for the accident and that the vessel's post-accident value, along with its pending freight, was $14,602,365 (C/A No. 16-1614). The cases were all consolidated under the lead case, C/A No. 16-902.[3] Thereafter, Cenac and the *Aris T* interests filed third-party complaints against Genesis Marine of Delaware, LLC and Genesis Marine, LLC (collectively, "Genesis") as the owners of the *Elizabeth M. Robinson*.[4] Genesis answered and asserted exoneration from, or limitation of, liability as a defense.[5] A Shell/Motiva employee, Antoine Morris, asserted claims in the limitation proceedings, seeking damages for personal injuries he allegedly sustained as a result of the accident.[6] Further, on January 24, 2017, VRNO and Shell/Motiva filed third-party complaints against Cenac's primary and excess insurers under Louisiana's direct-action statute, La. R.S. 22:1269, which allows injured persons to sue the insurers of a person alleged to have caused an accident.[7]

The limitation-of-liability and negligence phase of the case was tried before the Court, sitting without a jury, over ten days; and Morris's personal injury case was tried separately before the Court, sitting without a jury, over three days. Having considered the evidence admitted at trial, the arguments of counsel, the record, and the applicable law, the Court issues its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as

---

[2] Prior to trial, VRNO settled with the *Aris T* interests, and VRNO's claims against the *Aris T* interests were dismissed on the record in open court.
[3] R. Docs. 11, 18, 19, 28 & 33.
[4] R. Docs. 34 & 55.
[5] R. Docs. 41-43, 243 & 263.
[6] R. Docs. 58 & 59.
[7] R. Docs. 114 & 116.

such, and to the extent a conclusion of law constitutes a finding of fact, the Court likewise adopts it as such.

## FINDINGS OF FACT[8]

### I.    THE PARTIES AND VESSELS

1.      VRNO is a limited liability company, and at all relevant times owned and operated a refinery in St. Charles Parish, Louisiana, with supporting facilities, including the docks and mooring structures on the east bank of the Mississippi River at approximately mile marker 125 above the head of the passes ("AHP") (the "VRNO Facility").[9]

2.      Motiva is a limited liability company, and at all relevant times owned multiple berths and related facilities located in St. Charles Parish, Louisiana, on the east bank of the Mississippi River near mile markers 125 and 126 AHP (the "Shell/Motiva Facility").[10]

3.      Shell is a limited partnership, and at all relevant times was the co-owner of the Shell/Motiva Facility.[11]

4.      The Shell/Motiva Facility produces refined petroleum products and chemicals.  It includes two marine docks, referred to as "Berth 2" and "Berth 4," that are used to transfer products between the refinery and marine vessels.  At all pertinent times, Berth 2 and Berth 4 were jointly owned by Motiva and Shell.[12]

5.      Marmaras is a foreign company, and at all relevant times was the manager and operator of the *Aris T*.[13]

---

[8] This Findings of Fact and Conclusions of Law is divided into two sections: the first one dedicated to the liability of the vessels involved, and the second one to the personal injury claim.
[9] R. Doc. 320 at 4.
[10] *Id.*
[11] *Id.*
[12] *Id.* at 69.
[13] *Id.* at 4-5.

6.  ARIS T ENE is a foreign company, and at all relevant times was the owner of a single asset, the *Aris T*.[14]

7.  The *Aris T* is a 753-foot bulk freighter built in 2007 and bearing IMO Number 9343895 (gross tonnage: 49,973; breadth: 121 feet; summer draft: 37 feet; summer deadweight: 92,524 metric tons; horsepower: 15,050).  It has a single screw and is driven by a diesel engine.  It flies the Greek flag and its port of registry is Piraeus, Greece.  At all pertinent times, the *Aris T*'s classification society was Lloyd's Register.[15]

8.  The Genesis entities are limited liability companies, and at all relevant times owned and operated the *Elizabeth M. Robinson* and its attached red-flagged tank barges – GM 1008, GM 1011, and GM 3013 (collectively, the "*Elizabeth*").[16]

9.  The *Elizabeth M. Robinson* is a 110-foot inland towboat that was placed into service in 2015.  It is a twin screw 3,150 horsepower towboat equipped with conventional rudders.  The *Elizabeth* was configured in a string of three barges forward of the tug.  The overall flotilla measured approximately 1,010 feet.  The undisputed post-casualty value of the *Elizabeth* and its tow, together with pending freight, was $16,454,744.[17]

10.  Cenac is a limited liability company, and at all relevant times owned and operated the *Loretta G. Cenac* and its attached red-flagged tank barges – CTCO 338, CTCO 339, and CTCO 357B (collectively, the "*Loretta*").[18]

11.  The *Loretta G. Cenac* is a 99-foot inland towboat that was placed into service in 2015.  It is equipped with three Z-drives (azimuth thrusters) mounted in three propulsion units below the hull and capable of rotating 360 degrees.  As a result, the *Loretta* was more

---

[14] *Id.* at 5 & 63.
[15] *Id.* at 66.
[16] *Id.* at 5 & 63.
[17] *Id.* at 63, 66 & 67.
[18] *Id.* at 5.

maneuverable and easier to control than a conventional boat. The *Loretta* was configured in a two-by-one arrangement at the time of the casualty, with two barges attached to the tug side by side, and one barge forward of the barge on the tug's starboard side. Each of the barges measured 300 feet by 54 feet. The undisputed post-casualty value of the *Loretta* and its tow, together with pending freight, was $14,602,365.[19]

12.    On January 31, 2016, Continental Insurance Company and AGCS Marine Insurance Company subscribed to Cenac's primary protection and indemnity insurance with combined single limits of $1,000,000.[20]

13.    At the time of the incident, Cenac had excess insurance underwritten by New York Marine and General Insurance Company, Stonington Insurance Company, and National Specialty Insurance Company (collectively "Cenac's First Excess Insurers") in the amount of $29,000,000 of insurance coverage excess of the $1,000,000 primary coverage.[21]

14.    At the time of the incident, Cenac had a second layer of excess insurance coverage severally subscribed to by Certain Underwriters at Lloyd's of London ("Cenac's Second Excess Insurer," and collectively with Cenac's First Excess Insurers, "Cenac's Excess Insurers"), which provides $70,000,000 in insurance coverage excess of the $30,000,000 primary and first excess coverage.[22]

15.    SCF Waxler is a limited liability company, and at all relevant times, SCF Waxler owned and/or operated and was the owner *pro hac vice* of the *SCF Vision*, an inland river towboat, and the tank barges SCF 1201 and WTC 3019 (collectively "SCF Waxler vessels"),

---

[19] *Id.* at 63 & 66; Testimony of Sanamo.

[20] *Id.* at 5. The limits of Cenac's primary protection-and-indemnity insurance policies have been exhausted. *Id.* at 66.

[21] *Id.* at 5-6 & 75.

[22] *Id.* In a September 5, 2017, Order & Reasons, the Court held that the liability of Cenac's Excess Insurers is limited to, and cannot exceed, that of Cenac in accordance with the language of the insurance policies. R. Doc. 176.

which were moored at the VRNO facility on the east bank of the Mississippi River at mile marker 125. The parties stipulate that SCF Waxler's damages inclusive of prejudgment interest and costs, arising from the January 31, 2016 incident total $260,000.[23]

16.    Kirby is a limited partnership, and at all relevant times, owned and operated the *M/V Pedernales*, a vessel that was underway and adjacent to the tank barge *Kirby 28080*, which was moored at Berth 2 of the Shell/Motiva Facility (collectively, the "Kirby vessels").  The parties stipulate that Kirby's damages, inclusive of prejudgment interest and costs, arising from the January 31, 2016 incident total $33,500.[24]

## II.    FACTS ESTABLISHED BY EVIDENCE PRESENTED AT TRIAL

17.    On the evening of January 31, 2016, the Mississippi River was running high, with the Carrollton Gauge reading 15.03 feet.  At the relevant time, from 7:30 p.m. to 8:00 p.m., the weather was fair with a southerly wind and some light surface fog developing.[25]

18.    The Mississippi River's current was flowing at approximately 4.5 knots.[26]

19.    The *Aris T* was upbound in the Mississippi River in route to the ADM (Archer Daniels Midland) Terminal in Reserve, Louisiana, to load a cargo of soy beans.[27]

20.    The *Aris T* was under the command of Captain Kimon Baltas, who was employed by ARIS T ENE.[28]

21.    On January 31, 2016, Marmaras held a Document of Compliance and a Safety Management Certificate for its Safety Manual System ("SMS"), certifying that Marmaras was fully compliant with the requirements of the International Safety Management ("ISM") Code.[29]

---

[23] R. Docs. 320 at 5 & 70; 357.
[24] R. Doc. 444 at 2.
[25] R. Doc. 320 at 64; Exhibit 226.
[26] Testimony of Michael Leone (the compulsory pilot onboard the *Aris T*).
[27] R. Doc. 320 at 66.
[28] *Id.*; Testimony of Rania Ferentinou (Marmaras's corporate representative).
[29] R. Doc. 320 at 71.

22.    At all relevant times, the *Aris T*'s second officer, Dimitrios Bardouniotis, and its helmsman, Nilo Sevilleno, were also on the vessel's bridge.  The bridge team crewmembers were duly certified in accordance with the International Convention on Standards of Training, Certification, and Watchkeeping for Seafarers ("STCW"); flag requirements; and all other pertinent regulations.  All other *Aris T* crewmembers were also duly certified in accordance with the STCW.[30]

23.    The *Aris T*'s crewmembers were familiar with Marmaras's SMS in accordance with the requirements of the International Convention for Safety of Life at Sea ("SOLAS") and the SMS manual itself.[31]

24.    The *Aris T*'s crewmembers participated in an onboard training program that included safety meetings, drills, field instructions, video training sessions, and review of other materials from the ship's library.[32]

25.    As of January 31, 2016, the *Aris T*'s crewmembers had undergone appraisals by the master, chief engineer, and/or Marmaras's shoreside staff.[33]

26.    All members of *Aris T*'s bridge team were duly certified in Bridge Resource Management, which is the effective utilization and management of all resources (human, informational, and technical) available to a vessel's bridge team to achieve safe operation.[34]

---

[30] *Id.* at 70-71; Testimony of Ferentinou; Exhibits 37-42, 65-66 & 111-121.

[31] Testimony of Baltas, Sevilleno, Georgios Dikos-Drakos (the *Aris T*'s chief engineer), Ioannis Poulis (the *Aris T*'s second engineer), Maurice Ryan (tendered and accepted as a navigation expert) & David McFarlane (tendered and accepted as a safety management systems expert); Exhibits 38-42, 47-48, 66-67 & 111-121.

[32] Testimony of Ferentinou, Baltas, Dikos-Drakos, Poulis, Bardouniotis & Athanasios Athanasios (the *Aris T*'s chief officer); Exhibits 102-104, 137 & 159.

[33] Testimony of Ferentinou, Baltas, Athanasios, Dikos-Drakos & Bardouniotis; Exhibits 109-110, 137, 159 & 162.

[34] R. Doc. 320 at 71; Testimony of Ferentinou, Bardouniotis, Ryan & Emmanuel Bernardo (the *Aris T*'s second officer); Exhibit 68.

27. After the incident, the members of the *Aris T*'s bridge team were tested for alcohol in accordance with Marmaras's SMS policies, with negative results. Also, the *Aris T*'s crewmembers were adequately rested on January 31, 2016.[35]

28. The *Aris T*'s bridge team was using the radar and paper charts as navigational aids.[36]

29. The *Aris T*'s bridge was equipped with two Electronic Chart Display and Information System ("ECDIS") units that were marked "FOR TRAINING PURPOSES ONLY," and were not being used for navigation.[37]

30. ECDIS takes inputs from the automatic identification system ("AIS"), a vessel-tracking system, and provides a birds-eye view of the navigation picture that includes the location and motion of other vessels. Both ECDIS units were functioning and operating during the casualty. However, Marmaras had directed that the units were to be used for training purposes only, and no member of the *Aris T* bridge team used them to identify the developing risk of collision.[38]

31. On January 31, 2016, ECDIS was not a required navigational aid for bulk carriers, such as the *Aris T*, and did not become mandatory until July 1, 2017.[39]

32. The ECDIS units onboard the *Aris T* were equipped with Raster Navigational Charts ("RNCs"), and not Electronic Navigational Charts ("ENCs"). RNCs are copies of paper charts, produced by digital scanning techniques. Information on RNCs, which must be manually selected by the user, cannot be layered. Without selecting different scale charts, the lookahead

---

[35] Testimony of Baltas.
[36] Testimony of Baltas, Athanasios & Bardouniotis.
[37] Testimony of Ferentinou, Baltas, Athanasios, Ryan, McFarlane, Manolis Kyriakou (Marmaras's operations manager), Steve Cunningham (tendered and accepted as an expert in computer simulation and navigation) & Prentice Strong (tendered and accepted as a navigation expert).
[38] Testimony of Baltas.
[39] Testimony of Ferentinou, Kyriakou, Cunningham, Strong, McFarlane & Ryan.

capability of an ECDIS unit equipped with RNCs may be limited and may cause confusion when determining the identity of distant objects.[40]

33.     At about 1:40 p.m. local time[41] on January 31, 2016, the *Aris T* commenced its passage upriver, after completing a pre-departure checklist in accordance with Marmaras's SMS.[42]

34.     Prior to entering the Mississippi River, Baltas and the *Aris T*'s deck officers reviewed the U.S. Inland Navigation Rules.  Also, in accordance with Marmaras's SMS, Baltas met with the *Aris T*'s deck officers and conducted a risk assessment in connection with the prevailing high river conditions.[43]

35.     The *Aris T*'s equipment was in good working condition and the vessel did not experience any equipment failures on January 31, 2016.[44]

36.     Because it was anticipated that the *Aris T* was going to have an under-keel clearance of less than one meter at one point, Baltas, in accordance with Marmaras's SMS, called and obtained the approval of Marmaras's operations manager, Captain Spyros Emmanouil, to proceed with such clearance.[45]

37.     At about 3:48 p.m., Michael Leone, a licensed compulsory pilot with the New Orleans Baton Rouge River Steamship Pilots Association ("NOBRA"), boarded the *Aris T* and engaged in a pilot-to-pilot exchange with the departing compulsory river pilot.[46]  Leone also

---

[40] Testimony of Ferentinou, Cunningham, Strong, McFarlane & Ryan; Exhibit 438.
[41] All times referenced hereafter are local time on January 31, 2016.
[42] R. Doc. 320 at 71.
[43] Testimony of Baltas, Kyriakou, Ryan, Strong & McFarlane.
[44] Testimony of Baltas, Dikos-Drakos, Poulis, Cunningham, Ryan, Strong, Panagiotis Triantafyllos (Marmaras's fleet technical engineer) & Ariel Icaro Sangalang (the *Aris T*'s bosun).
[45] R. Doc. 320 at 71; Testimony of Baltas; Exhibit 62.
[46] R. Doc. 320 at 66; Testimony of Leone.

engaged in a master-pilot exchange with Baltas to discuss the *Aris* T's safe operating condition, the air draft for the safe passage under bridges, and the prevailing river conditions.[47]

38.    During the hours preceding the incident, Baltas and Leone continued to exchange information about the *Aris T*'s speed and air draft, as necessary to safely transit the Mississippi River and clear the several bridges encountered during the transit.[48]

39.    Leone's pilot number was "91," and he was identified in all VHF channel 67 radio communications by that number.[49]

40.    Leone completed his NOBRA apprenticeship in September 2014. From September 2014 until May 2015, NOBRA permitted Leone to pilot vessels up to 700 feet in length. By January 31, 2016, NOBRA permitted Leone to pilot vessels up to 755 feet in length. Leone had piloted 400 to 500 vessels on the Lower Mississippi River without incident.[50]

41.    After the master-pilot exchange, Leone asked Baltas to increase the *Aris T*'s speed 4-to-5 revolutions per minute ("RPMs") above maneuvering speed for a total of 109 RPMs, which resulted in a "speed over ground" between 9 to 10 knots, as the *Aris T* was proceeding against the river current.[51]

42.    Leone requested the additional RPMs because of the *Aris T*'s trim resulting from the ship's heavy ballast condition that was necessary to pass under the Huey P. Long Bridge.[52]

---

[47] Testimony of Leone, Baltas, Bardouniotis, Ryan & A.J. Gibbs (tendered and accepted as an expert in pilotage on the Mississippi River); Exhibit 58.

[48] Testimony of Leone.

[49] R. Doc. 320 at 67.

[50] *Id.*; Testimony of Leone, Baltas & Ryan.

[51] Testimony of Leone. Speed over ground is the speed of a vessel with respect to the ground or any fixed object. For example, a vessel with its engines stopped in a river with a downriver current of approximately 4.5 knots will have a speed over ground of 4.5 knots.

[52] *Id.*

43.     The *Aris T* was equipped with a voyage data recorder ("VDR").  A VDR is a data recorder fitted onboard ships that records various data including radar, speed, vessel position, bridge communication, VHF radio communications, and numerous other parameters. The *Aris T*'s VDR recorded bridge communication during the vessel's upriver navigation and the incident at issue, and for about five hours after the incident.[53]

44.     At about 7:40 p.m., the *Aris T* was proceeding upriver at a speed over ground of about 10 knots.[54]

45.     At an earlier time, the *Elizabeth M. Robinson* picked up its barges in Lemont, Illinois, and was downbound to deliver them to Bayou Fleet, a fleeting area located on the right-descending (or west) bank of the Mississippi River near mile marker 125, across from the VRNO and Shell/Motiva refineries.[55]

46.     At all relevant times, Darryl Christiansen, a licensed towboat captain employed by Genesis, with over 20 years of experience, was piloting the *Elizabeth*.[56]

47.     In 1999, the United States Coast Guard suspended Christiansen's license for two months because of his involvement in two marine casualties.  Christiansen was terminated from employment as towboat captain twice in his career.  Christiansen also suffered from migraine headaches.  Genesis was unaware of these matters when it hired Christiansen, although such knowledge would have been relevant to Genesis's hiring decision.[57]

---

[53] R. Doc. 320 at 75.
[54] Testimony of Leone.
[55] R. Doc. 320 at 67; Testimony of Darryl Christiansen (the *Elizabeth*'s captain).  A "fleet" is an area where barges are moored and transferred between towboats as they are moved to various destinations along the river.
[56] R. Doc. 320 at 64 & 76; Testimony of Christiansen.
[57] Testimony of Christiansen & Samuel Robinson (Genesis's corporate representative); Exhibits 209 & 213.

48.    The *Elizabeth*'s navigational equipment, steering, propulsion, and other vital systems were operating properly at the time of the incident.[58]

49.    The *Elizabeth* was equipped with two functioning radars.  Christiansen selected radar ranges of 0.75 nautical miles on one and 1.5 nautical miles on the other.  Christiansen used an "offset" feature on the radar that allowed him to view targets on the radar screen slightly more than 1.5 miles ahead of his pilothouse.[59]

50.    On January 26, 2016, the *Loretta* departed from a VRNO refinery in Memphis, Tennessee.  Its barges were destined for the VRNO refinery in St. Charles Parish, Louisiana.  On the evening of January 31, 2016, the *Loretta* was downbound, heading for the Magnolia Fleet, located below the VRNO Facility in St. Charles Parish, Louisiana, on the east bank of the Mississippi River.[60]

51.    Cenac's employee, Dennis Sanamo, a licensed towboat captain with 23 years of experience navigating tows on the Mississippi River, was piloting the *Loretta*.[61]

52.    The *Loretta* was equipped with two functioning radars.  Sanamo selected radar ranges of 0.75 nautical miles on one and 1.5 nautical miles on the other.  Sanamo used an "offset" feature on the radar that allowed him to view targets on the radar screen slightly more than 1.5 miles ahead of his pilothouse.[62]

53.    At all relevant times, the three vessels were approaching the Hahnville Bar, which is a 2,000-foot-wide bend in the Mississippi River between mile markers 124.5 and 126.0.[63]

---

[58] R. Doc. 320 at 76.
[59] *Id.* 67-68.  The radars were located on the pilothouse of the *Elizabeth*.
[60] *Id.* at 67.
[61] *Id.*; Testimony of Sanamo.
[62] R. Doc. 320 at 67.
[63] Testimony of Ryan.

54.     The *Loretta* and the *Elizabeth* were both equipped with a Rose Point electronic chart system ("ECS").  Leone used his portable pilot unit ("PPU"), a portable computer equipped with a Rose Point ECS program, while he was aboard the *Aris T*.  The Rose Point ECS uses global positioning satellite system ("GPS") data to show vessel icons moving in real time across a chart.  The Rose Point ECS program interfaces with the AIS transponder required by federal law to be carried by commercial vessels.  The program displays vessels proximate to one's own vessel and shows their speed and direction of travel.[64]

55.     Rose Point also has a user-selected function known as "predicted passing points" which predicts in real time the meeting point of vessels (*i.e.*, the meeting point of their AIS antennae) as they approach each other.  The meeting point is shown on the Rose Point display as a white line labeled with the vessel's name, speed, and time to intersection.  Sanamo and Leone were using the predicted passing point feature.  Christiansen was not.[65]

56.     Christiansen set the *Elizabeth*'s Rose Point at a range scale which only captured vessels either a half mile or three-quarters of a mile from the vessel.  Christiansen could have, but did not, set his vessel's Rose Point so that the *Aris T*'s location and speed, as well as the predicted passing point of the vessels, would appear on the *Elizabeth*'s computer display.[66]

57.     Leone's Rose Point and the ship's radars were set to show vessels within three-quarters of a mile of the *Aris T*'s wheelhouse.[67]

---

[64] R. Doc. 320 at 68.
[65] Testimony of Sanamo, Leone, Christiansen & Samuel Schropp (tendered and accepted as a navigation expert).
[66] Testimony of Christiansen, Schropp & Ryan; Exhibits 1, 5 & 6.
[67] Testimony of Baltas & Leone Testimony.

58.    The *Loretta* was not equipped with a working electronic compass on January 31, 2016.  The Rose Point ECS uses input from an electronic compass to show lateral motion of the bow and stern of a tow as well as the direction the tow is pointing.[68]

59.    The *Loretta* and the *Elizabeth* both departed from Baton Rouge between 9:00 and 9:30 a.m.  Throughout the day, the *Loretta* followed behind the *Elizabeth* as both vessels proceeded down the Mississippi River toward New Orleans, navigating several bends over approximately 100 river miles.[69]

60.    During this period, the pilot on the *Loretta* observed that the *Elizabeth* had difficulty navigating at least two bends in the river, but he did not pass on this information to Sanamo when he later came on watch.[70]

61.    While on watch, Sanamo used his personal cell phone to send text messages to other crewmembers and to make and receive calls from his girlfriend, Rayda Cheramie.  At about 6:54 p.m., Sanamo called Cheramie while he was piloting the *Loretta*.  The call lasted until about 7:30 p.m.  Between 7:21 p.m. and 7:23 p.m., Sanamo exchanged a series of text massages with a deckhand.[71]

62.    At about 7:18 p.m., while the *Elizabeth* and the *Loretta* were in a straightaway in the Mississippi River above the Bonnet Carre Spillway, Sanamo asked Christiansen if the *Loretta* could overtake the *Elizabeth* on the vessel's starboard side.  Christiansen declined the request because he thought the maneuver was too dangerous at that time.[72]

63.    At about 7:37 p.m., when Leone made an overtaking agreement with the upbound vessel the *Bayou Black*, he announced over the radio the *Aris T*'s location as 26-mile point. At

---

[68] R. Doc. 320 at 68.
[69] *Id.*
[70] Testimony of Sanamo & David Collins (the *Loretta*'s pilot).
[71] Testimony of Sanamo & Cheramie; Exhibit 292.
[72] Testimony of Christiansen & Sanamo; Exhibits 7 & 174.

such time, the *Aris T* was about 5.5 miles downriver from the *Loretta* and the *Elizabeth*, heading toward the two towboats at a speed over ground of approximately 10 miles per hour.[73]

64.    Neither Sanamo nor Christiansen heard Leone's communication with the *Bayou Black* – a communication that should have alerted them to the close and rapidly approaching *Aris T*. Nevertheless, Sanamo testified that he was then otherwise aware that the *Aris T* was somewhere below 26-mile point.[74]

65.    At about 7:38 p.m., Christiansen announced that the *Elizabeth* was "southbound Upper Saint Rose fleet." This announcement was heard on the *Aris T*'s radio, but Leone did not acknowledge this security call.[75]

66.    At about 7:40 p.m., the *Elizabeth* was pushing its tow downbound, at a speed of 9.4 knots.[76]

67.    Also at about 7:40 p.m., the *Loretta* was pushing its tow downbound, at a speed of 8.8 knots.[77]

68.    Between 7:40:29 p.m. and 7:40:35 p.m., Christiansen initiated a conversation with Sanamo proposing that the *Loretta* overtake the *Elizabeth*. Christiansen stated, "Yeah, you want to go on ahead, try go get on by me there … I, I don't really see anything else coming up this

---

[73] Testimony of Leone, Schropp & Strong; Exhibits 7 & 174. Computer-simulation and navigation expert Cunningham created a video reconstruction of the incident, depicting the general vicinity of Hahnville Bar from 7:34 p.m. to 8:00 p.m. on the evening of January 31, 2016. The Court finds that Cunningham's reconstruction – which is based on time-stamped GPS and AIS data taken from all three vessels, as well as electronic heading data extracted from the *Aris T* and the *Elizabeth* and five sets of available radar imagery – accurately depicts the size, position, heading, speed, and movement of the three vessels leading up to, during, and immediately following the incident. Cunningham's reconstruction also includes relevant audio recorded from the *Aris T*'s VDR, which recorded all VHF transmissions sent or received by the *Aris T*'s VHF radio and all voices recorded on the four microphones located on the *Aris T*'s bridge. Testimony of Cunningham.
[74] Testimony of Sanamo & Christiansen.
[75] Exhibits 7 & 174.
[76] Exhibit 413.
[77] *Id.*

way, except … ugh, that I can tell, if you want to try it."  This communication was heard on the *Aris T*'s radio, but Leone did not acknowledge or respond to it.[78]

69.    Christiansen was mistaken that nothing was coming upriver.  At that time, the *Aris T* was approximately four miles downriver from the two towboats, and the combined closing speed of the two groups of vessels was approximately 20 miles per hour.[79]

70.    At about 7:40:48 p.m., Sanamo told Christiansen, "I'm going right there at Magnolia Fleet."  This communication was heard on the *Aris T*'s radio.  Sanamo thought that he should continue to follow the *Elizabeth* until he reached his destination.[80]

71.    At about 7:40:52 p.m., Christiansen replied to Sanamo, "Okay, all right, appreciate it, thank you.  I'll be backing, you know stopping and backing up here at just below, um Bayou Fleet, thank you."  This communication was heard on the *Aris T*'s radio.[81]

72.    At about 7:41:00 p.m., Sanamo asked Christiansen, "Okay, you stopping at Bayou Fleet?"  This communication was heard on the *Aris T*'s radio.[82]

73.    At about 7:41:02 p.m., Christiansen confirmed to Sanamo, "I am stopping at Bayou Fleet."  This communication was heard on the *Aris T*'s radio.[83]

74.    At about 7:41:06 p.m., Sanamo told Christiansen, "K, All right, I'll shoot around you, and that two is better?"  This communication was heard on the *Aris T*'s radio.[84]

---

[78] Exhibits 7 & 174.
[79] Testimony of Schropp.
[80] Testimony of Sanamo; Exhibits 7 & 174
[81] Exhibits 7 & 174.
[82] *Id.*
[83] *Id.*
[84] *Id.*

75.     At about 7:41:12 p.m., Sanamo asked Christiansen, "Two whistle be good for you?  I'll drive back ahead on her a little."  This communication was heard on the *Aris T*'s radio.[85]

76.     At about 7:41:15 p.m., Christiansen confirmed to Sanamo, "Yeah, go ahead, two whistles."  This communication was heard on the *Aris T*'s radio[86] and completed an agreement for the *Loretta* to overtake the *Elizabeth* on the *Elizabeth*'s port side.  Their meeting with the *Aris T* was just 11 minutes away.

77.     At about 7:41:17 p.m., Sanamo told Christiansen, "Alright man, thank you."  This communication was heard on the *Aris T*'s radio.[87]

78.     Christiansen's announcement that he would be "stopping and backing up" at Bayou Fleet signaled to both Sanamo and Leone, that as the *Elizabeth* proceeded around the Hahnville Bar, the vessel would favor the right-descending (or west) bank as it maneuvered to back into Bayou Fleet.[88]

79.     Thus, at this point, the *Loretta* and the *Elizabeth* had reached an agreement by which the *Loretta* would overtake the *Elizabeth* on the *Elizabeth*'s port side.  Neither Christiansen nor Sanamo was aware of the *Aris T*'s upbound position when they made the overtaking agreement.[89]

80.     Both Christiansen and Sanamo could have used the predicted passing point feature of their Rose Point systems to determine the location and speed of the *Aris T,* and to predict that the vessels would all meet at the Hahnville Bar.  Further, Rose Point has an AIS target feature that will alert the operator to the presence of targets that are not on the screen.

---

[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] Testimony of Leone, Sanamo & Schropp.
[89] R. Doc. 320 at 68; Exhibits 7 & 174.

Both pilots failed to use this feature properly. This was an additional tool that should have alerted the pilots to a risk of collision.[90]

81.     Because the communications between Sanamo and Christiansen were transmitted on the bridge of the *Aris T*, Leone and Baltas knew, or should have known, that Sanamo and Christensen were not aware of the *Aris T*'s presence when they made the overtaking agreement.[91]

82.     No member of the *Aris T*'s bridge team did anything to correct the faulty assumption on the part of the two towboats that there was no upbound traffic in the vicinity. Neither did the *Aris T* slow down or stop to allow the two towboats to complete their overtaking maneuver before attempting to meet either of them.[92]

83.     At the *Aris T*'s speed of close to 10 miles per hour, it would take approximately 6 minutes and 1.2 miles to stop the ship under the existing conditions.[93]

84.     The *Aris T* could have safely slowed to 4 miles per hour to allow the two towboats to complete their overtaking. Instead, the *Aris T* continued at 4 RPMs above full speed into what Leone and Baltas knew, or should have known, would be a close quarters situation with the two towboats in a river bend that would leave little room to maneuver.[94]

85.     At about 7:41:36 p.m., Christiansen announced, "*Elizabeth Robinson*'s southbound, ugh, yeah, Upper St. Rose Fleet, be, ugh, stopping and backing in there, Bayou Fleet there, *Elizabeth Robinson*." This communication was heard on the *Aris T*'s radio.[95]

---

[90] Testimony of Sanamo, Schropp & Ryan; Exhibits 1 & 5.
[91] Exhibits 7 & 174.
[92] Testimony of Leone, Baltas & Strong.
[93] Testimony of Baltas.
[94] Testimony of Strong.
[95] Exhibits 7 & 174.

86.     Christiansen's announcement that he was stopping and backing into Bayou Fleet reinforced to Leone and Sanamo their assumptions that the *Elizabeth* would be staying close to the west bank to complete his announced maneuver of backing into Bayou Fleet.[96]

87.     At about 7:46 p.m., the *Loretta* increased its speed to about 11 knots to overtake the *Elizabeth*, who was steady at about 8.4 knots.[97]

88.     At about 7:46:39 p.m., Christiansen called Leone and said, "Northbound ship below, ugh, Valero."  This communication was heard on the *Aris T*'s radio.[98]

89.     At about 7:46:45 p.m., Leone replied to Christiansen, "91 is northbound below Valero."[99]

90.     At about 7:47:02 p.m., Sanamo answered a call on his cell phone from Cheramie and put the call on speaker phone.[100]

91.     The phone line remained open for 76 minutes and 49 seconds, including the crucial moments of the incident.[101]

92.     Sanamo did not actively engage in a conversation with Cheramie but would periodically tell her that he was "okay" throughout the incident.[102]

93.     Sanamo's periodically telling Cheramie that he was "okay" demonstrates that he was at least a little distracted by the open phone line.

94.     Sanamo's answering the call was a violation of Cenac's company policy that prohibited the use of cell phones in the wheelhouse.[103]

---

[96] Testimony of Leone & Sanamo; Exhibits 4 & 7.
[97] Testimony of Sanamo; Exhibit 413.
[98] Exhibits 7 & 174.
[99] *Id.*
[100] Testimony of Sanamo & Cheramie; Exhibit 292;
[101] Exhibit 292.
[102] Testimony of Cheramie.
[103] R. Doc. 320 at 64; Testimony of André Broussard (Cenac's corporate counsel) & Morris Soudelier (Cenac's corporate representative).

95.    Cenac lacked an effective mechanism by which to enforce its cell phone policy, and instead left enforcement up to its vessel captains.  Thus, Sanamo was responsible for enforcing the cell phone policy on the *Loretta* while failing to adhere to it himself.[104]

96.    At about 7:46:46 p.m., Christiansen told Leone, "91, I'm southbound here, *Elizabeth M. Robinson*, just ugh, coming, I'll be clearing upper St. Rose Fleet southbound, I'll have the *Loretta Cenac* overtaking me on the two here."[105]

97.    At about 7:47:04 p.m., Leone asked Christiansen what type of meeting arrangement would be better for Christiansen.[106]

98.    At about 7:47:06 p.m., Christiansen responded to Leone to propose a one-whistle (port-to-port) meeting arrangement and also said he did not know on which side Leone would want to pass the *Loretta*.  Further, Christiansen announced that he was "going to be stopping and backing in there at the Bayou Fleet."[107]

99.    At about 7:47:12 p.m., Leone confirmed the *Aris T*'s one-whistle passing agreement with the *Elizabeth*.[108]

100.    Despite having announced three times that it would be "backing" into Bayou Fleet, the *Elizabeth* was still in the middle of the river with its tow consisting of three strung-out barges pointing towards the west bank.[109]

101.    At about 7:47:15 p.m., Sanamo reached out to Leone to arrange a passing agreement between the *Loretta* and the *Aris T* saying, "*Loretta* to 91, he's [the *Elizabeth*'s] kinda

---

[104] Testimony of Broussard & Soudelier.
[105] Exhibits 7 & 174.
[106] *Id.*
[107] *Id.*
[108] *Id.*
[109] Exhibit 2.

out in the middle, I don't know what you want me to do for you.  I'm all the way out in the middle now trying to overtake him, just let me know how you want me to shape up for you."[110]

102.   At about 7:47:26 p.m., Leone replied to Sanamo, "All right, just ugh, I'll meet you on 1, just try and get over there as far as you can with him."[111]

103.   At about 7:47:33 p.m. and 7:47:35 p.m., respectively, Sanamo and Leone confirmed the *Loretta*'s one-whistle (port-to-port) meeting arrangement with the *Aris T*, and Leone informed Sanamo that the *Mike Wisen* was upbound behind the *Aris T*.[112]

104.   Sanamo and Leone believed that this exchange was made in accordance with the custom on the Lower Mississippi River that smaller tugs allow larger less-maneuverable, ocean-going vessels, such as the *Aris T*, to dictate meeting arrangements.[113]

105.   When Leone made the two meeting agreements with Christiansen and Sanamo, both Leone and Baltas knew that the *Loretta* was in the process of overtaking the *Elizabeth*. Leone could see the two downbound tugs on his Rose Point, which showed the tugs' respective locations and speeds.[114]

106.   Baltas, who was monitoring Leone's discussions with the other vessels, agreed with Leone's arrangements.[115]

107.   At this point, the Rose Point data for all three vessels predicted that they all would be meeting at the same time in the Hahnville Bar in the vicinity of the VRNO facility.  The United States Coast Guard AIS data reflected in Rose Point also confirmed that the course over

---

[110] Exhibits 7 & 174.
[111] *Id.*
[112] *Id.*
[113] Testimony of Sanamo, Leone, Gibbs, Ryan & Gregory Wallace (tendered and accepted as a navigation expert).
[114] R. Doc. 320 at 69.
[115] Testimony of Baltas.

21

ground of the *Elizabeth* was in the direction of the left-descending (or east) bank, not toward Bayou Fleet on the right-descending (or west) bank as was its stated destination.[116]

108.    At about 7:47:38 p.m., Christiansen told Sanamo, "I'm, I'm trying to get over there *Loretta*. This current is going to be pushing me down in there. So, alright … just letting you know." Shortly thereafter, Sanamo confirmed that he heard Christiansen. This communication was transmitted on the *Aris T*'s radio, but neither Leone nor Baltas heard it.[117]

109.    Between 7:48:08 p.m. and 7:48:23 p.m., Christiansen had a conversation with the captain of the *Mike Wisen* in which the captain of the *Mike Wisen* asked Christiansen if he was going to Bayou Fleet and Christiansen confirmed, "I'll be going into Bayou Fleet, backing in there." As a result, the captain of the *Mike Wisen* told Christiansen he would pass the *Elizabeth* on one whistle. This communication was heard on the *Aris T*'s radio.[118]

110.    Sanamo realized that the *Elizabeth* was still in the middle of the Mississippi River, sliding towards the east bank, and narrowing the space in which the *Loretta* and the *Aris T* would meet, rather than moving toward the west bank in accordance with Christiansen's stated intention to stop and back into Bayou Fleet.[119]

111.    At the same time, Leone's Rose Point continued to reflect a simultaneous meeting of all three vessels in the Hahnville Bar, and that the *Elizabeth*'s course continued sliding toward the left-descending (or east) bank, not towards Bayou Fleet, despite its heading.[120]

112.    At about 7:48:50 p.m., Sanamo contacted Leone and said, "I'll just try to back down 91 and get behind him cause I'm gonna be all up on the docks with you."[121]

---

[116] Testimony of Leone, Sanamo, Christiansen, Schropp & Strong; Exhibits 1, 5, 6, 6-B, 383 & 414.
[117] Testimony of Lenone & Baltas; Exhibits 7 & 174.
[118] Exhibits 7 & 174.
[119] Testimony of Sanamo.
[120] Testimony of Leone; Exhibit 6-C.
[121] Exhibits 7 & 174.

113.    At about 7:48:59 p.m., Leone asked Sanamo if he wanted the *Aris T* and the *Loretta* to have a two-whistle (starboard-to-starboard) passing agreement instead of passing on the one whistle.[122]

114.    At about 7:49:08 p.m., Sanamo replied to Leone, "No, I mean … I can try the two and drop down all the way on the docks, give you more room."[123]

115.    At about 7:49:20 p.m., thinking better of it, Leone told Sanamo, "Tell you what, just, let's keep it on the 1."[124]

116.    At about 7:49:25 p.m., Sanamo informed Leone that he had "it backing down, I'm going to try to get behind his [the *Elizabeth*'s] stern here."[125]

117.    Leone, however, was concerned that as the *Loretta* tried to back and fall in behind the *Elizabeth*, the *Loretta* would be pushed by the current into the *Aris T*'s path.[126]

118.    Between 7:49:34 p.m. and 7:49:40 p.m., Leone advised Sanamo, "Might want to keep some headway, so you don't fall down on me."  Cognizant of the *Loretta*'s maneuvering capability, Sanamo replied with the assurance, "I won't fall down."[127]

119.    At about 7:49:54 p.m., Leone effectively told Sanamo that the *Loretta* could continue overtaking the *Elizabeth* when Leone said to Sanamo: "Well we got plenty of room, come on, come on with it."[128]

120.    Baltas agreed with pilot Leone's assessment that there was sufficient room for the vessels to accomplish the meeting as planned.[129]

---

[122] *Id.*
[123] *Id.*
[124] *Id.*
[125] *Id.*
[126] Testimony of Leone.
[127] Exhibits 7 & 174.
[128] *Id.*; R. Doc. 320 at 76.
[129] Testimony of Baltas.

121.    Although Sanamo initially planned to abort the overtaking of the *Elizabeth* and tuck back behind it, he continued with the maneuver because Leone assured him that there was "plenty of room."[130]

122.    At no time did Sanamo tell Leone that he disagreed with Leone's assessment that there was plenty of room.[131]

123.    Because the *Loretta* was the downbound (and thus privileged) vessel, Sanamo had the right-of-way and could have insisted on changing the meeting arrangement with *Aris T*, but Sanamo did not do so.[132]

124.    Leone's assessment that the *Loretta* and the *Aris T* had "plenty of room" to complete their meeting agreement was wrong.  By this time, the maneuver was so precarious that it could only work if: (a) the *Elizabeth* somehow stopped its slide and began moving towards the west bank, which it gave no sign of doing; (b) the *Loretta* could somehow push out in front of the *Elizabeth* to complete the overtaking maneuver, which it had not been able to do thus far; and (c) nothing else went wrong.  Nevertheless, Baltas understood what Leone was doing and approved of his actions.[133]

125.    Between 7:50:02 p.m. and 7:50:22 p.m., Sanamo made a one-whistle (or port-to-port) passing agreement with the captain of the *Mike Wisen*.  This communication was heard on the *Aris T*'s radio.[134]

126.    At about 7:50:48 p.m., Leone gave a "midships" command, which was repeated by Baltas.[135]

---

[130] Testimony of Sanamo.
[131] Testimony of Sanamo & Leone.
[132] Testimony of Leone.
[133] Testimony of Baltas, Leone, Schropp, Strong & Wallace.
[134] Exhibits 7 & 174.
[135] *Id.*

127.    Between approximately 7:49:00 p.m. and 7:51:00 p.m., contrary to his representations to Leone, and without informing Leone or Christiansen, Sanamo had placed the *Loretta*'s Z-drives from full throttle to "clutch" (idle speed), thereby decreasing the *Loretta*'s speed from 10.7 to 9.6 knots over the ensuing minute.[136]

128.    Between 7:50:00 p.m. and 7:51:00 p.m., Leone recognized that the *Loretta* had reduced speed because it remained off the port quarter of the *Elizabeth* as that vessel was sliding toward the east bank, crowding the *Aris T*'s intended path.[137]

129.    At about 7:50:56 p.m., Leone asked Sanamo, "What'chu … you, you, you backing on her [the *Elizabeth*]?"[138]

130.    At about 7:51:00 p.m., Sanamo told Leone, "No, he's [the *Elizabeth*'s] right by me, he's sliding, still sliding down on me, I'm just trying to hold him, I'm about 20 feet off of him."[139]

131.    At about 7:51:05 p.m., Leone directed Sanamo, "All right, just keep driving on her, [garbled] or you'll fall on top of me if you don't."[140]

132.    At about 7:51:11 p.m., Christiansen began slowing the *Elizabeth* by working a stern flank to enter Bayou Fleet, which necessarily pushed the stern of the *Elizabeth* further to the tug's portside and towards the east bank, the *Loretta*, and the *Aris T*.[141]

---

[136] Testimony of Sanamo & Leone; Exhibit 143.
[137] Testimony of Leone.
[138] Exhibits 7 & 174.
[139] *Id.*
[140] *Id.*
[141] Exhibit 2 (the *Elizabeth*'s Blue Box data, Camera 5 recording at approximately 19:48 time stamp). The *Elizabeth*'s time stamps are two-minutes-and-forty-five seconds behind the actual time as recorded on the *Aris T*'s bridge.  Thus, the appropriate adjustment has been made to the referenced local time to maintain a correct sequence of events.

133.    The Mississippi River Traffic Information Service ("MRTIS") recorded that the stern of the *Elizabeth* moved 400 feet towards the east bank in the 4 minutes before the *Loretta* met the *Aris T*.[142]

134.    From about 7:51:00 p.m. to about 7:53:30 p.m., the *Elizabeth*'s swing indicator recorded that the vessel's stern moved at a rate of 3-to-6 feet per second towards the east bank.[143]

135.    Rose Point data recorded by the *Elizabeth*'s ECS shows that the *Elizabeth* was moving laterally toward the east bank at a rate of 5-to-7 feet per second in the 3 minutes preceding the accident.[144]

136.    Christiansen did not engage in any further communications with Sanamo or Leone.  At trial, Christiansen testified that he was positioned where he wanted to be in the river as the privileged vessel with respect to both the *Loretta* and the *Aris T*.  He also testified that the meeting agreement between the *Loretta* and the *Aris T* did not involve his vessel, so there was no need for him to engage in any communications regarding their agreement.[145]

137.    As the privileged vessel, Christiansen orchestrated a simultaneous overtaking by the *Loretta* and a passing agreement with the upbound *Aris T* that would all occur in a compressed space near the east bank side of the river.  Further, at this time Christiansen put the *Elizabeth*'s engines in full astern.

138.    By sliding in the current toward the *Loretta* and the east bank and having its engines in full astern thereby causing its stern to swing towards the *Loretta* and the east bank, the *Elizabeth* did not maintain its course and speed in the moments ahead of the incident.  This

---

[142] Exhibit 14.
[143] Testimony of Ryan.
[144] Testimony of Stakelum; Exhibit 516.
[145] Testimony of Christiansen.

occurred at the most inopportune time considering the positioning of the *Loretta* and the *Aris T*.[146]

139.    Even if Christiansen (as the *Elizabeth*) was, in fact, where he wanted to be, he was clearly not where he had repeatedly told the other vessels he (the *Elizabeth*) was going to be, and he was not doing what he told them he would be doing.[147]

140.    Between about 7:51:35 p.m. and 7:52:02 p.m., Leone gave a series of commands to the *Aris T*'s bridge crew, which were repeated by Baltas: "Port 5," "Midships," "Starboard 5," "Starboard 10."[148]

141.    At about 7:52:06 p.m., Leone shouted "*Cenac*, drive on it!"[149]

142.    At this juncture, Sanamo believed that increasing the *Loretta*'s speed would necessarily have altered the vessel's course over ground toward the east bank, which would have narrowed the space available for the *Aris T* to pass between the *Loretta* and the docks on the riverbank.[150]

143.    Between about 7:52:05 p.m. and 7:52:12 p.m., Leone gave a "midships" command, which was repeated by Baltas.[151]

144.    At about 7:52:12 p.m., Sanamo told Leone "Capt[ain], I'm driving, and I'm turning."[152]

145.    Sanamo steered the *Loretta* to the starboard side, which kept the *Loretta*'s bow from crossing the *Aris T*'s range lights but pushed its stern into the *Aris T*'s path.  At the last

---

[146] Testimony of Christiansen, Sanamo, Smith, Ryan & Ronald Campana (tendered and accepted as a navigation expert); Exhibits 2, 414 & 516.
[147] Testimony of Strong, Gibbs, Schropp & Campana.
[148] Exhibits 7 & 174.
[149] *Id.*
[150] Testimony of Sanamo & Campana.
[151] Exhibits 7 & 174.
[152] *Id.*

minute, before a potentially catastrophic collision with the *Aris T*, Sanamo steered the *Loretta* to port to get its stern out of the *Aris T*'s path.[153]

146.    The *Loretta* was secured to its tow by two-part face wires, jockey wires, and safety lines.  Face wires secure the towboat to its tow.  They run from winches on the towboat, around terminal fittings welded to the deck of a barge, and back to a terminal fitting on the towboat.  A two-part face wire runs from the boat to the barge (one part) then back to the towboat (second part).  A three-part face wire would run back to the barge a third time.  Jockey wires keep the towboat from sliding across the barge as the tow maneuvers; they are not intended to hold the towboat to the barge.  Safety lines are only intended to hold the towboat close to the barge if a face wire fails so that the crew can attempt to replace the face wire.[154]

147.    The *Loretta*'s port face wire parted at some point during its meeting with the *Aris T*.[155]

148.    Data from the *Loretta*'s Rose Point and camera and radar recording footage from the *Elizabeth* show that the *Loretta*'s port face wire likely broke sometime between 7:50:57 p.m. and 7:51:49 p.m., when the head of the *Loretta*'s tow and the bow of the *Aris T* were some distance apart.  This correlates with testimony from David Collins, the *Loretta*'s relief captain, who responded on deck to the casualty and remembered seeing the port running light of a large freighter in front of him.  It also corresponds with what was seen from the bridge of the *Aris T*.[156]

149.    At 7:52:13 p.m., the *Loretta* is clearly no longer parallel to the *Elizabeth*, with its bow closer to the *Elizabeth* than its stern, and with the *Loretta*'s stern continuing to swing into

---

[153] Testimony of Thomas Stakelum (tendered and accepted as a navigation expert); Exhibit 2.

[154] Testimony of Sanamo, Collins & Edward Shearer (tendered and accepted as an expert in naval architecture).

[155] Testimony of Sanamo, Leone, Collins, Cornelius Cooks (the *Loretta*'s tankerman) & Samuel Wells (the *Loretta*'s deckhand).

[156] Testimony of Schropp, Collins & Leone; Exhibits 2, 5, 7, 414 & 516.

the *Aris T*'s path. Had the *Loretta* been parallel to the *Elizabeth*, the *Loretta* could have been further toward the middle of the river.[157]

150. The parting of the *Loretta*'s port face wire caused the *Loretta* to be less maneuverable and to swing directly into the *Aris T*'s path.[158]

151. This incident was not the first time the *Loretta*'s face wire system failed. On November 11, 2015, the *Loretta* ran aground and bent its depth sounder when its starboard face wire slipped off a drum while the vessel and its flotilla were making a bend. The *Loretta* also experienced issues with its face wire system in November 2015 and another occasion when the U-bolt broke. Cenac attempted to fix the problem temporarily by re-bolting the line where it connected to the drum and/or tying a knot in the Spectra line above where it connects to the U-bolt. Other Cenac Z-drive vessels experienced similar problems, which was discussed among the Cenac pilots, including Sanamo and Collins. Cenac's repair and maintenance manager, Walt Cenac, a senior management employee, was aware of the issue, but a permanent redesign (using a three-part wire system) was not completed until after January 31, 2016.[159]

152. Cenac discarded the face wire after the accident.[160]

153. Less than 24 hours after the accident, *Aris T*'s counsel notified André Broussard, Cenac's corporate counsel, about the need to preserve all relevant evidence, and suits were filed less than one week later.[161]

154. Walt Cenac boarded the *Loretta* the day after the accident and did not see the parted face wire, nor does he know what happened to it.[162]

---

[157] Exhibits 514 & 517.
[158] Testimony of Collins, Schropp, Wells & Ryan; Exhibits 2, 413, 496-99.
[159] R. Doc. 320 at 76; Testimony of Sanamo, Collins, Wells & Ryan
[160] Testimony of Sanamo, Cook, Wells, Collins & Broussard.
[161] Testimony of Broussard.
[162] Testimony of Broussard & Cenac.

155.    The precarious and imprudent positions of all three vessels were summed up best by Sanamo when he testified that the crowded vessel meeting in the Hahnville Bar was "probably a party of all of us."[163]

156.    As the *Loretta* and *Aris T* closed in on each other, *Aris T* took evasive maneuvers to its starboard to avert a potentially catastrophic collision with *Loretta*.[164]

157.    Baltas agreed with Leone's collision avoidance maneuvers.[165]

158.    Between about 7:52:13 p.m. and 7:53:16 p.m., Leone gave a series of commands to the *Aris T*'s bridge crew, which were repeated by Baltas: "Hard left rudder," "Midships," "Port 10," "Port 20," "Hard port, hard to port," "Midships," "Starboard 20," "Hard to starboard," "Midships," "Hard to port."[166]

159.    At about 7:53:23 p.m., Baltas asked Leone if he should stop the engine, and Leone replied a few seconds later, "No!"[167]

160.    At about 7:54:00 p.m., the *Aris T* allided with the SCF Waxler vessels, which in turn damaged VRNO's Dock 1.[168]

161.    VRNO's damages are stipulated to total $20,000,000.[169]

162.    Between about 7:53:27 p.m. and 7:54:26 p.m., Leone gave a series of commands to the *Aris T*'s bridge crew, which were repeated by Baltas: "Midships," "Hard to starboard," "Stop engine," "Midships," "Let go port anchor!," "Stop engine," "Full astern."[170]

---

[163] Testimony of Sanamo.
[164] R. Doc. 320 at 64.
[165] Testimony of Baltas.
[166] Exhibits 7 & 174.
[167] *Id.*
[168] R. Doc. 320 at 64; Testimony of Baltas & Leone; Exhibits 7, 25, 26, 174 & 413.
[169] R. Doc. 333.
[170] Exhibits 7 & 174.

163.    Three minutes passed from the time Leone gave the command to drop the port anchor until the action was taken by the *Aris T*'s crew.[171]

164.    From the time Leone ordered full astern engines in an attempt to stop the vessel, it took about 2.5 to 3 minutes for the *Aris T* to deliver astern revolutions.  The vessel's pilot card indicates that, according to its sea trials, it takes 842 seconds, or just over 14 minutes, for the *Aris T*'s engines to go from full ahead to full astern.  This is typical of ocean-going bulk carriers, whose engines must gradually slow to a stop before reversing direction and building revolutions astern.[172]

165.    The *Aris T* continued moving upriver. It collided with the Kirby vessels and allided with various components of Shell/Motiva Berth 4 and Berth 2, causing damage to each of those berths.  Specifically, the *Aris T* allided with Berth 4's loading platform, upstream breasting dolphin, and upstream tripod, and Berth 2's dolphin no. 6, monopole no. 12, and monopole no. 13.[173]

166.    Shell/Motiva's damages are stipulated to total $22,000,000.[174]

167.    Because of the allision, the *Aris T* sustained physical damages totaling $133,268.58.[175]

168.    At about 7:54:40 p.m., Leone said to Sanamo, "Appreciate it there *Loretta*."[176]

169.    Seconds later, Sanamo replied to Leone, "Yeah, I'm, I tried everything, had a cable come undone."[177]

---

[171] *Id.*; Testimony of Leone.
[172] Testimony of Leone, Gibbs & Triantafyllos; Exhibit 58.
[173] R. Docs. 320 at 70; 333.
[174] *Id.*
[175] Stipulation at trial; Testimony of Triantafyllos; Exhibits 135, 135a, 135b, 135c & 442.
[176] Exhibits 7 & 174.
[177] *Id.*

170.    Thereafter, Leone said to Sanamo, "Huh, you just caused an accident."[178]

171.    At about 7:57:46 p.m., Sanamo told the captain of the *Mike Wisen*, "Yeah I don't have any face cables, they popped trying to get out of the ship's [*Aris T*'s] way, I'm trying to hold it down with some head lines stopping it."[179]

172.    Contrary to Christiansen's repeated representations regarding his intentions, the *Elizabeth* did not back into Bayou Fleet, but rather went into the fleet bow first.[180]

## CONCLUSIONS OF LAW

I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the claims in the complaints involved in this consolidated action under the admiralty and maritime laws of the United States, 28 U.S.C. § 1333, Rule 9(h) of the Federal Rules of Civil Procedure, and Rules C and F of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

2.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district and a substantial part of the property that is the subject of the action is situated within this district.

II.    GOVERNING LAW

3.    Because the events at issue occurred on navigable waters of the United States and involve traditional maritime activity that had a substantial impact on maritime commerce, the maritime law of the United States governs the parties' dispute.  *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249 (1973); 46 U.S.C. § 30101.

---

[178] *Id.*
[179] Exhibits 4, 7 & 174.
[180] Exhibit 14; Testimony of Camapna & Ryan.

### III.    MARITIME NEGLIGENCE

4.      To prevail on a maritime negligence claim, a plaintiff must prove that (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, (3) the breach actually and proximately caused the plaintiff's injury, and (4) the plaintiff sustained an injury. *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1253 (11th Cir. 2014); *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 211 (5th Cir. 2010).

5.      In determining the scope of the duty owed in a maritime negligence claim, the Fifth Circuit has held that courts must consider the foreseeability of the harm suffered by the complaining party, such that a "[d]uty may be owed only with respect to the interest that is foreseeably jeopardized by the negligent conduct." *In re Great Lakes Dredge*, 624 F.3d at 211 (quotations marks and citation omitted). In other words, a duty is owed "if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention." *Id.* (quotation and citation omitted).

6.      The standard of care, or duty, is a question of law that is established by statutes, rules, regulations, maritime custom, or general principles of negligence law. *S.C. Loveland, Inc. v. East West Towing, Inc*., 608 F.2d 160, 165 (5th Cir. 1979) (citing *Pennsylvania R.R. Co. v. S.S. Marie Leonhardt*, 202 F. Supp. 368, 375 (E.D. Pa. 1962)); *see also Targa Midstream Servs. Ltd. P'ship v. K-Sea Transp. Partners, L.P.*, 527 F. Supp. 2d 598 (S.D. Tex. 2007). The standard of care in maritime negligence cases is "reasonable care under existing circumstances." *Coumou v. United States*, 107 F.3d 290, 295-96 (5th Cir. 1997). However, negligence *per se* applies when a statute or regulation "establishes a clear minimum standard of care" and replaces the general standard of care. *Dougherty v. Santa Fe Marine, Inc.*, 698 F.2d 232, 234-35 (5th Cir. 1983).

7.      Under the *Oregon* Rule, it is presumed that a moving vessel operating under its own power is at fault when it allides with a stationary object.  *The Oregon*, 158 U.S. 186, 192-93 (1895).  Thus, the owner of a stationary object that is hit by a moving vessel can satisfy its initial burden of demonstrating the breach of a duty on the part of the vessel by invoking the *Oregon* Rule.  *Id.*  "This presumption operates to shift the burden of proof – both the burden of producing evidence and the burden of persuasion – onto the moving ship."  *Am. Petrofina Pipeline Co. v. M/V Shoko Maru*, 837 F.2d 1324, 1326 (5th Cir. 1988) (citing *Delta Transload, Inc. v. M/V Navios Commander*, 818 F.2d 445, 449 (5th Cir. 1987); *James v. River Parishes Co.,* 686 F.2d 1129, 1131-33 (5th Cir. 1982)).  The moving vessel can rebut the presumption by proving, by a preponderance of the evidence, that the allision was the fault of the stationary object, that the moving vessel acted with reasonable care, or that the allision was an unavoidable accident.  *Id.* (citing *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977); *Delta Transload*, 818 F.2d at 449; *James*, 686 F.2d at 1132; *Woods v. U.S. Dep't of Transp.*, 681 F.2d 988, 990 (5th Cir. 1982)).  The *Oregon* Rule's "presumption derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled in some way."  *Id.* (citing *Delta Transload*, 818 F.2d at 449; *Bunge*, 558 F.2d at 795).

8.      Here, the *Oregon* Rule plays no significant role.  The *Aris T* interests do not contest that the *Aris T* allided with certain stationary vessels and dock facilities. The *Oregon* Rule's presumption is not necessary to hold the *Aris T* interests liable to the extent of their proportionate share of fault for damage to the shoreside vessels and structures with which the *Aris T* allided on January 31, 2016.

9.      The *Pennsylvania* Rule instructs that a party who violates a statutory rule intended to prevent maritime accidents is presumed to have caused the accident.  *See Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991); *see also Candies Towing Co.*

*v. M/V B & C Eserman*, 673 F.2d 91, 93 (5th Cir. 1982) (the *Pennsylvania* Rule "constitutes an evidentiary rule reversing the burden of proof"). "In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." *The Pennsylvania*, 86 U.S. 125, 136 (1874). As an evidentiary presumption "designed to fill a factual vacuum," the *Pennsylvania* Rule, like other presumptions of fault under maritime law, is inapplicable where "the parties have introduced evidence to dispel the mysteries that gave rise to the presumption[]." *In re Mid-S. Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005) (quoting *Rodi Yachts, Inc. v. Nat'l Marine, Inc.*, 984 F.2d 880, 887 (7th Cir. 1993)).

10.    In this case, it is unnecessary to utilize the *Pennsylvania* Rule because there is no "evidentiary vacuum." Over the course of the two-week trial of the liability phase, the parties introduced ample evidence that the Court can analyze to determine fault for the accident. However, statutes and regulations, such as the U.S. Inland Navigation Rules, are relevant to determine the applicable standard of care. *S.C. Loveland*, 608 F.2d at 165 n.3.

11.    The Inland Navigation Rules apply to the portion of the Mississippi River where the accident occurred and are intended to prevent maritime casualties. 33 C.F.R. § 83.01, *et seq.*

12.    Rule 2 addresses a vessel's duty to follow both the prescribed navigation rules and any precaution required by the ordinary practice of seamen or the special circumstances of the case. It states:

Responsibility (Rule 2)

(a)  Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

(b)  In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including

the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger.

33 C.F.R. § 83.02.

13.    Rule 5 addresses a vessel's obligation to maintain a proper lookout by "all available means appropriate in the prevailing circumstances" so as to make a "full appraisal of the situation and of the risk of collision."  In its entirety, the rule states:

> Look-out (Rule 5)
>
> Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

33 C.F.R. § 83.05

14.    Rule 6 (safe speed) addresses a vessel's obligation to "at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions."  33 C.F.R. § 83.06. The rule identifies numerous factors to be "taken into account … [i]n determining a safe speed," including the state of visibility, traffic density, vessel maneuverability with special reference to stopping distance, and any constraints imposed by the radar range scale employed.  This list is not exhaustive.

15.    Rule 7 addresses what a vessel must do to ascertain whether a risk of collision exists.  It requires that a vessel "use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists."  In its entirety, the rule states:

> Risk of collision (Rule 7)
>
> (a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists.  If there is any doubt such risk shall be deemed to exist.

36

(b) Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects.

(c) Assumptions shall not be made on the basis of scanty information, especially scanty radar information.

(d) In determining if risk of collision exists the following considerations shall be among those taken into account:

> (i) Such risk shall be deemed to exist if the compass bearing of an approaching vessel does not appreciably change.

> (ii) Such risk may sometimes exist even when an appreciable bearing change is evident, particularly when approaching a very large vessel or a tow or when approaching a vessel at close range.

33 C.F.R. § 83.07.

16.    Rule 8 addresses what a vessel must do to avoid collision.  In its entirety,

the rule states:

Action to avoid collision (Rule 8)

(a)  Any action taken to avoid collision shall be taken in accordance with the Rules of this subpart (Rules 4-19) (§§ 83.04 through 83.19) and shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship.

(b)  Any alteration of course and/or speed to avoid collision shall, if the circumstances of the case admit, be large enough to be readily apparent to another vessel observing visually or by radar; a succession of small alterations of course and/or speed should be avoided.

(c) If there is sufficient sea room, alteration of course alone may be the most effective action to avoid a close-quarters situation provided that it is made in good time, is substantial and does not result in another close-quarters situation.

(d)  Action taken to avoid collision with another vessel shall be such as to result in passing at a safe distance.  The effectiveness of the action shall be carefully checked until the other vessel is finally past and clear.

(e) If necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion.

(f) (i) A vessel which, by any of these Rules, is required not to impede the passage or safe passage of another vessel shall, when required by the circumstances of the case, take early action to allow sufficient sea room for the safe passage of the other vessel.

(ii) A vessel required not to impede the passage or safe passage of another vessel is not relieved of this obligation if approaching the other vessel so as to involve risk of collision and shall, when taking action, have full regard to the action which may be required by the Rules of Subpart B (Rules 4-19).

(iii) A vessel the passage of which is not to be impeded remains fully obliged to comply with the Rules of Subpart B (Rules 4-19) when the two vessels are approaching one another so as to involve risk of collision.

33 C.F.R. § 83.08.

17.     Rule 9 governs navigation on narrow channels or fairways and dictates passing arrangements for vessels in narrow channels on the Western Rivers.  The rule states in pertinent part:

Narrow channels (Rule 9)

(a)(i) A vessel proceeding along the course of a narrow channel or fairway shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable.

(ii) Notwithstanding paragraph (a)(i) of this Rule and Rule 14(a) (§83.14(a)), a power-driven vessel operating in narrow channels or fairways on the Great Lakes, Western Rivers, or waters specified by the Secretary, and proceeding downbound with a following current shall have the right-of-way over an upbound vessel, shall propose the manner and place of passage, and shall initiate the maneuvering signals prescribed by Rule 34(a)(i) (§ 83.34(a)(i)), as appropriate. The vessel proceeding upbound against the current shall hold as necessary to permit safe passing.

33 C.F.R. § 83.09(a).

18.     The Mississippi River is a Western River under the Inland Navigation Rules.  33 C.F.R. § 83.03(n).  By the clear terms of the rule, the requirements of Rule 9(a)(ii) apply if the area of the Mississippi River in the vicinity of the Hahnville Bar is considered to be a narrow channel – which the parties dispute.

19.     The United States Coast Guard publishes a *Vessel Traffic Service User Manual* that provides information on navigating the Lower Mississippi River.  In explaining that the Inland Rules of the Road apply on the river, the Coast Guard states the following in "Appendix A: General Navigation" of the manual:

> Pay particular attention to the importance of … Inland Rule 9 – Narrow Channels where power driven vessels proceeding downbound hav[e] the right of way.
>
> Also, notwithstanding paragraph (a)(i) and Rule 14(a), a power driven vessel operating in narrow channels or fairways on the Great Lakes, <u>Western Rivers</u>, or <u>waters specified by the Secretary</u>, and proceeding downbound with a following current shall have the <u>right of way</u> over an upbound vessel, shall propose the manner and place of passage, and shall initiate the maneuvering signals prescribed by Rule 34(a)(i), as appropriate.
>
> The vessel proceeding upbound against the current shall hold as necessary to permit safe passing.

Exhibit 219 (emphasis in original).

20.     Christiansen, Sanamo, Leone, and Baltas all testified that the Hahnville Bar is not a narrow channel within the meaning of Rule 9, and that none of them acted or purported to act as if this rule governed their meeting arrangements.  Certain experts testified likewise.  In contrast, though, several other experts testified that the area of the Mississippi River around the Hahnville Bar was indeed a narrow channel.

21.     In *Marine Transport Lines, Inc. v. M/V Tako Invader*, 37 F.3d 1138, 1142-43 (5th Cir. 1994), the Fifth Circuit addressed the determination of what is a "narrow channel":

> Neither Rule 9 nor the Inland Navigation Rules Act defines "narrow channel." Courts interpreting the predecessor "Narrow Channel Rule," Article 25 of the Inland Rules, 33 U.S.C. § 210 (1976) (repealed), agreed that the determination of what is a "narrow channel" is a mixed question of law and fact.  *Canal Barge Co. v. China Ocean Shipping Co.*, 770 F.2d 1357, 1362 (5th Cir. 1985).  Lower courts have generally held that bodies of water up to 1,000 feet wide are narrow channels, while bodies of water 1,200 feet and over are not.  *See Maritrans Operating Partners L.P. v. M/T Faith I*, 800 F. Supp. 133, 140 (D.N.J. 1992) (citing cases).  However, we have explained that "[t]he application of the Narrow Channel Rule is not based on the physical dimensions of the body of water

alone." *Weathers Towing, Inc. v. M/V Herman Pott*, 570 F.2d 1294, 1295 (5th Cir. 1978) (interpreting Inland Article 25, 33 U.S.C. § 210 (1976) (repealed)). In *Weathers Towing*, we upheld the district court's application of Rule 9 to Scudder Bend, a 1,200-foot wide section of the Mississippi River, based on the presence of sandbars, the length and width of the vessels, and the fact that the channel curved 180 degrees at Scudder Bend. *Id*. at 1295-96.

On remand, the district court in *Marine Transport Lines* determined that the Luling Bridge section of the Mississippi River, which was 1,200 feet wide, was not a narrow channel, and this determination was unchallenged on appeal. 66 F.3d 320, 1995 WL 534954, at *1 (5th Cir. Aug. 1, 1995). Thereafter, in *Burma Navigation Corp. v. Reliant Seahourse MV*, 99 F.3d 652 (5th Cir. 1996), the Fifth Circuit observed that "[v]essels navigating the Mississippi River must adhere to the Narrow Channel Rules (Rules 9 and 14) ***unless otherwise agreed***." *Id*. at 658 (explaining "that a downbound vessel's right-of-way under Rule 9 is conditional in that the downbound vessel … must have proposed a manner and place for passage and initiated maneuvering signals under Rule 34(a)(i)," and that "[w]hen the downbound vessel exercises its authority under Rule 9(a)(ii), the upbound vessel must give way") (emphasis added). Still later, in *Bertucci Contracting Co. v. M/V Antwerpen*, 465 F.3d 254, 262 (5th Cir. 2006), the Fifth Circuit managed to avoid deciding whether the Mississippi River's Carrollton Bend – Nine Mile Point, which was estimated to be between 1,320 and 2,100 feet wide at its narrowest point, was a "narrow channel" by holding that the vessel had complied with both Rules 9 and 14.

22.     On the one hand, in the light of this guidance, and given that the Mississippi River spans approximately 2,000 feet wide in the area of the Hahnville Bar between mile markers 124.5 and 126, one can understand why experienced mariners (like those who testified in this case) might not consider the area to be a "narrow channel." On the other hand, recognizing that the Hahnville Bar can be difficult to navigate – posing issues with current (especially at high water) and shoreline features (highly-lit refineries on the east bank and a fleeting area with

frequent vessel traffic on the west bank), even though the bar is not one of the sharpest bends on the river – and further recognizing that the three vessels involved in this incident themselves measured between 700 and 1,010 feet in length, one can also understand why certain of the experts at trial opined that the area did constitute a narrow channel, just as the Coast Guard cautions mariners to treat it.

23.    This Court is surprised that the guidance to mariners from maritime authorities is not more definitive about whether the Hahnville Bar constitutes a narrow channel. Definitive guidance on this score might be more helpful to mariners, instructive to courts, and prudent for all.

24.    However, to the extent necessary for purposes of this case only, the Court finds that the vessels should have treated the Hahnville Bar area of the Mississippi River as a narrow channel under the specific circumstances prevailing in this area on the night of January 31, 2016, including high water, the current's direction into the bend which was toward the east bank of the river, nighttime navigation combined with nearby intense shore lighting, light fog triggering nearby fleeting activity, and the significant length of the vessels involved.

25.    Rule 13 addresses overtaking. It provides in part that "any vessel overtaking any other shall keep out of the way of the vessel being overtaken." 33 C.F.R. § 83.13(a).

26.    Rule 14 governs meeting situations between vessels. Unless a contrary agreement is reached, vessels are required to alter course to starboard to allow a port-to-port passage. The downbound vessel with a following current is the privileged vessel (meaning it has the right-of-way over an upbound vessel) and has the obligation to propose the manner of passage. In its entirety, the rule states:

Head-on situation (Rule 14)

(a)  Unless otherwise agreed, when two power-driven vessels are meeting on reciprocal or nearly reciprocal courses so as to involve risk of collision each shall alter her course to starboard so that each shall pass on the port side of the other.

(b)  Such a situation shall be deemed to exist when a vessel sees the other ahead or nearly ahead and by night she could see the masthead lights of the other in a line or nearly in a line and/or both sidelights and by day she observes the corresponding aspect of the other vessel.

(c)  When a vessel is in any doubt as to whether such a situation exists she shall assume that it does exist and act accordingly.

(d)  Notwithstanding paragraph (a) of this Rule, a power-driven vessel operating on the Great Lakes, Western Rivers, or waters specified by the Secretary, and proceeding downbound with a following current shall have the right-of-way over an upbound vessel, shall propose the manner of passage, and shall initiate the maneuvering signals prescribed by Rule 34(a)(i) (§ 83.34(a)(i)), as appropriate.

33 C.F.R. § 83.14.

27.    Rule 16, which addresses action by give-way (or burdened) vessels, provides that "[e]very vessel which is directed to keep out of the way of another vessel shall, so far as possible, take early and substantial action to keep well clear."  33 C.F.R. § 83.16.

28.    Rule 17 addresses actions by stand-on (or privileged) vessels.  In winding channels, the rule requires vessels to maintain their relative positions in the channel.  In pertinent part, the rule states:

Action by stand-on vessel (Rule 17)

(a)(i) Where one of two vessels is to keep out of the way, the other shall keep her course and speed.

(ii) The latter vessel may, however, take action to avoid collision by her maneuver alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in compliance with these Rules.

(b)  When, from any cause, the vessel required to keep her course and speed finds herself so close that collision cannot be avoided by the action of the give-way vessel alone, she shall take such action as will best aid to avoid collision.

…

(d)  This Rule does not relieve the give-way vessel of her obligation to keep out of the way.

33 C.F.R. § 83.17.

29.    Rule 34 addresses maneuvering and warning signals.  Rule 34(d) requires a vessel to sound a danger signal when it does not understand the other vessel's intentions.  The rule states:

> When vessels in sight of one another are approaching each other and, from any cause, either vessel fails to understand the intentions or actions of the other, or is in doubt whether sufficient action is being taken by the other to avoid collision, the vessel in doubt shall immediately indicate such doubt by giving at least five short and rapid blasts on the whistle.  Such signal may be supplemented by a light signal of at least five short and rapid flashes.

33 C.F.R. § 83.34(d).

30.    Regulations implementing the Vessel Bridge-to-Bridge Radiotelephone Act, 33 U.S.C. §§ 1201, *et seq.*, provide in pertinent part: "Each person who is required to maintain a listening watch under section 5 of the Act shall, when necessary, transmit and confirm, on the designated frequency, the intentions of his vessel and any other information necessary for the safe navigation of vessels."  33 C.F.R. § 26.04(b).

31.    A compulsory pilot's negligence is attributable to the vessel.  Generally, only the vessel is liable *in rem* for the pilot's negligent acts; however, the shipowner is liable *in personam*, in addition to the vessel's liability *in rem*, if the negligence of the master or crew contributed to the accident.  *Probo II London v. Isla Santay MV*, 92 F.3d 361, 365 (5th Cir. 1996).

32.    A ship's master "is entitled to assume that the pilot is an expert on local conditions and practices, until it becomes manifest that the pilot is steering the vessel into danger." *Osprey Ship Mgmt. Inc. v. Foster*, 387 F. App'x 425, 433 (5th Cir. 2010) (quoting *Avondale v. Int'l Marine Carriers, Inc.,* 15 F.3d 489, 492-93 (5th Cir. 1994)).  As a result, the pilot's presence does not free the master of all obligations regarding the vessel's safety.  *Id.* Rather, the master must ensure "that his officers and crew duly attend to the pilot's orders" and "he himself is bound to keep a vigilant eye on the navigation of the vessel and, when exceptional circumstances exist, not only to urge upon the pilot to use every precaution, but to insist upon such being taken."  *Id.* at 433-34 (quoting *The Oregon,* 158 U.S. at 195) (brackets omitted).

33.    Leone was a licensed pilot with sufficient experience.  Baltas's testimony and the *Aris T*'s VDR recordings demonstrate that Baltas remained engaged in the *Aris T*'s navigation while Leone was at the helm.    Further, Baltas's conversation with another crew member regarding the ship's ballasting was an essential part of the vessel's navigation of the river and did not take Baltas's attention away from the unfolding situation that led to the accident.  Baltas testified that he watched Leone's actions as the situation at issue unfolded and agreed with Leone's critical decisions.  Baltas's attention to the situation is also evidenced by his asking Leone about stopping the engine during the incident and his repeating Leone's helm commands. There is no evidence that anything Baltas or the vessel's crew did, or did not do, caused or contributed to the accident.  The *Aris T* may be held liable, *in rem*, for its portion of the fault, but Marmaras and ARIS T ENE cannot be held liable *in personam*.

34.    The principle of comparative fault applies to general maritime torts.  "[W]hen two or more parties have contributed by their fault to cause property damage in a maritime collision …, liability for such damage is to be allocated among the parties proportionately to the

comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault." *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975). "Where both parties to a collision are in violation of statutes designed to prevent collisions, the court may apportion fault between the parties, unless either party proves that its statutory violation was not a substantial contributing cause of the collision. Even without a statutory violation, liability may be imposed simply where there is negligence." *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 364 (5th Cir. 2006) (citations omitted).

35.    Considering the facts as found by the Court and the above-referenced legal principles, the Court finds that Cenac and Genesis are primarily liable for causing the *Aris T*'s allision with VRNO's and Shell/Motiva's docks and SCF Waxler's and Kirby's vessels, and that the *Aris T*, *in rem*, is also liable but shares a lesser portion of the fault. Each of these parties violated rules designed to prevent allisions, and none has proved that its rule violations were not a substantial contributing cause of the allision, so the Court will apportion fault between the parties.

36.    Cenac is liable because the *Loretta* violated duties placed upon it by Inland Rules 2 (prudent seamanship), 5 (lookout), 7 (risk of collision), 8 (action to avoid collision), 9 (failure to propose manner of passing in narrow channel), 13 (overtaking), 14 (failure to propose manner of passing in meeting situation), 16 (action by give-way vessel), and 34(d) (danger signal). Cenac is also liable because the *Loretta* violated duties placed upon it by the regulations implementing the Vessel Bridge-to-Bridge Radiotelephone Act. The *Loretta*'s breaches of these duties were contributing causes of the accident that caused damage to VRNO, Shell/Motiva, SCF

45

Waxler, and Kirby.  Moreover, under the *Pennsylvania* Rule (to the extent applicable), Cenac did not prove that its statutory fault could not have been a cause of the allision.

37.     Specifically, Sanamo failed to maintain a proper lookout and assess the risk of collision because he agreed to overtake the *Elizabeth* without knowing the position and intentions of the *Aris T* and without recognizing that the three vessels would meet in close proximity to each other on the same side of the river in the bend during high water and strong current conditions.  Sanamo had tools at his disposal that, if properly used, would have alerted him to the *Aris T*'s presence.  He had Rose Point to assess the presence, heading, and speed of the *Aris T* below the Hahnville Bar, and to ascertain the *Loretta*'s predicted passing point with the *Aris T* in the Hahnville Bar.  Sanamo's failure to use Rose Point was particularly imprudent because Sanamo admitted that he was aware the *Aris T* was upbound prior to his overtaking agreement with the *Elizabeth*, but he nevertheless failed to verify the *Aris T*'s location and potential impact on the overtaking.  The *Loretta* did not have a working electronic compass at the time of the incident, thus limiting the information about the vessel's heading that would have been available to other vessels via Rose Point.  Thus, Sanamo failed to use the available features of Rose Point as would have alerted him and the other vessels to the dangerous three-abreast meeting and overtaking situation that developed.

38.     The range scales of the *Loretta*'s radars were set to 0.75 and 1.5 nautical miles, which only gave Sanamo the ability to look ahead via radar slightly more than 1.5 miles.  Given the prevailing circumstances, it was imprudent for Sanamo not to have set one of the radars to at least 2 miles on an offset basis.  Had he done so, Sanamo would have seen the *Aris T* in ample time to reassess his decision to overtake the *Elizabeth*, and instead, to fall-in behind the *Elizabeth* in ample time to avoid a risk of collision with the *Aris T* in the Hahnville Bar.  Sanamo, however, gave no indication that he was taking into account the *Aris T* even after it appeared on his radar.

46

He made no attempt to contact the vessel until after the *Aris T* had completed its meeting agreement with the *Elizabeth*. Sanamo did not hear the *Aris T*'s overtaking agreement with the *Bayou Black*, which should have also alerted him to the *Aris T*'s presence.

39. Sanamo violated Rules 2, 9 and/or 14 by failing to propose the place of passage with the *Aris T* and by failing to require the *Aris T* to hold until the *Loretta* and the *Elizabeth* completed their overtaking. At the time the proposed meeting with the *Aris T*, Sanamo knew that the *Loretta* was having difficulty overtaking the *Elizabeth*. Sanamo had failed to increase the *Loretta*'s speed as would ensure completion of the overtaking maneuver before arriving at the place of passing with the *Aris T*. The *Elizabeth* was in the center of the river and either was, or soon would be, significantly encroaching upon the right-descending side of the channel. Sanamo knew that the *Elizabeth* was sliding towards the east bank and forcing the *Loretta* towards that direction. As the downbound vessel, Sanamo had the obligation under Rules 9 and 14 to dictate the manner and place of meeting, and he should have directed the *Aris T* to slow or hold until the overtaking was complete. His failure to do so was a both a contributing and proximate cause of this accident.

40. Sanamo (the *Loretta*) violated Rules 7, 8, 13, and 16 by failing to stay well clear of the *Elizabeth* during the overtaking maneuver, which created a serious risk of collision. As a result of these violations, the unrefuted evidence is that the *Loretta* blocked the *Aris T*'s path, which caused the *Aris T* to take evasive actions to starboard, ultimately causing the vessel to allide with the vessels and docks.

41. As the *Loretta* and the *Elizabeth* maneuvered around the Hahnville Bar, Sanamo had a further opportunity to avoid the accident at 7:48:50 p.m. when he called the *Aris T* and stated that he was going to abort the overtaking of the *Elizabeth* and fall in behind that tug. This declaration by Sanamo was notice to all three vessels of a clear risk of collision. At that point, it

was still possible for Sanamo to abort the overtaking and fall in behind the *Elizabeth*, particularly given the *Loretta*'s being a Z-drive towboat. Sanamo also knew that the *Elizabeth* was continuing to alter its course and sliding to the east bank. He knew that he, in turn, was forcing the *Aris T* towards the docks. Sanamo knew, or should have known, that by that point it was too late for the *Aris T* to slow to any significant degree. Sanamo should have aborted the overtaking and fallen behind the *Elizabeth*. His failure to do so contributed to the accident.

42. Further, Sanamo assumed the entire time that the *Elizabeth* was going to be backing into Bayou Fleet, which never occurred. Sanamo should have reached out by radio communication to obtain clarification of Christiansen's intentions. The failure to do so violated 33 C.F.R. § 26.04(b). As a last resort, Sanamo should have sounded the danger signal when Christiansen's actions did not match Sanamo's expectations. The failure to do so violated Rule 34(d). These violations were a contributing and proximate cause of the accident.

43. The damage resulting from the incident was readily and easily foreseeable given the close proximity to the affected docks of the *Loretta*'s operations on the Mississippi River. Sanamo's violations of the Inland Navigation Rules and other regulations markedly contributed to the allision and breached Cenac's duty of care to the vessels and terminals in the vicinity.

44. Additionally, the Court finds that prior to the incident, Cenac was aware of face wires slipping and parting when barges were towed by its Z-drive-equipped tugs.[181] In

---

[181] Cenac discarded the face wire after the accident. Due to Cenac's spoliation of the evidence, the other parties seek an adverse inference against Cenac that the face wire was in poor condition. Under federal law, "[s]poliation of evidence 'is the destruction or the significant and meaningful alteration of evidence.'" *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) (quoting *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 612 (S.D. Tex. 2010)). "[A] party seeking the sanction of an adverse inference instruction based on spoliation of evidence must establish that: (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Rimkus*, 688 F. Supp. 2d at 615-16 (citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003)).

"Generally, the duty to preserve arises when a party has notice that the evidence is relevant to litigation or should have known that the evidence may be relevant to future litigation." *Id.* at 612 (quotations and citations

particular, face wires had either parted or slipped off winches previously when barges were pushed by the *Loretta*.  The *Loretta* had been extended by approximately 20 feet while still in the shipyard under construction.  Pursuant to 33 C.F.R. § 164.75, Cenac was required to equip the *Loretta* with face wires that were appropriate for the vessel's horsepower.  Cenac undertook no analysis of the forces that would apply to the face wires or how the increased length of the tug would affect those forces. Nor did Cenac make any reasonable effort to evaluate why its face wires continued to part or slip.  Prior to this incident, Cenac attempted to correct the problem through makeshift efforts, like tying knots in the line, rather than undertaking a permanent fix.[182] Naval architect Edward Shearer testified that the *Loretta*'s two-part face wire system was inadequate to withstand the stresses placed on the wires.  Post-accident testing confirmed that turning the propulsion hard-over exceeded the face wires' breaking strength by 34%.[183]

---

omitted).  As for culpability, the Fifth Circuit permits "an adverse inference against the spoliator or sanctions against the spoliator only upon a showing of 'bad faith' or 'bad conduct.'" *Guzman*, 804 F.3d at 713 (quoting *Condrey v. SunTrust Bank of Georgia*, 431 F.3d 191, 203 (5th Cir. 2005) (internal quotation marks omitted)).  "Bad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence."  *Id*. (citing *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998)).  "'Intent is rarely proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors.'"  *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007) (discussing intentional destruction in addressing motion for spoliation-of-evidence sanctions) (quoting *Morris v. Union Pac. R.R.*, 373 F.3d 896, 902 (8th Cir. 2004)).

The Court finds that Cenac spoliated evidence by failing to retain the parted port face wire after the incident.  Cenac knew the face wire was important because, immediately after the accident, Leone told Sanamo there had been an accident, and Sanamo admitted that the face wire broke. Thus, Sanamo's testimony that he did not realize there was an accident when the face wire was discarded because he thought that the incident was simply a "near miss" for his vessel is not credible.  Further, Broussard knew of the need to preserve evidence less than 24 hours after the accident, and he mentioned the face wire as an issue in a February 4, 2016 report to the Coast Guard regarding the accident.

Both Sanamo and Walt Cenac knew about the port face wire's parting and the damage it caused to the *Loretta*'s mooring bitt when the events at issue occurred or shortly thereafter and did nothing to preserve the face wire, nor did Sanamo or Walt Cenac report the parted face wire to the company.  Both had a motive to conceal the parted face wire as a contributing cause of the incident: the former to obfuscate that his maneuvers caused a mechanical failure, and the latter to protect either himself, as maintenance and repair supervisor responsible for the two-part face wire system, or the company.  The Court finds that their respective acts in failing to preserve this evidence amount to intentional acts of concealment, and the other parties are entitled to an inference that the face wire was not in good condition at the time of the events at issue, contrary to Cenac's assertion.

[182] Testimony of Walt Cenac (Cenac's corporate representative), Sanamo, Schropp & Shearer.

[183] Testimony of Shearer.

45.    The Court also finds that, when the *Loretta*'s port face wire parted, it caused the *Loretta* to respond in such a way as to shift its stern to port, thus blocking the *Aris T*'s path, which in turn caused the *Aris T* to take evasive action to starboard ultimately resulting in the allision.  The *Loretta*'s action was a contributing and proximate cause of the accident.  Cenac's failure to properly design and utilize an adequate face wire system was also a contributing and proximate cause of the accident and constitutes independent negligence.

46.    Additionally, Sanamo violated Cenac's cell phone policy and Rules 2 and 5 by the continuous use of his cell phone with Cheramie during the sequence of events leading to the allision.  This use violated his duty of care as master of the *Loretta* to his vessel and the vessels and terminals in his immediate vicinity during an especially critical maneuvering operation involving the three vessels at issue.  Sanamo was speaking with Cheramie during a period when he should have been assessing the presence of traffic in his vicinity before reaching an overtaking agreement with the *Elizabeth* and a passing agreement with the *Aris T*.  Sanamo's failure to ascertain the presence of the upbound *Aris T* around the bend occurred contemporaneously with his call with Cheramie, and the Court finds a causal connection between that call and his navigational failures.

47.    Further, Sanamo's cell phone use on the evening of January 31, 2016, was not an isolated occurrence.  It was part of a long-standing pattern of behavior on his part.  The U.S. Coast Guard had specifically warned against precisely this type of cell phone use.  Marine Safety Advisory 01-10, entitled "Distracted Operations" and issued on October 29, 2010, declared that the "potential risk" associated with "improper use of cellular telephones and other devices … should be apparent to vessel owners and operators."  The Coast Guard strongly recommended that vessel owners and operators "develop and implement effective operational policies outlining

when the use of cellular telephones and other devices is appropriate or prohibited."[184]  Cenac failed to do so.  While Cenac did develop a cell phone policy, it failed to train Sanamo on its policy, it entrusted Sanamo to enforce the policy insofar as his vessel was concerned, and it failed to take appropriate measures to ensure that the policy was being enforced.  Cenac thus did not have "effective operational policies" governing cell phone use.

48.     Genesis is liable for the *Elizabeth*'s violation of Inland Rules 2 (prudent seamanship), 5 (lookout), 7 (risk of collision), 8 (action to avoid collision), 9 (keeping to the outer limit of the channel that lies on the vessel's starboard side as is safe and practicable), and 17 (action by stand-on vessel).  The *Elizabeth*'s breaches of these duties were contributing causes of the accident that resulted in damage to VRNO, Shell/Motiva, SCF Waxler, and Kirby.  Moreover, under the *Pennsylvania* Rule (to the extent applicable), Genesis did not prove that its statutory fault could not have been a cause of the allision.

49.     Christiansen failed to maintain a proper lookout and properly assess the risk of collision when he proposed and then agreed to an overtaking maneuver by the *Loretta* without knowing the whereabouts of the upbound *Aris T*.  Christiansen failed to properly assess the risk of collision by not assessing the location where the three vessels would meet in close proximity in the river.  Christiansen should have heard the *Aris T*'s overtaking agreement with the *Bayou Black*, which would have alerted him to the *Aris T*'s presence.  In addition, Christiansen had tools at his disposal that, if properly used, would have alerted him to the *Aris T*'s presence, but he failed to use them.

50.     First, Christiansen should have set the range of his Rose Point to encompass vessel traffic below the Hahnville Bar.  Had he done so, he would have seen the *Aris T*'s location, speed, and direction of travel.  He would have also seen a predicted passing point with

---

[184] Exhibit 222.

the *Aris T* in the Hahnville Bar had that feature been activated.  All this information would have informed Christiansen that in fact there was traffic that would affect the overtaking of the *Elizabeth* by the *Loretta*, which is contrary to his radio transmission that "I don't really see anything else coming up this way."  Christiansen's failure to use Rose Point to assess vessel traffic below the Hahnville Bar was imprudent.

51.    Second, the range scales of *Elizabeth*'s radars were set to 0.75 and 1.5 nautical miles, which only gave Christiansen the ability to look ahead via radar slightly more than 1.5 miles.  Given the prevailing circumstances, it was imprudent not to have set one of the radars to at least 2 miles on an offset basis.  Had he done so, Christiansen would have seen the *Aris T* before he made his incorrect and misleading representation that there was no upbound traffic.  Even with the radars set as they were, the *Aris T* appeared on the *Elizabeth*'s radar screen shortly after Christiansen made the overtaking agreement with the *Loretta*.  However, there is no indication that Christiansen recognized the presence of the vessel.  He did not correct his erroneous report that there was no upbound traffic, and he made no attempt to contact that upbound traffic for approximately five minutes.

52.    Christiansen failed to take appropriate action to avoid the close-quarters situation that resulted in *Aris T*'s allision with the docks.  Specifically, while Christiansen continually announced an intention to back into Bayou Fleet, his actions through the meeting and overtaking maneuvers crowded the *Loretta* and the *Aris T* into the left-descending (or east) bank half of the river while the Mississippi River's 4-to-5 knot current drove all three vessels toward the east bank in the river bend.

53.    Christiansen violated Rules 2, 9 and/or 14 by failing to propose the place of passage and by failing to require the *Aris T* to hold until the two towboats completed their overtaking.  At the time that Christiansen proposed to meet the *Aris T*, Christiansen knew that the

52

*Loretta* was overtaking him and coming up his port side. He knew that his vessel was located in the center of the river and either was or soon would be encroaching upon the right-descending side of the channel. He knew or should have known that the current was changing his course and setting him towards the east bank in the direction of the *Loretta*. Nevertheless, he disregarded his obligations under Rules 2, 9 and 14 by dictating a meeting arrangement that placed the *Aris T* in a precarious position. As the privileged vessel, Christiansen should have required the *Aris T* to slow or hold until the overtaking was complete. His failure to do so was a contributing and proximate cause of the accident.

54.     Christiansen violated Rule 9 by failing to "keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable." It is not adequate for Christiansen to intone that, as the privileged vessel, he was where he wanted to be to avoid vessels moving in and out of the fleeting areas on the west bank. The *Elizabeth* did not require the deeper water of the channel, and it was unreasonable and imprudent for Christiansen to keep the vessel in the middle of the channel when there was water of sufficient depth to his starboard to accommodate his vessel. It was similarly a violation of Rule 2 for Christiansen to allow the *Elizabeth* to be pushed by the current further towards the east bank as the three vessels met in the Hahnville Bar. Christiansen had the power and maneuvering room to move the *Elizabeth* away from the *Loretta*; he could have, but did not, move closer to the right-descending (or west) bank, as both the *Loretta* and the *Aris T* expected based on his repeatedly-announced intentions; and he could have done so while maintaining a "sustainable curvature" (that is, a course paralleling the curvature of the river within a navigable channel).[185]  Instead, by remaining in the center of the

---

[185] Testimony of Smith.

river, he needlessly funneled all three vessels to meet and overtake each other in less than half of the river's width in a river bend in high water conditions.

55.      Christiansen violated Rules 7, 8 and 17 by failing to maintain course and speed and backing down in close proximity to the *Loretta*, which led to the latter's evasive maneuvers, exposure to high-stress physical forces, and ensuing equipment failure.  Further, Christiansen's violation of Rule 2 was compounded by his placing the *Elizabeth* in astern propulsion as it started to maneuver into Bayou Fleet, thereby moving his vessel's stern further toward the east bank and into the projected path of the *Loretta* in violation of Rules 2 and 17.

56.      Moreover, Christiansen's behavior throughout this casualty violated the ordinary practices of good seamanship mandated by Rule 2.  Regardless of whether Christiansen was where he wanted to be to back into Bayou Fleet, he gave no regard for the predicament he was creating for the *Aris T* and *Loretta*, and he exacerbated that predicament by going full astern as all three vessels met in the Hahnville Bar.  His imprudent disregard for the risk of collision he was complicit in creating was a contributing and proximate cause of the incident.

57.      Christiansen caused the allision by agreeing to a passing maneuver and an overtaking maneuver that occurred at the same time in tight quarters while the vessels faced the adverse effects of high water and strong current conditions, by violating Rule 9, and by backing in close proximity to the *Loretta*.  Christiansen's decision to start backing while the *Loretta* was close on his port quarter precipitated the allision sequence by causing the *Loretta* to take evasive action to avoid a collision with the *Elizabeth*.

58.      The damage resulting from the incident was readily and easily foreseeable given the close proximity to the affected docks of the *Elizabeth*'s operations on the Mississippi River. Christiansen's violations of the Inland Navigation Rules and other regulations markedly

contributed to the allision and breached Genesis's duty of care to the vessels and terminals in the vicinity.

59.     The *Aris T, in rem,* is liable for its violation of Inland Rules 2 (prudent seamanship), 6 (safe speed), 7 (risk of collision), and 9 (failure to hold up to allow a safe passing).[186]  The *Aris T, in rem,* is also liable because it violated duties placed upon it by the regulations implementing the Vessel Bridge-to-Bridge Radiotelephone Act.   The *Aris T*'s breaches of these duties were contributing causes of the accident that resulted in damage to VRNO, Shell/Motiva, SCF Waxler, and Kirby.   Moreover, under the *Pennsylvania Rule* (to the extent applicable), the *Aris T* did not prove that its statutory fault could not have been a cause of the allision.

60.     The *Aris T* had the opportunity to slow its speed, yet maintain steerageway given the current, to permit safe passage by the *Loretta* and the *Elizabeth* but chose not to do so.   The overtaking agreement between the two towboats was heard on the *Aris T*'s bridge, when neither boat was aware of the *Aris T*'s presence.   Leone should have radioed the towboats to ensure that their overtaking agreement took the *Aris T* into account.   Leone knew, or should have known had he properly used the Rose Point on his PPU, that his vessel would be meeting two downbound tugs in a river bend (the Hahnville Bar) at night, in high river conditions, in the vicinity of several refineries.   The *Aris T* should have slowed to allow the overtaking to be completed before attempting to meet the two towboats in that bend.   The situation was even clearer once the meeting agreements between the *Aris T* and the two towboats were made.   It was evident from

---

[186] The Court finds that the *Aris T* did not violate Rules 5 (lookout) and 7 (risk of collision) in connection with ECDIS.  Although *Aris T* was equipped with two functioning ECDIS systems, it was not yet required to have such systems and they were clearly for training purposes only.  Leone was using Rose Point on his PPU and looking out of the windows.  Leone was aware of the two downbound towboats.  The *Aris T*'s use of its ECDIS display would not have revealed any additional information to Leone for purposes of maintaining a proper lookout or assessing risk of collision.  There is no evidence that the *Aris T*'s crew's not using the ECDIS display causally contributed to the accident.

radar that the two towboats were occupying a large portion of the river east of the river's middle. In addition, Sanamo warned Leone, "I don't know what you want me to do for you, I'm all the way out in the middle now trying to overtake him." The *Aris T*, therefore, had ample data available to it, which Leone did not consider, with which a prudent seaman would have slowed down to allow the two towboats to complete their overtaking maneuver. The failure of the compulsory pilot to do so was a contributing and proximate cause of the accident.

61.     Further, Leone's insistence that that the *Loretta* continue the overtaking when Sanamo announced that he was aborting it was also negligent and violated Rules 2 and 7. Experienced mariners testified that it was customary on the Mississippi River for smaller vessels (like the *Loretta*) to defer to larger vessels (like the *Aris T*).[187]   Contrary to Leone's assertion, there was not "plenty of room" for the three vessels to meet by this point. The *Elizabeth* was continuing to be pushed towards the east bank and was forcing the *Loretta* in that direction, threatening to block the path of the rapidly oncoming *Aris T*. Leone's Rose Point confirmed that the *Aris T* would be meeting both towboats at the same time in the Hahnville Bar, with all three vessels crowded toward the left-descending bank. A prudent seaman would not have overruled the stated intention of a towboat captain, who had a better appreciation of his vessel's capabilities, to abort an overtaking. Moreover, Leone contributed to Sanamo's confusion about the meeting by proposing, however briefly, a dangerous two-whistle (starboard-to-starboard) passing with the *Loretta*. These actions were a contributing and proximate cause of the accident.

62.     Further, Leone assumed the entire time that the *Elizabeth* was going to be backing into Bayou Fleet, which never occurred. Leone should have radioed the *Elizabeth* to ask for clarification of its intentions. The failure to do so violated 33 C.F.R. § 26.04(b).[188]   As a last

---

[187] Testimony of Wallace & Sanamo.
[188] Testimony of Gibbs & Campana.

resort, under Rule 34(d), Leone should have sounded the danger signal when Christiansen's actions did not match Leone's expectations. These violations were a contributing and proximate cause of the accident.

63. The damage resulting from the incident was readily and easily foreseeable given the close proximity to the affected docks of the *Aris T*'s operations on the Mississippi River. Leone's violations of the Inland Navigation Rules and other regulations contributed to the allision and breached the *Aris T*'s duty of care to the vessels and terminals in the vicinity.

64. After the contact with VRNO, Leone handled the *Aris T* as best he could, under the *in extremis* circumstances, to minimize the impact of the allision by landing as flat as possible to the docks. Because of the *Aris T*'s size and forward momentum, it was physically not reasonably possible for Pilot Leone to avoid the allision with the Shell/Motiva docks.[189]

65. Likewise, none of the damages caused by the *Aris T* could reasonably have been avoided by any actions of the vessel and its crew after it took evasive measures to steer to avoid the *Loretta*. Indeed, the actions of Leone and the *Aris T* crew were necessary to minimize damage to the docks by "landing" the vessel as flat as possible, and any delay in the dropping of the vessel's port anchor was due to the vessel's striking Berth 2, causing the dock's lighting (made of concrete) to fall on the vessel's deck.[190]

66. The Court allocates fault among the three vessel interests as follows: *Aris T* – 10%; Genesis – 45%; and Cenac – 45%.

## IV. LIMITATION OF LIABILITY

67. As a general matter, the liability of a shipowner for a property damage claim arising out of a maritime casualty may not exceed the value of the vessel and pending freight, if

---

[189] Testimony of Leone, Baltas, Strong, Ryan, Triantafyllos & Kyriakou.
[190] Testimony of Strong, Ryan, Leone, Baltas & Sangalang; Exhibit 442.

the negligent act causing the casualty occurred without the vessel owner's privity or knowledge. *See* Shipowner's Limitation of Liability Act, 46 U.S.C. § 30505. The court in *Continental Insurance Co. v. L&L Marine Transportation Inc*., 2017 WL 4844272, at *3 (E.D. La. Oct 26, 2017), set forth the general rules governing a shipowner's right to limit its liability under the Act:

> The Limitation of Liability Act permits a vessel owner to limit its liability with respect to claims arising from the vessel's operation. *See* 46 U.S.C. § 30501, *et seq.* But the owner is only entitled to limit its liability if it lacks "privity or knowledge" of the cause of the loss or injury. *Brunet v. United Gas Pipeline Co*., 15 F.3d 500, 504 (5th Cir. 1994). When a court determines whether a shipowner is entitled to exoneration or limitation of liability, it employs a two-step process. *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976). First, the party seeking to dissolve limitation must establish that the vessel was negligent or unseaworthy, and those acts caused the accident. *Petition of Kristie Leigh Enterprises, Inc.*, 72 F.3d 479, 481 (5th Cir. 1996). Then, "the burden shifts to the owner of the vessel to prove that negligence was not within the owner's privity or knowledge." *In re Hellenic*, 252 F.3d 391, 395 (5th Cir. 2001).
>
> To establish unseaworthiness, the claimant must establish that the vessel was not "reasonabl[y] fi[t] to perform or do the work at hand." *Farrell Lines*, 530 F.2d at 10, n.2. Further, a vessel is unseaworthy if it is not adequately prepared to successfully navigate foreseeable hazards or challenges it may face. *Walker v. Harris*, 335 F.2d 185, 191 (5th Cir. 1964). An incompetent or inexperienced crew can, but does not necessarily, create an unseaworthy condition. *Orient Mid-East Lines, Inc. v. Shipment of rive on Board S.S. Orient Transporter*, 496 F.2d 1032, 1040 (5th Cir. 1974). However, the party cannot just prove that the vessel was unseaworthy; it must also establish that the unseaworthy condition was the proximate cause of the injury or damages. S*mith v. Trans-World Drilling Co*., 772 F.2d 157, 162 (5th Cir. 1985). Specifically, the party moving to dissolve limitation must show "that (1) the unseaworthiness played a substantial part in bringing about or actually causing the injury and that (2) the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Id.*
>
> A court will deny limitation of liability if the shipowner had knowledge or privity of the negligent acts or unseaworthy conditions that caused the damage or injury. *Farrell Lines*, 530 F.2d at 10. The owner has privity "if he personally participated in the negligent conduct or brought about the unseaworthy condition." *In re Omega Protein, Inc.,* 548 F.3d 361, 371 (5th Cir. 2008) (quoting *Trico Marine Assets, Inc. v. Diamond B Marine Services, Inc.*, 332 F.3d 779, 789 (5th Cir. 2003)). "When the shipowner is a corporation, knowledge is judged by what the corporation's managing agents knew or should have known with respect to conditions or actions likely to cause the loss." *Brunet*, 15 F.3d at 504. Accordingly, "knowledge of an unseaworthy or negligent condition is normally imputed to a corporate owner if the 'condition could have been discovered

through the exercise of reasonable diligence.'"  *Omega Protein*, 548 F.3d at 371 (quoting *Brister v. A.W.I., Inc*., 946 F.2d 350, 356 (5th Cir. 1991)).  However, a master's mistake of navigation, when he is otherwise competent and the owner exercised reasonable care in selecting him, does not bar limitation of liability.  *Id.*; *Kristie Leigh Enterprises*, 72 F.3d at 481.

68.    "Privity or knowledge" extends beyond actual knowledge to the knowledge that the shipowners could have obtained by a reasonable investigation at the inception of the voyage.  *Matter of Central Gulf Lines*, 176 F. Supp. 2d 599, 619 (E.D. La. 2001) (citing *Brister v. AWI, Inc.*, 946 F. 2d 350, 358 (5th Cir. 1991)).

69.    The *Aris T* interests, Genesis, Cenac, and Cenac's Excess Insurers all claim the right to limit their respective liability to the value of their vessels, plus pending freight at the conclusion of the voyage.  The Court finds that Genesis, Cenac, and Cenac's Excess Insurers are not entitled to limit their liability, but the *Aris T* interests are able to do so.

70.    Genesis hired an incompetent master based upon an inadequate background investigation.  Genesis failed to properly check Christiansen's credentials in violation of its own hiring policies and failed to discover crucial information regarding his physical condition, past license suspensions, and past firings by major towing companies.  At least some of the matters addressed in Christiansen's history reveal an attitude of arrogance on his part that also played a role in this incident, as Christiansen repeatedly insisted that "he [the *Elizabeth*] was always where he wanted to be," thereby disregarding the risk of collision his own vessel was creating for other vessels.  Additionally, Genesis provided no training to Christiansen with respect to the use of the Rose Point navigation system.  The failure to do so resulted in Christiansen's not using all available means, as required by the Inland Rules, to maintain a proper lookout and assess the risk of collision, and improperly applying the Rules to the allision sequence, which his actions and inaction precipitated.  Christiansen failed to adequately employ his Rose Point GPS to expand its range to ascertain the presence of the *Aris T* around the bend.  Further, Genesis never trained

Christiansen to properly employ his Rose Point navigation system to ascertain the presence of the *Aris T* around the bend. He admitted at trial that had he been aware the *Aris T* was upbound, he would have called off the overtaking maneuver with the *Loretta*. Christiansen also failed to properly assess the risk of collision when he began backing the *Elizabeth* in close proximity to the *Loretta*. Moreover, Genesis's general manager, Paul Guidry, approved the downstreaming maneuver employed by Christiansen during the allision sequence without requiring the use of an assist tug prior to the *Elizabeth*'s entering Bayou Fleet. It follows that Genesis had privity or knowledge of one or more essential issues that contributed to this marine casualty. Genesis is liable for its comparative fault and allocated percentage of liability, but also jointly and severally liable under United States maritime law for all other sums adjudicated in the event that other parties fail to pay all or part of their respective shares.

71.    The *Loretta*'s master, Sanamo, violated the company's cell phone policy during the time leading up to the allisions. The company's policy was neither monitored nor enforced. Sanamo violated the policy with impunity, even though he was the person whom the company tasked with enforcing the policy aboard the vessel. Had the company monitored compliance or otherwise had an effective enforcement policy, Sanamo would not have been able to spend an inordinate amount of time on his cell phone with his girlfriend while on watch towing barges loaded with petroleum products on the Mississippi River and during which Sanamo should have been assessing the presence of traffic in his vicinity before making an overtaking agreement.

72.    Additionally, the Court finds that the *Loretta* was unseaworthy because it did not have an adequate face wire system and, that prior to the incident, Cenac was aware of other incidents in which face wires parted when barges were towed by its Z-drive-equipped tugs. Face wires had parted previously when barges were pushed by the *Loretta*. The tug had been extended by many feet while still in the shipyard under construction. Cenac undertook no

analysis of the forces that would apply to the face wires or how the increased length of the tug would affect those forces.  Cenac made no reasonable effort to evaluate why face wires continued to part.  The Court also finds that the *Loretta*'s port face wire parting contributed to the allision by causing or contributing to the need for the *Loretta* and the *Aris T* to take evasive maneuvers when the *Loretta*'s stern blocked the *Aris T*'s path.  For the foregoing reasons, the Court finds that Cenac possessed privity or knowledge of conditions that caused or contributed to the *Aris T*'s alliding with the docks and vessels and is not entitled to limit its liability to the value of its vessels plus pending freight.  Cenac is liable for its comparative fault and allocated percentage of liability, and also jointly and severally liable under United States maritime law for all other sums adjudicated in the event that other parties fail to pay all or part of their respective shares.

73.    Because Cenac is not entitled to limit its liability, Cenac's insurance policy provides coverage up to $100 million, and the total damages at issue are less than the policy limit, Cenac's Excess Insurers are liable for Cenac's share, and also jointly and severally liable under United States maritime law for all other sums adjudicated in the event that other parties fail to pay all or part of their respective shares.

74.    The *Aris T* interests are entitled to limit their liability – ARIS T ENE as owner of the *Aris T*, *see* 46 U.S.C. § 30505, and Marmaras as a vessel operator having significant management and operational control over the *Aris T*.  *See In re Ingram Barge Co.*, 2007 WL 2088369, at *3 (E.D. La. July 19, 2007).  The *Aris T*'s culpability rests with navigational decisions made by its compulsory pilot.  Neither the vessel owner, ARIS T ENE, nor the ship manager, Marmaras, possessed privity or knowledge of the pilot's failure to abide by any navigation rules.

75.    The Court finds that no superseding act of negligence by the *Aris T* or its pilot caused or contributed to the damages suffered by Shell/Motiva's docks, and thus does not apply a different allocation of fault with respect to those damages.  In this case, there was no "later cause of independent origin that was not foreseeable" that was attributable to the *Aris T* or its pilot; the *Aris T*'s evasive maneuvers and allision with the docks arose out of the predicament created by the *Elizabeth* and the *Loretta*'s unexpected movements in the river and the *Aris T*'s own navigational errors in the unfolding maritime casualty.  In *Stolt Achievement, Ltd. v. Dredge B.E. Linholm*, 447 F.3d 360, 368-69 (5th Cir. 2006), the court found that the casualty was caused by negligent acts that "occurred within a very small window of time," and so rejected the argument that the negligence of a third party was "a superseding cause of the collision."  The same is true here.

## V.    POST-CASUALTY VALUE OF THE *ARIS T*

76.    When a vessel owner is entitled to limit its liability, the limitation fund equals the post-accident value of the vessel plus pending freight.  46 U.S.C. § 30505(a).

77.    The law on vessel valuation for limitation-of-liability purposes was succinctly summarized in *Complaint of North American Trailing Co.*, 763 F. Supp. 152, 154-55 (E.D. Va. 1991) (footnote and some citations omitted), as follows:

> The law is well settled that the value of the vessel is to be determined at the conclusion of the voyage during which the casualty occurred; that is, the value immediately after the casualty.  When the vessel is repairable, [the value of the vessel] ordinarily is the market value of the vessel as it then exists, less the cost of repairs.  *Norwich Co. v. Wright*, 80 U.S. (13 Wall.) 104 (1871); *Standard Oil Co. v. Southern Pacific Co.*, 268 U.S. 146 (1925).
>
> In *Standard Oil* the Supreme Court set forth the basic guidelines for ascertaining the value of a vessel.  The court should look first to the market value of the vessel, as established by evidence of either the actual sale of the vessel or contemporaneous sales of comparable vessels.  268 U.S. at 155.

> If there is no market for the vessel, or if sales of similar vessels are too few in number to indicate its market value with reasonable probability, the court must use other methods of arriving at its value. *Standard Oil*, 268 U.S. at 155. The court's objective is still to ascertain as nearly as possible
>
>> the sum which, considering all the circumstances, probably could have been obtained for her on the date of the collision; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser willing to buy.

*Standard Oil*, 268 U.S. at 155-56.

78.    At the outset of the instant litigation, the *Aris T* interests obtained two appraisal reports for purposes of limitation: one from English White Shipping Limited, which estimated the *Aris T*'s value at about $7,000,000, and one from Compass Maritime Services, which appraised the *Aris T*'s value at $7,500,000. Ultimately, the *Aris T* interests accepted a third appraisal report submitted by VRNO, which valued the vessel at $8,660,000, and posted security of this amount plus pending freight, setting the total limitation fund at $8,778,440. At the time, no other party, notably including Genesis or Cenac, objected to the valuation of the *Aris T*.

79.    Over two years later, Genesis submitted a fourth valuation report by Andrew J. Minster of Rivers and Gulf Marine Surveyors, Inc. ("Rivers & Gulf"). The Rivers & Gulf valuation report places the *Aris T*'s "present market value as of January 2016" at $12.46 million, based on "the weighted average between the Market Approach value and the Cost Approach value." Andrew Minster, an appraiser with Rivers & Gulf, testified that he was not able to identify any bulk carrier appraisals that he performed prior to 2016, nor has he ever been accepted before as an expert in the appraisal of bulk carriers. Minster testified that, in preparing a valuation of the *Aris T*, he "did research in the markets, talked to various brokers, [and] read up on some articles." However, Minster could not recall any of the "various brokers" he consulted, nor could he recall speaking to any sale-and-purchase brokers in London, Japan, Greece, Germany, New York, or elsewhere. Minster referenced *Workboat Magazine* and *The Maritime*

*Executive* as two sources of information he relied upon in forming his opinions, but he admitted that those sources are primarily concerned with the oil-and-gas and Gulf-of-Mexico markets and have "not very much" information about bulk carriers.[191]

80.    According to the jurisprudence on vessel valuation for limitation-of-liability purposes, to establish the limitation fund, a court must determine the fair market value of the vessel at the end of the voyage on which the loss or damage occurred.  If, and only if, the market value for the vessel cannot be established through contemporaneous sales of comparable vessels, the court may look to other indicia of value, such as replacement costs appropriately depreciated, less the cost of repairs, or the insured value of the vessel.  Applying this law to the Rivers & Gulf report, this Court finds that the "weighted average" of the valuations under the market and cost approaches to value is not instructive for vessel valuation purposes in the context of the limitation action.

81.    The *Aris T*'s value was adequately estimated at the beginning of this litigation by three valuation reports that took into consideration "sufficiently comparable" sales to determine the fair market value of the vessel at the end of the voyage.  The *Aris T* interests submitted two appraisal reports, both from well-renowned vessel valuation experts.  Despite these two appraisals, the *Aris T* interests accepted the appraisal report submitted on behalf of one of the claimants, VRNO, which includes additional comparable sales, notably including one from January 27, 2016 of a post-Panamax vessel built in 2007 (the same year as the *Aris T*).  Genesis failed to raise an objection to *Aris T*'s and VRNO's valuations at the time they were issued, much less to submit its own appraisal report at that time, when the *Aris T* interests were about to file their limitation pleadings.  Instead, more than two years later, Genesis decided to present its

---

[191] Testimony of Minster.

report to contest not one, but three other appraisal reports.  Thus, the Court will not adopt the valuation analysis by Rivers & Gulf, but instead adopts the valuation by VRNO's appraiser.

82.    Based on the foregoing, the post-casualty value of the *Aris T* plus pending freight was properly appraised at $8,778,440 for purposes of setting the limitation fund of the *Aris T* interests.[192]

83.    At the trial of this matter, the parties stipulated that the *Aris T* sustained damages totaling $133,268.58 as a result of the allision.  Accordingly, the *Aris T*'s appraised value should be reduced by the amount of the *Aris T*'s stipulated damages to derive the *Aris T*'s post-incident value, or $8,645,171.42 ($8,778,440.00 - $133,268.58 = $8,645,171.42).  This amount constitutes the limitation fund of the *Aris T*.

## VI.    DAMAGES

84.    Under the general maritime law, when multiple defendants are found liable, they are also jointly and severally liable to a plaintiff.  *Daigle v. L & L Marine Trans. Co*., 322 F. Supp. 2d 717, 732 (E.D. La. 2004) (citing *Hardy v. Gulf Oil Corp*., 949 F.2d 826, 829 (5th Cir. 1992)); *see also McDermott, Inc. v. AmClyde,* 511 U.S. 202, 220-21 (1994); *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260 (1979).  The "rule of 'joint and several liability' permits a plaintiff to obtain full legal redress from any defendant, even if that defendant's actions were not solely responsible for the plaintiff's injuries."  *Hardy v. Gulf Oil Corp.*, 949 F.2d 826, 829 (5th Cir. 1992).  Any judgment in a limitation proceeding is joint and several, but that fault can be apportioned for purposes of contribution.  *Jefferson Barracks Marine Service, Inc. v. Casey*, 763 F.2d 1007 (8th Cir. 1985).  If one or more party is entitled to limit its liability, the remaining co-defendants are jointly and severally liable for the damages

---

[192] Because the limitation fund of the *Aris T* interests is adequate to cover the damages assessed to them in this Order & Reasons, it is unnecessary for the Court to consider whether it is appropriate to increase the amount of the limitation fund by the 6% figure advanced by VRNO under the admiralty supplemental rules.  R. Doc. 455 at 23.

remaining after the limitation amount is exhausted even though that results in a judgment greater than the proportionate share of their liability.  *See Joia v. Jo-Ja Serv. Corp.*, 817 F.2d 908, 914 (1st Cir. 1987).

85.    For the reasons stated above, Genesis, the *Aris T*, and Cenac were all at fault in causing the accident and are jointly and severally liable to VRNO, Shell/Motiva, SCF Waxler, and Kirby for their damages, except to the extent the *Aris T* interests are entitled to limitation.

86.    The parties have stipulated that VRNO's damages are $20,000,000 and Shell/Motiva's damages are $22,000,000.  VRNO and Shell/Motiva have stipulated that they do not seek to recover prejudgment interest or costs.  SCF Waxler's damages, inclusive of prejudgment interest and costs, are stipulated to total $260,000.  Kirby's damages, inclusive of prejudgment interest and costs, are stipulated to total $33,000.  The Court accepts these stipulations.

87.    The claimants are entitled to recover the following respective amounts from the vessel interests based upon the above allocations of fault:

|  | *Aris T* | Cenac | Genesis |
|---|---|---|---|
| **VRNO** | $2,000,000 | $9,000,000 | $9,000,000 |
| **Shell/Motiva** | $2,200,000 | $9,900,000 | $9,900,000 |
| **SCF Waxler** | $26,000 | $117,000 | $117,000 |
| **Kirby** | $3,300 | $14,850 | $14,850 |

88.    By virtue of the Louisiana Direct Action Statute, La. R.S. 22:1269, Cenac's Excess Insurers are jointly and severally liable to the claimants for all damages sustained by them as a result of or arising out of the negligence and comparative fault of Cenac and for all damages for which Cenac is responsible.

## FINDINGS OF FACT[193]

### I.    THE CLAIMANT

**1.**    Morris is a citizen of Louisiana and a former employee of Shell/Motiva who was working at Berth 1 of the Shell/Motiva Facility at the time of the incident.[194]

### II.    FACTS ESTABLISHED BY EVIDENCE PRESENTED AT TRIAL

2.    Morris was employed by Shell/Motiva in Norco, Louisiana, for 13 years. He was an experienced process operator. At the time of the incident, Morris was attempting to transition to the logistics department, which involved training as a dock operator. On the evening of January 31, 2016, Morris was assigned to Berth 1 of the Shell/Motiva dock on the Mississippi River.[195]

3.    At around 7:50 p.m., Morris was standing on the Berth 1 dock awaiting further instruction from his supervisor after the conclusion of barge-loading operations. He received a communication over his hand-held radio from Mike Kelly, the Berth 4 operator, advising that a ship had hit Berth 4 a mile downstream and warning personnel at Berths 1 and 2 to be on the lookout.[196]

4.    Upon hearing this warning, Morris did not locate his Berth 1 supervisor and ask for instructions. Instead, he made the independent decision to walk to an emergency shutdown device ("ESD") to turn off the flow of product in the lines on the dock. The ESD was located 5-to-10 feet away from where Morris was standing when he made this decision.[197]

---

[193] This second section of the Findings of Fact and Conclusions of Law relates to Antoine Morris's personal injury claims. To the extent applicable, all findings of fact and conclusions of law stated in the first section concerning the vessels' liability are adopted and apply herein.
[194] Testimony of Morris.
[195] *Id.*
[196] *Id.*
[197] *Id.*; Exhibit 402.

5.      Morris never engaged the ESD.  He testified that as he was preparing to move in that direction, he looked up and saw a co-worker, Nathan Sylve, walking toward him, about to "get on the catwalk" that connected Berths 1 and 2.  At the same time, Morris testified he saw a vessel in the distance beyond the co-worker and downriver from Berth 2.  The dock was well lit, so that Morris could see the entire length of Berths 1 and 2, Sylve, and the *Aris T* downriver from Berth 2.  Morris then turned quickly in an upriver direction and in the process of pivoting to turn left, lost his footing, and fell.[198]

6.      Morris admitted at trial that he panicked at the sight of the distant vessel and that his haste was the cause of his fall, and he agreed that he essentially tripped on his own feet.[199]

7.      Berth 1, where Morris remained at all material times, was not struck, moved, shaken, or otherwise impacted in any way by the *Aris T* allision with the Berth 2 dolphin.[200]

8.      No physical action of any defendant caused Morris to trip or fall.[201]

9.      Morris's location on Berth 1 at the time of the allision between the *Aris T* and the Berth 2 dolphin was at least 1,000 feet upriver of the dolphin.[202]

10.      Morris was not in immediate or actual danger from the *Aris T* at the time he fell or at any other time.  In fact, he could easily have walked to shore before the *Aris T* arrived at Berth 1.[203]

11.      Morris had access to the catwalk leading to the levee a mere 20 to 25 feet away from his location.[204]

---

[198] Testimony of Morris.
[199] *Id.*
[200] *Id.*
[201] *Id.*
[202] *Id.*; Testimony of Ryan; Exhibits 402 & 413.
[203] Testimony of Morris.
[204] *Id.*; Exhibits 402 & 526.

12.     The forward speed of the *Aris T* at the time it made contact with the Berth 2 dolphin was less than 5 miles per hour.[205]

13.     The forward speed of the *Aris T* after it made contact with the Berth 2 dolphin decreased rapidly so that it was traveling at only 1.5 miles per hour at 8:00 p.m., when its bow was still downriver from the point where Morris fell and then sheltered.[206]

14.     Morris could not dispute either that it took at least 3½ minutes from the time he tripped and fell for the *Aris T* to reach a point in the river abreast of his location or that there was plenty of time for him to evacuate the area had he chosen to do so.[207]

15.     Morris ultimately admitted that the version of events he related to his neuropsychologist of a huge, black ship right in front of him was accurate "in my mind" and "in my world."[208]

16.     Morris admitted that when the *Aris T* passed his location on the river side of Berth 1, it was going upriver, under tug assistance, was not angled toward Berth 1, and was not moving toward him or his location but was instead well out in the river.[209]

17.     No other workers around Morris at Berth 1 attempted to flee.[210]

18.     No one witnessed Morris fall on the evening of January 31, 2016.[211]

19.     Morris did not see the *Aris T* collide with the Berth 2 dolphin.[212]

20.     Morris did not witness an injury to any other individual on the evening of January 31, 2016.[213]

---

[205] Testimony of Leone; Exhibit 413.
[206] *Id.*
[207] Testimony of Morris.
[208] *Id.*
[209] *Id.*
[210] *Id.*
[211] *Id.*
[212] *Id.*
[213] *Id.*

21.    After getting up from his fall, Morris did not attempt to leave Berth 1.  Instead, he testified that he walked to the edge of the berth, sat down across from the oil barge crew, and waited until the *Aris T* had passed.[214]

22.    Morris remained at work until his shift ended at 4:00 a.m. on the morning of February 1, 2016.   At that time, he walked across the gangway to shore, got in his car, and left the facility.   Morris did not report an accident or injury to his employer or any other party during or after his shift on January 31/February 1, 2016, or at any time before he left the Shell/Motiva Facility.[215]

23.    Morris testified that he did not suffer a loss of consciousness, nausea, vomiting or light sensitivity after his fall.[216]

24.    Morris visited Dr. Cullen Ocmund, a family practitioner, on February 2, 2016.  He reported sleep issues and neck pain, following an event he described as "ship hit barges while loading it," an inaccurate description of what transpired.  He did not report a fall on the job consistent with his trial testimony. He also did not give a history of hitting his head, having back pain, or experiencing concussion symptoms.  In fact, he specifically denied such symptoms.  He was diagnosed with neck pain and given a muscle relaxer and a sleep medication.[217]

25.    Morris returned to Dr. Ocmund on February 12, 2016.  Again, he made no report of having fallen at work, striking his head, or suffering a concussion.  Instead, he merely reported a problem with the sleep medication Dr. Ocmund had given him on the prior visit.[218]

26.    At the suggestion of his attorney, Morris saw Dr. Peter Liechty on February 16, 2016.  At that time, he gave a history that the dock on which he was standing was struck by a ship

---

[214] *Id.*; Exhibit 526.
[215] Testimony of Morris.
[216] *Id.*
[217] *Id.*; Exhibit 368.
[218] Exhibit 368.

with a large jarring force that knocked him down – a version of events different from what he told Dr. Ocmund and how he testified at trial. Based on this history, Dr. Liechty related his complaints of neck and back pain to the events of January 31, 2016. Notably, Morris again did not report a head injury or concussion symptoms to Dr. Liechty, a neurosurgeon.[219]

27.    On March 9, 2016, Morris saw Dr. David Axelrad of Houston, Texas, a psychiatrist and psychotherapist. Morris gave a more dramatic history of events to Dr. Axelrad, stating he was loading a barge with diesel when he heard a loud boom. Morris contradicted this statement at trial, claiming he never said he heard a boom.[220]

28.    Dr. Axelrad initially concluded that Morris was experiencing post-traumatic stress disorder ("PTSD") and depression and prescribed three anti-depressant drugs. However, Dr. Axelrad did not provide psychotherapy to Morris and did not assist Morris in obtaining such treatment nearer his home in Louisiana, though the doctor had concluded that it would be beneficial and had discussed this treatment option with Morris. Morris never attempted on his own to obtain psychotherapy. Dr. Axelrad admitted that psychotherapy for PTSD is most effective the sooner it is rendered after the event; yet neither he nor Morris made the effort to arrange for it.[221]

29.    Dr. Axelrad has seen Morris every several months since the first visit, mainly to refill his antidepressant medication prescriptions. In 2018, he saw Morris a total of three times. In 2019, he had one telephone conversation with him in March.[222]

30.    Dr. Axelrad testified that he believed Morris experienced a traumatic brain injury and that this in some way affected his ability to function. However, he could not explain the

---

[219] Testimony of Liechty.
[220] Testimony of Morris & Axelrad; Exhibits 352 & 373.
[221] Testimony of Morris & Axelrad.
[222] Testimony of Axelrad.

mechanics of this alleged injury or why Morris never reported any concussion symptoms, or striking his head, to his previous treating previous (Drs. Ocmund and Liechty) and never experienced any memory deficits surrounding the accident. Dr. Axelrad could not point to any permanent lingering effects of the alleged traumatic brain injury. Dr. Axelrad also could not point to any place in his report where Morris told him he had a concussion or concussion symptoms as a result of the January 31, 2016 fall.[223]

31. Dr. Axelrad testified that Morris told Dr. Sean Graham about striking his head. Graham was a pain management doctor Morris saw for the first time on May 3, 2016, as a referral from Dr. Liechty to receive epidural steroid injections into his back. In fact, Morris related yet another version of events to Dr. Graham, stating that "he fell and hit his head and lower back when a ship collided with the dock he was working on." Dr. Graham's examination notes of neurologic evaluation state that Morris was "alert and oriented x 3 with no impairment of recent or remote memory, able to name objects and repeat phrases. Appropriate fund of knowledge and normal coordination." Under the heading "Neuropsychiatric," Graham recorded that Morris's mental status was essentially "normal."[224]

32. Morris was independently evaluated by Dr. Harold Ginzburg, a board-certified psychiatrist retained by defendants. Dr. Ginzburg, a specialist in PTSD and traumatic brain injury from his years treating members of the armed forces, testified that Morris never suffered from traumatic brain injury and did not suffer from or have any permanent effects from PTSD. Dr. Ginzburg administered the Mississippi Civilian PTSD scale and found that it showed that Morris's complaints did not rise to the level of PTSD. He reviewed the diagnostic criteria for PTSD and noted that it required exposure to actual or threatened death, serious injury, or sexual

---

[223] *Id.*
[224] Exhibit 378.

violence in one of several ways (*viz.,* directly experiencing the traumatic event, witnessing in person an event occurring to others, learning that the traumatic event occurred to close family members or friends, or repeated or extreme exposure to aversive details of the traumatic event). He noted that Morris fit none of these criteria, as he was not directly threatened or involved in the allision and did not see anyone injured who was.[225]

33.     Dr. Ginzburg found no evidence of a traumatic brain injury.  Specifically, he noted that there was no evidence of retrograde amnesia (*i.e.,* loss of pre-event memory), because Morris testified in detail as to the entire sequence of events prior to his fall.  Likewise, he displayed a clear memory of events after the fall, including where he went afterwards and seeing the *Aris T* pass by in the river. Dr. Ginzburg also observed that Morris's records reflected no bruises, cuts, or abrasions on his head, no period of unconsciousness, and no other concussion symptoms that would objectively support a head or brain injury.[226]

34.     Dr. Ginzburg also noted that Morris had spent the past three years taking gabapentin, trazodone, and wellbutrin and has not fully recovered from his alleged symptoms of depression and anxiety.  He noted that this, and the failure to provide or obtain psychotherapy, made recovery more difficult.  He also noted that none of the three medications was replaced with an alternative medicine that might have provided a better clinical presentation, and that no effort was made to alter, reduce, or stop any of the medication to see if it would improve Morris. Dr. Ginzburg also observed that the emotional symptoms described by Morris's girlfriend could have been the result of a variety of other mundane causes, including the medication Morris was taking.[227]

---

[225] Testimony of Ginzburg.
[226] *Id.*.
[227] *Id.*

35.    Finally, Dr. Ginzburg testified that Morris fit the diagnostic criteria for malingering. He presented in a context where he could get financial gain by providing inaccurate descriptions of his illness and the causation of his alleged fall. Dr. Ginzburg noted that Morris gave multiple different versions of events to different treating physicians, which raised the question of secondary gain.[228]

36.    The Court finds Dr. Ginzburg to be a credible witness and accepts his explanations as to Morris's condition.

37.    Morris received physical therapy for his neck and back complaints, as well as a series of epidural steroid injections. Dr. Liechty testified that he recovered fully and had no prospective disability from these body parts; in fact, he stated that the findings in those areas were "absolutely insignificant."[229]

38.    After a year of treatment, Dr. Liechty revised his diagnosis as reflected in his March 30, 2017 examination notes, concluding that Morris was suffering from sacroilitis, an inflammation of the area between the sacrum and iliac bones. He testified that this was confirmed by a diagnostic block injection in May 2017. Although this diagnosis was made two years before trial, at the time of trial, Morris still had not chosen to undergo surgery. Dr. Liechty testified that his surgeries for sacroilitis have a 100% success rate and Morris would be able to return to work pain free at a medium duty level afterward. While Morris testified that he had not undergone the surgery because he did not have the funds for a surgery, he was contradicted by Dr. Liechty, who stated that Morris was "fearful of surgeries."[230]

---

[228] *Id.*
[229] Testimony of Liechty.
[230] *Id.*

## CONCLUSIONS OF LAW

1.    Maritime negligence law, as explained above, applies to Morris's personal injury claim.  Thus, to prevail, Morris must prove that the vessel interests breached a duty that they owed to him and that such breach was the cause of Morris's injury.  *Franza*, 772 F.3d at 1253; *In re Great Lakes Dredge*, 624 F.3d at 211.

2.    In *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992), the Fifth Circuit explained "legal cause" as applied in maritime cases:

> Under the general maritime law, a party's negligence is actionable only if it is a 'legal cause' of the plaintiff's injuries.  *See Chavez v. Noble Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978).  "[L]egal cause is something more than 'but for' causation, and the negligence must be a 'substantial factor' in the injury."  *Thomas v. Express Boat Co.*, 759 F.2d 444, 448 (5th Cir. 1985) (citations omitted).  The term "substantial factor" means more than "but for the negligence, the harm would not have resulted."  *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 223 (5th Cir. 1975); *see also Chisholm v. Sabine Towing & Transp. Co.*, 679 F.2d 60, 63 (5th Cir. 1982).

3.    The evidence adduced at trial proved that the vessel interests did not breach a duty owed to Morris because the vessels' negligence was not a substantial factor in bringing about Morris's alleged physical and mental injuries and his injuries were not a foreseeable result of the accident.  Thus, the vessels' negligence was not the legal or proximate cause of Morris's alleged injuries.

4.    Morris's testimony established that neither he nor the dock on which he was standing was physically impacted by any of the vessels.  He did not feel any vibrations from, nor did he hear the impact of, the allision.  Morris saw the *Aris T* when it was at least 1,000 feet and five minutes away from his location.  Instead of calmly walking to shore, which he had ample time to do, Morris panicked and tripped over his own feet, after which he returned to the edge of the dock and sat down to watch the *Aris T*, which by then was being assisted by tugs, pass by out in the middle of the river, moving away from the Shell/Motiva docks.  The cause-in-fact and

proximate cause of Morris's injuries was his own carelessness or inattention, and any emotional injury or PTSD he suffers was caused by his own decisions not to move to shore, report his injury, and seek aid. There is nothing in the record to establish that Morris's alleged injury was a foreseeable result of the vessel interests' negligence or that such negligence was the legal or proximate cause of Morris's alleged injury. The vessel captains could not have anticipated that their navigational mistakes would have caused Morris, who did not hear or see the allision, to panic and injure himself on a dock that was not hit, and was never in danger of being hit, by the *Aris T*. This conclusion is supported by the facts that workers on the barge adjacent to the dock on which Morris was injured did not have the same reaction and that Morris sat and watched the *Aris T* pass.

5.      Morris gave divergent, exaggerated, and sometimes false accounts of the incident to his medical professionals. As a result, the Court finds that Morris's testimony about the incident is not credible, and it must be discounted in material respects.

6.      Further, Morris cannot recover for his alleged emotional injury under the "zone of danger" theory. Although the Fifth Circuit has "declined to adopt or preclude the zone of danger theory" of recovery for emotional distress, *Gough v. Natural Gas Pipeline Co.*, 996 F.2d 763, 766-67 (5th Cir. 1993), district courts within this circuit have held that a party may recover for purely emotional harm under such a theory "if the claimant was objectively within the zone of danger; claimant feared for his life at the time of the accident or person was in danger; and his emotional injuries were a reasonably foreseeable consequence of the defendant's alleged negligence." *Owens v. Global Santa Fe Drilling Co.*, 2005 WL 840502, at * 3 (E.D. La. Apr. 8, 2005) (citing *Anselmi v. Penrod Drilling Corp.*, 813 F. Supp. 438, 442 (E.D. La. 1993); *Williams v. Treasure Chest Casino, L.L.C.*, 1998 WL 42586 (E.D. La. Feb. 4, 1998)).

7.     Morris was not in the zone of danger. The *Aris T* did not strike, and never was in danger of striking, the dock on which Morris was working. The allision occurred over 1,000 feet from where Morris was located and, by the time the *Aris T* passed Morris, it was traveling at a slow rate of speed, it was in the middle of the river under the assistance of tugs, and it was moving away from the Shell/Motiva docks. Morris had ample time to leave the dock calmly before the *Aris T* passed. Morris was never in immediate danger. *See Plaisance v. Texaco, Inc.*, 966 F.2d 166 (5th Cir. 1992) (seaman's claimed emotional injury was not a reasonably foreseeable consequence of defendant's negligence when seaman was not objectively threatened by fire resulting from gas explosion of tug's pipeline).

8.     Nor can Morris claim emotional damages under the physical injury or impact rule because (1) he sustained no physical injuries as a result of the vessel's negligence; and (2) even if he had, his claimed emotional injuries do not result from his alleged physical injuries. *See Ainsworth v. Penrod Drilling Corp.*, 972 F.2d 546 (5th Cir. 1992).

9.     For these reasons, the Court finds that Morris has failed to prove his maritime negligence claims against the vessel interests.

## CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS ORDERED** that Cenac and Genesis are not entitled to limit their liability, but the *Aris T* interests are entitled to do so, with the post-casualty value of the *Aris T* and pending freight being $8,645,171.42.

**IT IS FURTHER ORDERED** that judgment be entered in favor of VRNO, Shell/Motiva, SCF Waxler, and Kirby, and against the *Aris T* interests, Cenac, and Genesis in the following respective amounts, and jointly and severally except to the extent the *Aris T* interests are entitled to limitation:

(1)   In favor of VRNO and against the *Aris T* in the amount of $2,000,000;

(2)   In favor of VRNO and against Cenac in the amount of $9,000,000;

(3)   In favor of VRNO and against Genesis in the amount of $9,000,000;

(4)   In favor of Shell/Motiva and against the *Aris T* in the amount of $2,200,000;

(5)   In favor of Shell/Motiva and against Cenac in the amount of $9,900,000;

(6)   In favor of Shell/Motiva and against Genesis in the amount of $9,900,000;

(7)   In favor of SCF Waxler and against the *Aris T* in the amount of $26,000;

(8)   In favor of SCF Waxler and against Cenac in the amount of $117,000;

(9)   In favor of SCF Waxler and against Genesis in the amount of $117,000:

(10)  In favor of Kirby and against the *Aris T* in the amount of $3,300;

(11)  In favor of Kirby and against Cenac in the amount of $14,850; and

(12)  In favor of Kirby and against Genesis in the amount of $14,850.

**IT IS FURTHER ORDERED** that judgment be entered in favor of the *Aris T* interests, Cenac, and Genesis and against Morris, dismissing his claims with prejudice.

New Orleans, Louisiana, this 19th day of November, 2019.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE