UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SCF WAXLER MARINE, LLC | * | 16-CV-0902 and Consolidated Cases |
| versus | * | Section M |
| M/V *ARIS T* | * | April 29, 2019 |

* * * * * * * * * * * * * * * *

VOLUME I
BENCH TRIAL BEFORE
THE HONORABLE BARRY W. ASHE
UNITED STATES DISTRICT JUDGE

Appearances:

| | |
|---|---|
| For Valero Refining - New Orleans, LLC: | Blank Rome, LLP<br>BY: KEITH B. LETOURNEAU, ESQ.<br>DOUGLAS J. SHOEMAKER, ESQ.<br>717 Texas Avenue, Suite 1400<br>Houston, Texas 77002 |
| For Valero Refining - New Orleans, LLC: | Wagner Bagot & Rayer, LLP<br>BY: G. BEAUREGARD GELPI, ESQ.<br>601 Poydras Street, Suite 1660<br>New Orleans, Louisiana 70130 |
| For Motiva Enterprises, LLC, and Shell Chemical, LP: | Liskow & Lewis, APLC<br>BY: THOMAS P. DIAZ, ESQ.<br>BRETT D. WISE, ESQ.<br>701 Poydras Street, Suite 5000<br>New Orleans, Louisiana 70130 |

Appearances:

| | |
|---|---|
| For Marmaras Navigation Ltd.: | Chaffe McCall, LLP<br>BY: DANIEL A. TADROS, ESQ.<br>ALAN R. DAVIS, ESQ.<br>IFIGENEIA XANTHOPOULOU, ESQ.<br>1100 Poydras Street, Suite 2300<br>New Orleans, Louisiana 70163 |
| For Cenac Marine Services, LLC: | Waits Emmett & Popp, LLP<br>BY: RANDOLPH J. WAITS, ESQ.<br>JOHN F. EMMETT, ESQ.<br>1515 Poydras Street, Suite 1950<br>New Orleans, Louisiana 70112 |
| For Cenac Marine, LLC's Excess Underwriters: | Frilot, LLC<br>BY: PATRICK J. MCSHANE, ESQ.<br>T. PATRICK O'LEARY, ESQ.<br>1100 Poydras Street, Suite 3700<br>New Orleans, Louisiana 70163 |
| For Genesis Marine, LLC, and Genesis Marine, LLC of Delaware: | Phelps Dunbar, LLP<br>BY: E. MARTIN MCLEOD, ESQ.<br>WILLIAM J. RIVIERE, ESQ.<br>JUSTIN C. WARNER, ESQ.<br>365 Canal Street, Suite 2000<br>New Orleans, Louisiana 70130 |
| Official Court Reporter: | Toni Doyle Tusa, CCR, FCRR<br>500 Poydras Street, Room B-275<br>New Orleans, Louisiana 70130<br>(504) 589-7778 |

Proceedings recorded by mechanical stenography using computer-aided transcription software.

# INDEX


| | Page |
|---|---|
| Steven Cunningham | |
| Direct Examination By Mr. Letourneau | 22 |
| Cross-Examination By Mr. Emmett | 38 |
| Cross-Examination By Mr. Riviere | 46 |
| Cross-Examination By Mr. Diaz | 53 |
| Michael Leone | |
| Direct Examination By Mr. Tadros | 58 |
| Cross-Examination By Mr. Diaz | 159 |
| Cross-Examination By Mr. McShane | 203 |

**MORNING SESSION**

**(April 29, 2019)**

**THE COURT:** Good morning. Be seated.

Let's call the case.

**THE DEPUTY CLERK:** Civil Action 16-902 and consolidated cases, *SCF Waxler Marine, LLC v. M/V Aris T*.

**THE COURT:** Before we get started, I wanted to ask if there are any preliminaries we need to discuss before we go ahead and call the first witness.

**MR. LETOURNEAU:** Your Honor, Keith Letourneau for VRNO. There are a few things that we'd like to address with you. You have on the right side of the court five boxes of 29 binders of exhibits. The vast majority of those are unobjected to. I would request that we basically move those unobjected-to exhibits into evidence.

**THE COURT:** Are they the same exhibits that were delivered to chambers that I have that are marked unobjected to?

**MR. LETOURNEAU:** That's correct, Your Honor.

**THE COURT:** I had three boxes of unobjected-to documents. That's why I'm pausing here to ask this question. Is there a difference between five boxes here and three boxes that I received? Is it the same binders in three boxes that are now in five?

**MR. LETOURNEAU:** Your Honor, our understanding was

09:02

that you were to receive a complete set of the exhibits, both objected to and unobjected. The court reporter was to receive the same set. Why they are in three boxes, I --

**MR. GELPI:** If I may. Judge, Beau Gelpi for VRNO. The five boxes are the joint exhibits. In addition, there are three boxes of objected-to exhibits, which we have a copy over there. We haven't moved them over to the section to be admitted first.

**THE COURT:** Yes. Okay. I stand corrected. That's my error. I'm misreading the labels on the boxes. I do have three objected-to labeled boxes of exhibits, and then I have six boxes that are unobjected to, which is also different than five but less of a difference. So maybe the same binders that are put into five boxes are in my six.

**MR. RIVIERE:** We understood, Your Honor, that there were a total of 29 binders.

**THE COURT:** I haven't taken the binders out all at the same time to check that. So let's just proceed.

Just for purposes of the record, rather than moving into evidence five boxes of unobjected-to documents, let's make sure we do it by exhibit number, which may be what you were about to say before I interrupted anyway.

**MR. LETOURNEAU:** Your Honor, I could certainly do that. In fact, what we have and will be distributed to all opposing counsel is a binder of VRNO's exhibits that we intend

09:04

to rely upon in our case in chief. If I may read into the record those exhibits so we can identify them for the record and get them admitted into evidence.

**THE COURT:** When you say "read into the record," you're not going to read 959 --

**MR. LETOURNEAU:** No, no, just the numbers.

**THE COURT:** Yes, let's do that. If there's any objection along the way, I want other counsel to note it right then because I don't want to get to the end and have to go back.

Are we all on the same page?

**MR. LETOURNEAU:** Yes, Your Honor. I will identify the documents that I understand are objected to as we go along.

We are offering Exhibits 1, 2, 4, 5, 6 --

**THE COURT:** You might need to go slower. Sorry.

**MR. LETOURNEAU:** Certainly, Your Honor. We are offering Exhibits 1, 2, 4, 5, 6, 7, 9, 174-A, 175, 176-A, 209, 237, 239, 474, 294.

Then from Exhibit 383, which contains its own set of exhibits: 1, 4, 6, 11.

From Exhibit 395, which also contains its own exhibits: 6, 7, 8, 9, 10.

From Exhibit 396, Exhibit 8. From 396 also Exhibit 9. Exhibit 9 is an objected-to document. It's a letter from Russell K. Hooper of Western Towing to Darryl

09:06

Christiansen, outlining discipline.

**THE COURT:** Wait. Why are we referring to an objected-to document at this point?

**MR. LETOURNEAU:** We were going to offer it, Your Honor. If anybody wants to object to it at this point in time -- you said to present those.

**MR. MCLEOD:** Judge, Marty McLeod on behalf of Genesis. What I would propose that we do is right now we formally offer into evidence all of the unobjected-to exhibits, and then at the time that the objected exhibit is offered, then we could raise our objection as necessary, and the Court could rule at that time.

**THE COURT:** That's what the Court had anticipated doing. Let's do that. Let's not do any objected-to exhibits at this point, just the unobjected exhibits.

**MR. TADROS:** I'm sorry, Your Honor. I understood -- and maybe the others can correct me -- that we had prepared a full list of all the exhibits that would be used on the liability side; in other words, today's trial. Can we just say 1 through 400 or whatever --

**MR. EMMETT:** 412.

**MR. TADROS:** Then if we just each go individually with each exhibit, we'll be here for hours, Your Honor.

**THE COURT:** What I prefer is that at the beginning of the trial, essentially all counsel are standing up and saying,

09:08

"We have no problem with Exhibits 1 through 412. We are jointly moving them all into admission."

**MR. TADROS:** So moved.

**MR. RIVIERE:** Your Honor, we move to admit those, 1 through 412.

**THE COURT:** They are admitted.

**MR. LETOURNEAU:** Your Honor, 413 is an objected-to exhibit, at least it was identified as such. That is the computer simulation of our first witness.

I have spoken with all of my colleagues, and I believe that that is now no longer an objected-to exhibit. So we would move to admit Exhibit 413.

**THE COURT:** Is there any objection?

413 is admitted.

**MR. LETOURNEAU:** Also, Your Honor, there are a variety of résumés from experts whose CVs have been identified as objected-to documents, but I also believe those likely are now not objected to. Those would be Exhibits 469-H, K, B, and G, at least for us. I don't know if anybody else wants those CVs in. We would move to admit those exhibits.

**THE COURT:** Any objection?

**MR. EMMETT:** No objection.

**MR. DIAZ:** No objection.

**MR. MCLEOD:** No objection.

**THE COURT:** No objection.

09:09

**MR. TADROS:** No objection, Your Honor.

**THE COURT:** They are admitted.

**MR. LETOURNEAU:** Your Honor, the next item that we would like to discuss with you is that we had reached a settlement agreement between VRNO and *Aris T*, and so we believe that there has been a change in the alignment of certain witnesses in terms of examination. We have sent an email off to opposing counsel concerning those witnesses. I can identify those for you now if you like.

**THE COURT:** Are they a part of the revised anticipated order of witnesses?

**MR. LETOURNEAU:** They are included in there, but we did not delineate the alignment with respect to VRNO and *Aris T* with respect to these witnesses.

**THE COURT:** Okay. Well, I would appreciate the delineation of the alignment. Is there an objection?

**MR. MCLEOD:** No, Your Honor. Again, Marty McLeod on behalf of Genesis. We had moved to compel information regarding the terms of that settlement, and Magistrate van Meerveld granted our motion in part to require them to produce the terms.

On Friday they sent what they titled a "Joint Response to Magistrate's Order" that was not filed in the record. It's a three-page document. We would propose that be admitted into evidence as Exhibit 414 because it's the terms of

09:11

their settlement. It reflects the realignment they have just indicated on the record.

**MR. TADROS:** Your Honor, it's a judge-tried case. I don't think it's appropriate to admit into evidence any terms of a settlement. We can tell you which witnesses we are going to be aligned on, but that's about it.

**THE COURT:** Is it anticipated that this document will be made a part of the record?

**MR. LETOURNEAU:** Your Honor, we can certainly make it part of the record, although we don't really believe it needs to be filed in the Court's electronic database.

**THE COURT:** You do or do not?

**MR. LETOURNEAU:** Do not.

**THE COURT:** Even though it's a response to Judge van Meerveld's order?

**MR. LETOURNEAU:** Yes, Your Honor. She had directed that the response be sent by email, not to be filed.

**MR. MCLEOD:** Your Honor, I think you can maybe talk to Magistrate van Meerveld about that. The document that was sent to us does not disclose the settlement amount; it only talks about the terms. We are not offering that as evidence of liability or compromise, only evidence to show any issues that the Court may or may not deem relevant as to witness bias. That's the reason we think it's relevant.

**THE COURT:** I'm sorry. You were up.

09:12

**MR. EMMETT:** John Emmett. Before we move on from this alignment issue, there is an issue about cumulative expert testimony.

**THE COURT:** Before we move to that issue, let me go ahead and complete dealing with this issue with respect to the settlement, if you don't mind.

I'm not going to admit this exhibit at this point in time. I will take it under advisement, consider it. I think that the same information is made available to the Court by what's about to be disclosed to me with respect to the alignment; maybe not the terms of the settlement, but maybe I shouldn't be aware of the terms of the settlement in conjunction with the trial. I'll take that under advisement.

**MR. MCLEOD:** That's fine. Thank you, Your Honor.

**THE COURT:** Thank you. Yes.

**MR. EMMETT:** On the alignment issue, there are a number of expert witnesses originally retained by Valero that were going to talk about the navigation of the ship. I understand those witnesses are going to be called but not for that purpose but for other purposes.

My concern is if I cross-examine the witness on the navigation of the ship, am I going to be prevented from asking my own navigational expert questions about ship navigation? For example, the first witness will be Mr. Cunningham. Mr. Cunningham was originally both a computer

09:13

graphics and a navigation expert. He is only going to be offered as a computer graphics expert or something similar this morning. I'm sure that I and also Genesis would like to cross-examine him on his navigation opinions, but I don't want to be stopped from calling my own navigation expert.

**MR. TADROS:** That would be my position, Your Honor.

Mr. McLeod thankfully filed a motion to preclude cumulative presentations. If they each have navigation experts, we will hear from their experts. There's no point in hearing from Mr. Cunningham other than the simulation he is going to explain to the Court.

**THE COURT:** Just thinking out loud, thinking through the issue that you're presenting, if -- what's the name of the first witness?

**MR. LETOURNEAU:** Cunningham.

**THE COURT:** If Mr. Cunningham gets up and he doesn't address any navigational issues anyway, wouldn't a cross-examination that would delve into the areas of navigation be beyond the scope of direct?

**MR. TADROS:** It would be, Your Honor.

**MR. LETOURNEAU:** Yes, Your Honor.

**THE COURT:** Yes, sir.

**MR. MCLEOD:** Your Honor, I would disagree with that. Our position is he tendered an expert report on behalf of Valero. Now that expert, they don't want to present those

09:15

opinions, but it's in his expert report. I think under the rules -- he has been tendered as an expert in both re-creation and navigation. It's not as if we are calling our own expert in ship navigation twice; we are calling an adverse witness. So it goes to impeach Valero's case that the *Aris T* is now somehow not at fault. I think it is relevant.

I don't think it's cumulative because it's not as if Cenac or Genesis are presenting a ship navigation expert twice. We are cross-examining their witness who they retained for that purpose. So I don't think that would be beyond the scope of direct. That's who he has been tendered as, and it's impeachment.

**THE COURT:** He has been tendered that way for purposes of discovery and for purposes of providing expert reports, but he has not been tendered for that purpose for purposes of trial.

If what they are deciding today as a matter of trial strategy is not to have this expert address navigational matters, is there some authority you're relying upon to suggest that you should be able to delve into matters addressed in an expert report that aren't presented as a part of the affirmative case at trial through that expert?

**MR. MCLEOD:** In terms of case law, no, but I do think it is important to note that Valero's position has changed. If I wanted to call Valero's expert witness that they tendered as

09:16

an expert in my own case in chief, I can do that; and it's Valero's witness, it's Valero's expert. So if I do that in my own case in chief, I feel like I'm entitled to. My point is if they are only going to ask him about the re-creation now, why not go ahead and get it all out now versus me having to call him back as Valero's expert witness?

**THE COURT:** Because they don't want you to do that now. Isn't that --

**MR. MCLEOD:** That's quite clear.

**THE COURT:** So if you can accomplish, by calling Mr. Cunningham back as a witness in your trial, the same thing that you seek to accomplish right now, then why don't we leave it at that and allow for presentation of the case in the way that each of the parties wants to present their case. I think we will handle it that way.

But having said that and to address the original question, I'm not then going to say that you can't call your own navigational expert because it's cumulative.

**MR. MCLEOD:** Okay.

**THE COURT:** I do see there's a distinction between calling an adverse witness on a navigational issue with respect to a point that was previously set forth as an opinion in that expert's report and then presenting your own navigational expert.

I know you're going to say it's cumulative.

09:18

**MR. TADROS:** I am, Your Honor, but more importantly, neither of these parties listed him as a witness in their case in chief. My position is going to be exactly as Your Honor said. If their decision is to only present him on the simulation, then they are limited to cross-examination on those issues and that's it. Because, Your Honor, then they are double-teaming me after they themselves made a big deal about avoiding cumulation.

**THE COURT:** I haven't gone back and looked at the pretrial order, but I assume there's the ordinary entry at the end of the list that says "and we can call anybody else's witness." Right?

**MR. TADROS:** There is, Your Honor.

**THE COURT:** In that sense they have Mr. Cunningham in their list on their case. Perhaps it's a catch-all, but they have. I think you can handle it through cross-examination at the point.

Your cross examination -- I know different courts handle it differently. If they call Mr. Cunningham as an expert witness, I'm going to allow them to do it by leading questions and strict cross-examination type of rules. I'm not going to limit you to direct, though.

**MR. TADROS:** Thank you, Your Honor.

**THE COURT:** I have seen courts do it that way. I think that unnecessarily restricts people who have their roles

09:19

reversed. Know that going in.

**MR. TADROS:** Thank you, Your Honor.

**MR. MCLEOD:** Thank you, Your Honor. Fair enough.

**THE COURT:** Thank you.

**MR. LETOURNEAU:** Your Honor, I would identify the following witnesses as those that we believe *Aris T* and VRNO are aligned with:

Captain Manolis Kyriakou, and that last name is spelled K-Y-R-I-A-K-O-U. Captain A.J. Gibbs. Captain Maurice Ryan. Rania Ferentinou. George Burkley. Captain Gregory Smith. Shane Bird. Mandy Michael. Eric Degeter.

**THE DEPUTY CLERK:** Spelling, please.

**MR. LETOURNEAU:** D-E-G-E-T-E-R.

Brian Teste, T-E-S-T-E. Thomas Gaise, G-A-I-S-E. Tonja Koob, K-O-O-B.

Also, Your Honor, Captain Michael Leone, the *Aris T's* pilot. *Aris T* and VRNO's position is that we are not aligned with respect to him, but we did receive objections from Genesis and Cenac Marine's counsel about dual examinations of him. We have decided amongst ourselves that Mr. Tadros would do the direct examination and we will not examine Captain Leone.

Lastly, Your Honor, I believe we need to sequester all the fact witnesses.

**MR. MCLEOD:** Your Honor, Marty McLeod again on behalf

09:22 of Genesis. I would like to state our position for the record that we believe that Valero and *Aris T* interests are completely aligned on all fact witnesses and all expert witnesses. We don't think there's any real reason to delineate between anything. They are completely aligned. That's our position.

**THE COURT:** I understand the position. So long as they are recognized as distinct parties in the case, I think that we handle them distinctly.

**MR. TADROS:** Fair enough.

**MR. MCLEOD:** Thank you, Judge.

**THE COURT:** In terms of now sequestration, how many people in the courtroom do we need to ask to be excused to the hallway? I'm going to have to rely on you to identify those for me --

**MR. LETOURNEAU:** Just one.

**THE COURT:** -- because I'm not going to be able to identify them.

**MR. TADROS:** At this point only one, Your Honor, Pilot Michael Leone.

**THE COURT:** Mr. Leone, you need to go into the hallway and wait until you are called as a witness.

So the rest of the gentlemen -- I don't think I see any ladies -- in the gallery are either expert witnesses or observers or part of the counsel team?

**MR. LETOURNEAU:** That's correct.

09:23

**MR. TADROS:** That's correct.

**MR. LETOURNEAU:** Actually, Your Honor, there is one more thing to talk about, and that is the composite deposition cuts between the parties. We had requested a brief extension to file those. You granted that through 5:00 this afternoon. We are in the process of doing that.

One of the parties had requested that we delete Captain Sanamo and Captain Christiansen's deposition cuts because both of those witnesses will be appearing live. We have no objection to that, but we haven't conferred with everybody to make sure everybody is in concert with that.

**THE COURT:** It makes sense to the Court to cut them if they are going to appear as witnesses live here at trial. Rather than going through needless work on behalf of your own teams, the Court is not going to consider it if they are witnesses here live at trial.

Any objection to cutting them?

**MR. LETOURNEAU:** Lastly, Your Honor, there were a number of additions to those composite deposition cuts that were provided to us over the weekend by *Aris T's* counsel, which have been incorporated into the composite cuts. We did receive objections from Genesis Marine's counsel. They were reviewing them, and they have not gotten back to us as to whether or not they have any objection to those cuts. We would like to go ahead and finalize that and instruct our vendor to go ahead and

09:25

print those composite cuts for you.

**THE COURT:** Understood.

**MR. MCLEOD:** Your Honor, Marty McLeod on behalf of Genesis. We believe we just need 24 hours because they were kind of constantly changing. So 5:00 p.m. tomorrow we would be able to respond completely. We just need a last chance to review any new excerpts.

**MR. TADROS:** No objection to that, Your Honor.

**MR. LETOURNEAU:** No objection. We just need a little bit of time to make sure our vendor can produce whatever changes Genesis is insisting upon.

**THE COURT:** When you say 24 hours, Mr. McLeod, until 5:00 tomorrow? Is that what you are suggesting?

**MR. MCLEOD:** Yes, Your Honor.

**THE COURT:** They are going to need time, then, to make sure they can get incorporated, right? So we are talking about another 24 hours or --

**MR. SHOEMAKER:** We can probably do it quicker than that, but that would be helpful.

**THE COURT:** By 5:00 Wednesday we will have the deposition composites completely finalized. Okay.

Anything else?

**MR. LETOURNEAU:** Just one last thing, Your Honor, and that is we prepared for you the binder that I was alluding to earlier with the VRNO documents for your ease of reference.

09:26

May I approach?

**THE COURT:** Yes, please.

**MR. LETOURNEAU:** With that, Your Honor, I believe we are ready for our first witness.

**MR. EMMETT:** Your Honor, John Emmett on behalf of Cenac. A couple of preliminary matters first. I would like to introduce Mr. Andre Broussard, general counsel for Cenac, who is our party representative today.

**THE COURT:** Good morning.

**MR. DIAZ:** Tommy Diaz on behalf of Shell and Motiva. Andrew Miller, with Shell Oil Company, is here with us today at counsel table.

**THE COURT:** Mr. Miller, good morning.

**MR. LETOURNEAU:** Your Honor, Nathan Mechler is our representative from Valero, in-house counsel from San Antonio.

**THE COURT:** Good morning, Mr. Mechler.

**MR. MCLEOD:** Good morning, Your Honor. I have Rick Alexander from Genesis. He is our corporate representative as well.

**THE COURT:** Good morning, Mr. Alexander.

**MR. ALEXANDER:** Good morning.

**MR. EMMETT:** Not to belabor a point, I want to be clear, Your Honor. With respect to Mr. Cunningham, can we put on our direct examination of that witness when Valero concludes with him so he doesn't have to come back from Houston either

09:27

later in the week or next week?

**THE COURT:** Well, now we are trying to have the cake and eat it too.

**MR. EMMETT:** We will do it any way you want. I just want to know how the Court would like us to proceed.

**THE COURT:** I guess I'm going to put on the white hat at this point. I would be willing to do that, but if there's objection from any of the parties, I'm not going to require them to deviate from the strategy that they have for the presentation of their case.

**MR. LETOURNEAU:** We do object, Your Honor.

**MR. TADROS:** Same here, Your Honor.

**THE COURT:** Good thing the flights work pretty easily between here and Houston.

Other preliminary matters?

You may call your first witness.

**MR. LETOURNEAU:** Thank you, Your Honor. VRNO calls Steve Cunningham to the stand.

Your Honor, we also have a trial director, Danny Thankachan. He is working on behalf of Dock Interests, Cenac Marine, and *Aris T*.

**MR. RIVIERE:** Judge, we have Scott Newnam on behalf of Genesis Marine.

**THE COURT:** Good morning, Mr. Newnam.

**MR. NEWNAM:** Good morning.

09:29

**STEVEN CUNNINGHAM,**

having been duly sworn, testified as follows:

**THE DEPUTY CLERK:** State your full name and correct spelling for the record, please.

**THE WITNESS:** Steven John Cunningham, S-T-E-V-E-N, John, J-O-H-N, Cunningham, C-U-N-N-I-N-G-H-A-M.

**DIRECT EXAMINATION**

**BY MR. LETOURNEAU:**

**Q.** What is your occupation?

**A.** I am a master mariner , marine consultant, and principal surveyor and regional manager.

**Q.** What do you do as a marine consultant?

**A.** As a marine consultant, I typically work on marine insurance claims, P&I, hull and machinery, and I do expert witness work.

**Q.** Do you also do preparations of accident reconstructions?

**A.** That is correct. One of the areas I specialize in is the analysis of electronic navigation data and the replay or reconstruction of that data.

**Q.** For whom do you work?

**A.** I work for Independent Maritime Consulting.

**Q.** For whom did you work at the time that you prepared your computer reconstruction of the allision sequence in this case?

**A.** At the time, I worked for London Offshore Consultants.

**MR. LETOURNEAU:** Danny, may I ask you to bring up

09:30 Exhibit 469-G, please.

**BY MR. LETOURNEAU:**

**Q.** Mr. Cunningham, do you see that exhibit in front of you?

**A.** Yes.

**Q.** Is that a true and correct copy of your CV except for the employer listed?

**A.** That is correct.

**Q.** What kind of Master of Science degree did you obtain?

**A.** I completed a Master of Science degree in the professional practice of marine accident investigation, during which the final project for that degree was essentially in the available electronic data for accident reconstruction.

**Q.** How many times have you prepared computer reconstructions of marine casualty incidents?

**A.** I don't have the exact number, but it's dozens.

**Q.** Have you testified as an accident reconstruction expert?

**A.** Yes, I have.

**Q.** Approximately how many times?

**A.** I've testified once in federal court. I had another accident reconstruction shown and admitted into evidence on another case in federal court which I did not testify on, and I've given testimony in deposition.

**Q.** How many times in deposition?

**A.** For accident reconstruction, a few times. I don't recall the exact number.

09:32
**Q.** Were you asked by us to prepare a computer reconstruction of the allision sequence in this case?
**A.** Yes, sir.
**Q.** Before I ask you about that process, let's talk about some nomenclature for just a moment, if I might. What is a VDR?
**A.** A VDR is a voyage data recorder, which is essentially a black box system.
**Q.** What is a Blue Box?
**A.** A Blue Box is another form, essentially, of a black box system. Blue Box is one of the brand names which is geared toward providing voyage data recorders for smaller boats.
**Q.** For inland tugs, for instance?
**A.** For instance, yes.
**Q.** What is Rose Point?
**A.** Rose Point is a version of an electronic chart system.
**Q.** What is a PPU?
**A.** PPU is the abbreviation for portable pilot unit, which again is another form of electronic chart system.
**Q.** Do Rose Point and PPU both rely upon GPS?
**A.** Yes.
**Q.** Do they rely upon differential GPS?
**A.** They can, and most of the time that is typical, yes.
**Q.** What is the difference between GPS and differential GPS?
**A.** A GPS system has a lower accuracy. A typical conservative estimate of a GPS satellite position would be 10 meters with a

09:34

confidence level of 95 percent.

Differentially corrected GPS systems obtain local corrections from nearby shore stations, and therefore they typically have an accuracy of 1 to 2 meters 95 percent of the time.

**Q.** The three vessels involved in this particular incident, did they use differential GPS?

**A.** From review of the data, it certainly appears so, based on the high resolution and high density plotting of the data, and the accuracy level is very high.

**Q.** If you would, can you explain how you go about the process of preparing a computer reconstruction of the allision sequence in this case.

**A.** In this case the first step is to extract the raw GPS data from the available sources. For instance, we extract the GPS data from the voyage data recorder or the electronic chart systems of each vessel. With the GPS data comes a time stamp, GPS-derived time stamp. It's also possible to extract heading data. Using GPS heading and time data, we can then plot the tracks of the vessels.

In this instance what I did is reference those positions to generic scale models of each of the vessels. That is a generic model that has been scaled to the correct length and beam to represent those vessels. Then an offset is applied for the stipulated antenna positions.

09:35

**Q.** Let's talk about each of the three vessels. What data did you rely upon to reconstruct the track of the *Aris T*?
**A.** Primarily I relied upon the GPS positions, heading, and time available from the voyage data recorder.
**Q.** What data did you rely upon to reconstruct the track of the *Elizabeth M. Robinson*?
**A.** Primarily that was the GPS positions available from AIS data as well as the vessel's own electronic chart system GPS data.
**Q.** What data did you rely upon to reconstruct the track of the *Loretta G. Cenac*?
**A.** Once again it was AIS data as well as the GPS positions available from the electronic chart software. With the *Loretta G. Cenac*, to obtain the heading data, then we relied upon five sets of radar images that were available from four different vessels.
**Q.** So why did you have to rely upon radar data to obtain heading data for the *Loretta G. Cenac*?
**A.** That vessel did not have a gyrocompass or any heading output available in the data. So unlike the other two vessels, where we were able to obtain position and heading, the heading data from a gyrocompass or any compass was unavailable for that vessel. However, we did have radar images available. And due to the length of the tow, just under 700 feet, the direction or the heading of those barges are clearly visible on those radar

09:37

images and, therefore, that was an alternative means to extract an accurate heading number.

**Q.** So what were the sources of the radar data that you relied upon?

**A.** Radar data was available from the *Elizabeth M. Robinson's* Blue Box system, which were screenshots of the two sets of radar images available from that vessel. Radar images were also available from the *Aris T* voyage data recorder. We also had radar images available from a fourth vessel, the vessel that was moored*, SCF Vision*.

**Q.** How would you evaluate the accuracy of the *Loretta G. Cenac's* tow throughout your accident reconstruction based upon that radar data?

**A.** In summary, excellent. I believe the position data is accurate to 1 to 2 meters, with a high degree of professional certainty. Because of all of the available means we had available, I was able to triangulate the data. We had three sources available for each data used. That data triangulation provides a validation of the data, which was shown to be highly accurate.

**Q.** How about the accuracy of the heading course, the actual degree that the *Loretta G. Cenac* was pointing, if you will, in the river?

**A.** So I took measurements from the three different sources of radars. I estimate that the heading accuracy is within

09:38

1 to 2 degrees.
**Q.** Are the vessel's respective sizes accurate, as depicted in your computer reconstruction?
**A.** Yes.
**Q.** So how did you sync the movements of the three vessels together to ensure the accuracy of their relevant positions in the river?
**A.** Because the primary source of data was GPS positions or differentially corrected GPS positions, the time stamps that come with those positions are GPS-derived to the nearest whole second. Therefore, I considered the data that was used time-synced to within 1 second.
**Q.** I think you said moments ago with differential GPS you believed the position accuracy of the vessels was accurate to within a few meters. Is that correct?
**A.** Correct. I think the position accuracy is less than a meter. If we take into account any data rounding, then overall my conclusion is that the positions used in this reconstruction are accurate to 1 to 2 meters.
**Q.** Was there any difference in the recordings in the *Elizabeth M. Robinson's* Blue Box data versus other electronic recordings?
**A.** The difference is the *Elizabeth Robinson* recording only captured the radar images as well as CCTV. Unlike on board the *Aris T*, there's no audio recording.

09:40

**Q.** Was there a time sync difference between the *Elizabeth M. Robinson's* recordings and other recordings?

**A.** Yes. Whilst all of the data was accurate to within -- or synchronized to within 1 second, there was a 2-minute 35-second offset on the radar image data available from the *Elizabeth M. Robinson*, and that correction was applied.

**Q.** You did account for that difference in your computer reconstruction of the allision sequence?

**A.** Absolutely, correct.

**Q.** What audio was included in your computer reconstruction?

**A.** The audio that is included is extracted from the *Aris T* voyage data recorder.

**Q.** What audio was not included?

**A.** There is one caption within the video, which is a communication which was captured on one of the U.S. Coast Guard VTS channels, that is clearly referenced within the reconstruction to show that is where that communication came from. All of the audio that is heard is taken from the voyage data recorder of the *Aris T*.

**Q.** Just to make sure I understand, the caption you included that identifies a VHF channel recording was not captured on the *Aris T's* VDR, but it was captured by the Coast Guard AIS recording; is that correct?

**A.** Exactly, correct.

**Q.** Did you modulate the audio in any way?

09:41

**A.** With the audio there are four channels available on the *Aris T* VDR system: one on the wheelhouse, the chart room, bridge wings, and VHF audio. So, for example, in most of the audio I have removed the bridge wing audio, which applies a lot of extra background noise and would therefore lower the quality of what would be on the bridge.

**Q.** How would you evaluate the accuracy of the audio included in your computer reconstruction?

**A.** I believe the audio is -- it accurately represents the communications between the vessels on what would have been audible on the bridge of the *Aris T*.

**Q.** But it may have been a different sound or volume with other background noise that personnel aboard the *Aris T* encountered?

**A.** Yes. For instance, some of the audio is recorded directly from the VHF system, which is a hundred percent clear; while on the bridge of a vessel, the location of that radio as well as the personnel would bear a result on how well that audio was heard.

**Q.** The purpose of your modulation was essentially to allow the listener here to hear the audio with greater clarity?

**A.** Exactly.

**Q.** What animation or models of other vessels did you include in your computer reconstruction?

**A.** So whilst the three primary vessels are included, I

09:43

included 3D models of several tug and barge units on the berth at the terminals or near the terminals in question.

**Q.** Was the surrounding area shown in your computer reconstruction based upon satellite imagery?

**A.** In the final presentation, yes, I chose satellite imagery.

**Q.** When was that imagery recorded?

**A.** I believe the actual imagery date was three months after the event.

**Q.** Does that satellite imagery show the actual barges that were tied up at Bayou Fleet on January 31, 2016?

**A.** Not on that day, no.

**Q.** The elapsed time of your computer simulation was approximately 20 minutes from start to finish?

**A.** A little less, yes.

**Q.** Your actual recording is somewhere around 16 minutes and some seconds. Why was there a difference between the elapsed time from when you started until you finished versus what you actually included in your computer reconstruction?

**A.** So within that time frame, from the beginning until the conclusion of the incident, there were a few periods of essentially dead time I chose not to include and shortened the length of the overall video.

**Q.** There were no audio communications that occurred during those 4 minutes?

**A.** None that I considered significant.

09:44

**Q.** Does your computer reconstruction accurately depict the positions of the three vessels at all times throughout the computer reconstruction?

**A.** Yes.

**Q.** Are you confident in the accuracy of your computer reconstruction of the allision sequence to a reasonable degree of professional certainty?

**A.** Yes.

**MR. LETOURNEAU:** Danny, may I ask you to pull up Exhibit 416, please.

Danny, would you start playing it. I want to pause it when we have the opening view of the vessels on the channel.

(Video played.)

**BY MR. LETOURNEAU:**

**Q.** Captain, I would like to have you describe --

**MR. LETOURNEAU:** You can pause it right there, Danny.

**BY MR. LETOURNEAU:**

**Q.** I would like you to describe, if you would, the general configuration of the two downbound tows.

**A.** The first tow that's actually highlighted right now is the *Elizabeth M. Robinson*, and the inland towing vessel is displayed pushing three 300-foot loaded oil barges in a linear or strung-out fashion.

**MR. LETOURNEAU:** Let's go ahead and play it.

09:46

(Video played.)

**MR. LETOURNEAU:** Go ahead and pause it, Danny.

**BY MR. LETOURNEAU:**

**Q.** What does that depiction show for the *Loretta G. Cenac*? What was her configuration?

**A.** So, once again, she is pushing three loaded oil barges. This time the configuration is slightly different, where two of the barges are side by side, or hipped up, and the third barge is on the starboard bow. The overall length is just under 700 feet as opposed to 1,000 feet for the *Elizabeth M. Robinson*.

**MR. LETOURNEAU:** Let's play a few seconds more.

(Video played.)

**MR. LETOURNEAU:** Go ahead and pause it.

**BY MR. LETOURNEAU:**

**Q.** Where is the *Aris T* shown in your depiction there?

**A.** In the beginning of this replay, the *Aris T* is shown just below 26 Mile Point in the bottom right-hand corner, as highlighted on the video right now.

**Q.** I would ask you to use your touch screen, and would you please draw an arrow showing the direction of flow of the river.

**A.** (Complies.)

**Q.** Would you draw a line that outlines the right descending bank.

09:47

**A.** This would be the right descending bank, otherwise known as the west bank.
**Q.** Would you just draw an R next to that.
**A.** (Complies.)
**Q.** Then if you would please draw a line depicting the left descending bank.
**A.** (Complies.)
**Q.** Draw an L next to that, please.
**A.** (Complies.)
**Q.** I'm just going to go ahead and print this. Then we will go ahead and clear this.
Mr. Cunningham, would you identify where the Valero Dock 1 exists on this satellite depiction.
**A.** (Complies.)
**Q.** Put a V next to that.
**A.** (Complies.)
**Q.** Show Motiva's Berth 2 and 4.
**A.** The first one would be No. 4, and this one would be No. 2.
**Q.** Would you draw a circle around Bayou Fleet.
**A.** Yes. This would be the area known as Bayou Fleet.
**Q.** Put a B next to that, please.
**A.** (Complies.)
**Q.** Would you also draw a circle around Magnolia Fleet.
**A.** Magnolia Fleet would be just down here.
**Q.** Draw an M next to that, please.

09:49

**A.** (Complies.)

**Q.** We will go ahead and print this. We will clear the screen.

**THE COURT:** Are you going to introduce these two printed images into evidence?

**MR. LETOURNEAU:** Yes, Your Honor. For the Court's convenience, I will mark these as Exhibits 413-A and 413-B.

**THE COURT:** Is there any objection?

Let me them be admitted.

**BY MR. LETOURNEAU:**

**Q.** When we talk about Bayou Fleet and we talk about Magnolia Fleet, what exactly is a fleeting area?

**A.** A fleeting area is an area where typically a fleet of barges are temporarily located.

**Q.** So if you look in the upper left-hand corner of your computer simulation, it's in rather small print, but there appears to be a time sequence.

**A.** That is correct. Daytime local time.

**Q.** Does that run throughout the totality of your computer simulation?

**A.** Correct.

**Q.** Does it accurately correlate to the positions of the vessels at local time during the actual voyage of each vessel?

**A.** Yes.

**Q.** In the audio that we will hear, you hear a variety of

09:51

discussions concerning "See you on the one" or "Do you want to do it on the two" or "one-whistle" or "two-whistle." What does that mean?

**A.** Yes. This is all in reference to the Inland Navigation Rules, Rule 34, maneuvering and boarding signals. So a one-whistle passing agreement means I intend to leave you on my port side.

So in the case of a head-on meeting situation, it's essentially a port-to-port passing agreement. In the case of overtaking, then a two-whistle means I intend to overtake you on your port side.

**Q.** By "port side," they are referring to, if you will, the left side of the vessel?

**A.** That is correct. Port is the left side. Starboard would be the right side.

**MR. LETOURNEAU:** Your Honor, with that, we would like to play this computer simulation for the Court's edification. The audio at times does have some crackling noises, but it doesn't permeate the computer simulation. It runs about 16 minutes and 24 seconds.

**THE COURT:** Any objection to playing the --

**MR. EMMETT:** No objection.

**MR. MCLEOD:** No objection, Your Honor.

**THE COURT:** Let's go ahead and play the simulation.

Before we start, are you going to go back

09:52 through the simulation to ask questions of the witness about any of the navigation --

**MR. LETOURNEAU:** No, Your Honor, I'm not.

**THE COURT:** That's going to be done by navigation experts later on?

**MR. LETOURNEAU:** Correct.

(Video played.)

**MR. LETOURNEAU:** Danny, can you pause it right there, please. Just rewind it just a couple seconds so we get that caption.

**BY MR. LETOURNEAU:**

**Q.** Mr. Cunningham, I just wanted to clarify. This is the caption you mentioned, where the VTS or the VHF/FM recording was not on the *Aris T* VDR but you captured it from the Coast Guard AIS recording?

**A.** Yes. As it was not heard on the VDR, it is captioned in the video.

**Q.** This was a communication from the *Elizabeth M. Robinson*?

**A.** Correct.

**MR. LETOURNEAU:** Please proceed, Danny.

(Video played.)

**MR. LETOURNEAU:** Danny, let's pause it there.

**BY MR. LETOURNEAU:**

**Q.** Just for clarification, Mr. Cunningham, the depiction of the tug and barges at the Shell/Motiva dock, was that tug and

10:09

barge actually there at the time of the event? In other words, it appears as though the *Aris T* made contact, but that did not occur, correct?

**A.** That did not occur. The vessel that's shown there is in the approximate position and without showing any of the vessel movements of the towing vessel or the barges.

**MR. LETOURNEAU:** We'll go ahead and complete the last 35 seconds, Danny.

(Video played.)

**MR. LETOURNEAU:** Your Honor, that concludes our examination. We pass the witness.

**THE COURT:** Any cross-examination?

**CROSS-EXAMINATION**

**BY MR. EMMETT:**

**Q.** Good morning, Mr. Cunningham. I'm John Emmett. I represent Cenac. I believe we met at your deposition.

**A.** Yes. Good morning, sir.

**Q.** Since you are the first witness, I want to establish a timeline with you.

**MR. EMMETT:** Danny, if you could call back up Exhibit 413. I would like you to move to 1:40:29 universal time, which is 7:40:29 local time.

Stop it right there.

**BY MR. EMMETT:**

**Q.** This is the first contact between the *Elizabeth Robinson*

10:11

and the *Loretta Cenac* that is recorded on your re-creation, correct?

**A.** That is recorded on the re-creation, correct.

**MR. EMMETT:** Go ahead and play it forward.

(Video played.)

**MR. EMMETT:** Stop it right there.

**BY MR. EMMETT:**

**Q.** Can you translate that for us. What does that mean?

**THE COURT:** Can you mark where you stop it so that we have the transcript --

**MR. EMMETT:** The time stamp is 7:40:48. The time stamp appears in the upper left-hand corner.

**BY MR. EMMETT:**

**Q.** Can you translate for us what the *Robinson* has said.

**A.** Yes. Perhaps if we can go back just a few seconds to the caption, it would be easier to explain that way.

**Q.** Sure.

**A.** So the *Elizabeth Robinson* has called the *Loretta Cenac*. They have asked, "Are you going to try to pass me here?"

The *Elizabeth Robinson* says they don't see anything coming up this way and then asks the question, "If you want to pass" -- is essentially asking "If you want to try it, I'm happy for you to pass me now."

**Q.** What does "I don't really see anything else coming up this way" mean, based upon your experience?

10:13

**MR. TADROS:** Your Honor, objection. He is trying to get into the mind -- he's trying to do exactly what we talked about, this whole cross-examination. Captain Sanamo and Captain Christiansen are going to be here. They can tell you what they were thinking.

**THE COURT:** Is there any reason we need to do this at this point in time with this witness?

**MR. EMMETT:** I can skip over these types of questions, Judge, but I would like to highlight certain things that are contained in his re-creation for the Court, if that's permissible.

**THE COURT:** It's permissible. In terms of interpretation of what is said, I don't think we need to go there. I'm not saying you can't do that through another witness. I'm fairly confident that I get it, but to make sure I get it, I don't mind you asking the questions of witnesses at a later point in time. I don't think you need to do that with this witness at this time.

**MR. EMMETT:** Let's move forward to 1:40:52. Go ahead and play it.

(Video played.)

**MR. EMMETT:** Stop it.

**BY MR. EMMETT:**

**Q.** This is the first time the *Robinson* announces he is going to be stopping at Bayou Fleet; is that correct?

10:14

**A.** The first time in the video, yes.

**MR. EMMETT:** Now, if we can go forward to 1:42:15.

**MR. THANKACHAN:** It skips from 1:41 to 1:45.

**MR. EMMETT:** So you skipped over that?

**MR. THANKACHAN:** It's not in the re-creation.

**MR. EMMETT:** Let's make it 1:41:15. There's a mistake in the transcript of the VDR.

**BY MR. EMMETT:**

**Q.** The only question I have for you is two whistles means that the *Loretta* is going to pass on the port side of the *Elizabeth M. Robinson* or overtake on her port side, right?

**A.** Correct.

**MR. EMMETT:** If we can go forward to 1:41:36.

**BY MR. EMMETT:**

**Q.** The question here is this is now the third time that the *Robinson* has announced that he'll be stopping and backing in there, Bayou Fleet; is that correct?

**A.** Possibly. I don't recall exactly if that's the third time or not without going through the sequence.

**Q.** Well, I thought we just played the 1:40:52 to 1:41:02 where he said it twice, "I will be stopping at Bayou Fleet." Do you recall that?

**A.** Yes.

**Q.** So this is the third time; is that right?

**A.** Correct.

10:16

**MR. EMMETT:** We go forward to 1:47:06.

**BY MR. EMMETT:**

**Q.** At this point, this is now the fourth time that the *Robinson* announces to traffic that it will be stopping and backing at Bayou Fleet; is that correct?

**A.** Yes, sir.

**Q.** At 1:47:38, this is the recording you captured from the VTS rather than the VDR?

**A.** Not the one that's shown. I think it's just before or after this.

**Q.** This is the one right here, 1:47:38 -- or 41 on our time stamp. Do you have any explanation as to why this wasn't recorded on the VDR?

**MR. MCLEOD:** Object to the form. It calls for speculation. I don't know that he would know why it wasn't recorded on the VDR.

**MR. EMMETT:** He's familiar with this.

**THE COURT:** Well, I'm going to let him answer the question because he is responsible for re-creating the simulation and he may know.

**MR. MCLEOD:** Fair enough.

**THE WITNESS:** I don't recall exactly right now which U.S. Coast Guard VTS channel that was. One explanation is it was possibly broadcast on a different channel that was not recorded on the *Aris T*.

STEVEN CUNNINGHAM - CROSS

10:18

**BY MR. EMMETT:**

**Q.** Are you able to testify that this was an actual communication that was made by the *Elizabeth Robinson* to the *Loretta Cenac* that you have included in your re-creation?

**A.** Yes. That communication was made over VHF.

**MR. EMMETT:** If we go forward to 1:48:20, local time 7:48:20.

Can you go back to the previous communication.

Now go forward. I want the communication "I will be going into Bayou Fleet, backing in," which is the next one.

**BY MR. EMMETT:**

**Q.** Now, this communication at 1:48:20 is the fifth time the *Robinson* announces he will be backing into Bayou Fleet; is that right?

**A.** Fifth time in this video, yes.

**MR. EMMETT:** At 1:48:50, Danny, if you could, please.

**BY MR. EMMETT:**

**Q.** This is a communication from the *Loretta Cenac* to the ship. Do you know, based upon your experience as a navigator, what the captain of the *Loretta Cenac* is offering to the pilot?

**A.** Yes. He is offering to abort the overtaking maneuver, to slow down and drop back behind the *Elizabeth M. Robinson*.

**MR. EMMETT:** Go forward to the response from the ship at 1:48:59.

10:20

**BY MR. EMMETT:**

**Q.** The pilot asks the question: "All right. You want me to pull for the two?" Do you have an understanding, based upon your training, knowledge, and experience, what the pilot is asking the *Loretta Cenac*?

**MR. TADROS:** Your Honor, again, same objection. The pilot is waiting here to testify. He can ask him what he meant, but this witness can't get into the pilot's mind.

**THE COURT:** It does seem to go beyond the simulation, the reconstruction here that this witness is to testify about. I'm sure you are going to ask your reconstruction expert the same question.

**MR. EMMETT:** Yes, sir.

**THE COURT:** Sustained.

**MR. EMMETT:** Let's move forward to 1:53:52.

**BY MR. EMMETT:**

**Q.** This is when the order to let go the port anchor is given, based upon your re-creation?

**A.** Correct.

**MR. EMMETT:** If we can go forward to 1:57 -- I believe it's 23.

**BY MR. EMMETT:**

**Q.** This is the first sound of the port anchor actually being dropped out, correct?

**A.** Correct, sir.

10:22

**Q.** More than 3 minutes later?

**A.** Yes, sir.

**MR. EMMETT:** All right, sir. Thank you for your time.

Your Honor, subject to the right to recall the witness in our case.

**MR. MCSHANE:** John, the subpoena is here. Do you want to do that now?

**MR. EMMETT:** Your Honor, we prepared a subpoena for Mr. Cunningham to return and testify in our case in chief. I just simply want to notify the Court that we will be serving him with a subpoena prior to his departure.

**THE COURT:** So noted.

**MR. RIVIERE:** Your Honor, Bill Riviere on behalf of Genesis.

**THE COURT:** Good morning.

**MR. RIVIERE:** I have a few questions. First, a housekeeping matter.

Keith, you have not submitted him as an expert during your examination. Are you going to do that?

**MR. LETOURNEAU:** Your Honor, I assumed that he was already, since we already had the computer simulation admitted into evidence, but we tender him as an expert accident reconstruction witness.

**THE COURT:** Is there any objection to the tender?

10:23

**MR. RIVIERE:** No, sir.

**MR. TADROS:** No.

**MR. EMMETT:** No.

**THE COURT:** The Court recognizes Mr. Cunningham as an expert in accident reconstruction. I want to get the designation correct. Accident reconstruction as opposed to marine reconstruction?

**MR. LETOURNEAU:** Your Honor, marine accident reconstruction would be appropriate.

**THE COURT:** Marine accident reconstruction. So noted.

**CROSS-EXAMINATION**

**BY MR. RIVIERE:**

**Q.** Good morning, Mr. Cunningham.

In connection with your testimony of the *Elizabeth's* calls where she would be heading to Bayou Fleet, I want to ask you a few questions about Bayou Fleet on your demonstration.

**MR. RIVIERE:** If you could pull up that exhibit at, say, 7:40:48, Scott.

That's good right there. What time do we have there? It's 7:46:38.

**BY MR. RIVIERE:**

**Q.** You had circled Bayou Fleet earlier for the Court, correct?

**A.** Correct.

10:24

**Q.** With respect to the background imaging, what date was that that you used for the land mass and the fleet in the river?
**A.** If you allow me to refer to my report, I can give you the exact date.
**Q.** You may.
**A.** So the imagery date was April 6, 2016.
**Q.** Do you know the river conditions at that time? Did you look into that? High water? Low water?
**A.** Not on April 6, no.
**Q.** Certainly the imaging for Bayou Fleet reflects that date in April of 2016, I think you said?
**A.** Correct.
**Q.** Not the night of the incident?
**A.** Correct.
**Q.** There is imaging available of Bayou Fleet on the night of the incident that we can demonstrate for the Court, correct, and that is as depicted on the radars of the various vessels?
**A.** There's radar images, which is not satellite imagery but radar images, correct.
**Q.** It would be actual images that reflect the capacity on that evening and the volume of barges and other vessels in Bayou Fleet, as reflected on the images of the various vessels' radars in this case?
**A.** I agree to the extent it would give an indication of the number of barges located there. Perhaps not exactly, but it

10:26

would certainly give an indication.
**Q.** It would give an indication of their parameters in connection with the sides of the hulls of the vessel or at least from the radar beam shooting from the vessel? It would show how far that distance is from the vessel to the outer structures and barges fleeted at Bayou Fleet?
**A.** You could get an approximate distance from those radar images, yes.
**Q.** In fact, that would be a very accurate distance, would it not, since it would be an actual radar image recorded on whichever vessel we were looking at, be it the *Elizabeth* or the *Aris T* or the *Loretta*?
**A.** Well, distances taken or ranges taken from radar images are accurate to perhaps several meters or more in the best case.
**Q.** As you know, on this night it was a condition of developing fog, high river conditions; there may be more vessels parked or fleeted at Bayou Fleet than demonstrated in the imaging we are seeing in your reconstruction. Correct?
**A.** Well, there could have been more or less, yes.
**Q.** Could be, yes. Just to make that point, the radar imaging would be from actual imaging that evening of this event versus your reconstruction?
**A.** Yes.
**Q.** I think we can look at it here. For example, the *Loretta*

10:27 shows an aqua-colored line both before, in front of the vessel, and astern of it; and each of the other two vessels, the *Aris T* has a red line and sort of a lighter-colored line for the *Elizabeth*.

Could you please explain to the Court what that is in relation to each of those vessels in connection with your reconstruction.

**A.** Absolutely. They are the actual track lines, the GPS-derived position datas, and the tracks are overlaid there on the image.

**Q.** That depicts the AIS GPS position of each of the vessels at any particular moment over its track, both leading up to the point demonstrated here at 7:46:38, and also it shows the future path that that vessel traveled ahead of it in your reconstruction?

**A.** It shows the GPS track, yes.

**Q.** So basically we can look at those track lines in this screenshot and see the exact path each of the vessels followed leading up to this point of capture of the screenshot and eventually through the end of your reconstruction, correct?

**A.** For the GPS antenna position, yes.

**Q.** The GPS antenna position of that vessel.

You said for both *Aris T* and the *Elizabeth* you had a gyrocompass heading that you could triangulate or, for lack of a better term, to show the exact position of that vessel and

10:29

its heading in your reconstruction?
**A.** The heading data shows the heading, which was also cross-referenced with the available radar images.
**Q.** For the *Loretta* you had to triangulate from other radars to that vessel captured that evening in order to get the fairly exact heading of *Loretta* at any given point in time?
**A.** Correct. I had to measure the heading data from three sources of radar imagery.
**Q.** In connection with the *Elizabeth's* future track beyond this, you did not create the reconstruction of her going into Bayou Fleet that night, did you?
**A.** I did not include that in this video, no.
**Q.** It stops before the *Elizabeth* proceeded into Bayou Fleet, correct?
**A.** This video stops, yes.
**Q.** In connection with your analysis of this matter, even though you did not include it in your reconstruction, did you observe that fact through the AIS data that you were reviewing from, for example, the *Elizabeth's* Blue Box or its VDR, so to speak?
**A.** Yes. The data I plotted extended before and beyond what is shown in the video, so I have seen the maneuver she took to back into Bayou Fleet.
**Q.** You were aware of that, you had all the verifiable data, exact GPS positioning, but you did not include that in your

10:30 reconstruction?
**A.** I stopped the reconstruction a few minutes after the allisions.
**Q.** Why did you stop the reconstruction before the *Elizabeth* backed into Bayou Fleet that day?
**A.** The purpose of the reconstruction was to show the significant events leading up to the allisions and a few minutes afterwards. For what I was doing, I didn't consider it significant to illustrate the backing-in maneuver.
**Q.** Were you asked not to include that in your reconstruction?
**A.** I was never asked.
**Q.** You just chose to do that on your own?
**A.** Correct.
**Q.** You certainly could have done that with the data you had in hand?
**A.** Yes.
**Q.** The timing issue from the Blue Box data from the *Elizabeth*, I think you said there was a certain offset from actual local time to the time that was set on the Blue Box?
**A.** Correct.
**Q.** Please explain that again for me and how you accounted for that.
**A.** Because the radar images from the Blue Box have a time sequence displayed on there, essentially a clock, when you compare that time to the position of the vessel, as verified

10:32 through the chart system or AIS data, there was clearly a 2-minute 35-second difference.

**Q.** That's accounted for in the timing that is time-stamped on your reconstruction?

**A.** Yes.

**MR. RIVIERE:** Scott, if we could pull up Exhibit 383-237.

**BY MR. RIVIERE:**

**Q.** Now, the last exchange on this page, the *Elizabeth Robinson*, "Yeah, I am trying to get over there*, Loretta*. This current is pushing me down in there. All right. Just letting you know," you have confirmed from the objective evidence you had in hand that that was recorded by the Coast Guard AIS recording?

**A.** We are referring to the first paragraph, correct?

**Q.** The last two lines of that exhibit before you, which is --

**A.** Okay, the last two. Yes, that was recorded on the U.S. Coast Guard VHF channel.

**Q.** You had the verbal audio available to you of that broadcast by the *Elizabeth* at the time of this exchange, correct?

**A.** Correct.

**Q.** Why did you only list it in your reconstruction by a subtitle below even though it was available as recorded and heard by the U.S. Coast Guard's AIS recordings?

10:33

**A.** The audio chosen for the reconstruction, I chose to limit that to only what was recorded on the *Aris T*. So I had extracted the sound files which are then incorporated into the video. To incorporate the audio from the VTS channel, I would have had to extract that separately and add an additional sound file. In my mind, I'm now mixing up the sound files. I found it simpler to include only the audio from the VDR but include a caption of that one piece of audio that wouldn't be played.

**Q.** You heard that exchange with your ears?

**A.** Correct.

**Q.** Did you hear that only from the Coast Guard AIS, or did you also hear it from any other sources, such as the *Loretta*?

**A.** No. It was only audible on the Coast Guard VTS VHF channel.

**MR. RIVIERE:** Give me one second, Your Honor.

**THE COURT:** Sure.

**MR. RIVIERE:** That's all I have. Thank you very much. We will see you in the future.

**MR. DIAZ:** Your Honor, just a couple questions.

**CROSS-EXAMINATION**

**BY MR. DIAZ:**

**Q.** Mr. Cunningham, Tommy Diaz on behalf of Shell and Valero.

In terms of the last answers you were giving, the Blue Box data on the Genesis vessel is 2 minutes and 35 seconds slower than the other time stamps from the other vessels and

**STEVEN CUNNINGHAM - CROSS**

10:35

data?
**A.** I don't recall. I would have to go back and verify which direction it was in.
**Q.** In response to and regarding Mr. Emmett's questions, there was some discussion in terms of the reconstruction reflecting that there was an order to drop anchor at 7:53:52 and the first audio-discernable issue with respect to the anchor with the running of the chain at 1:57:23, correct?
**A.** Correct.
**Q.** But you, in creating that re-creation, do not mean to suggest that nothing is going on between those two points in time, correct?
**A.** No.
**Q.** In fact, you're only able to capture and reflect what is heard on the bridge of the *Aris T*; and to the extent that a very large light crashes onto the deck of the *Aris T* after it hits Berth 4, if you can't hear it from the audio recordings, you don't include it on the reconstruction, do you?
**A.** Correct.
**Q.** You did not go to the bosun's testimony to talk about how the crashing of that light prevented him from going up the forecastle in order to release the anchor. You wouldn't then include that in the reconstruction because it isn't part of what you can hear from an audio or visual standpoint, correct?
**MR. EMMETT:** Objection, Your Honor. Lack of

10:36

foundation.

**MR. DIAZ:** It was an if. It was a hypothetical.

**THE COURT:** It is a hypothetical. This is an expert witness. It does relate to the extent of what he captures in the simulation. I'm going to allow it. Thank you.

**THE WITNESS:** No, I did not include that.

**BY MR. DIAZ:**

**Q.** If there are other actions taken in between the order to drop anchor and other anchor-related handling issues, you simply have not captured those because they are not captured by audio on the *Aris T's* VDR, correct?

**A.** Correct.

**MR. DIAZ:** Thank you very much.

**THE COURT:** Mr. Tadros, did you have any questions?

**MR. TADROS:** No, Your Honor.

**THE COURT:** Redirect?

**MR. LETOURNEAU:** No redirect, Your Honor.

**THE COURT:** May I be so bold as to ask a question? It does relate to the simulation, so I will give everybody an opportunity to clean up any mess that I make.

With respect to the video, the simulation that I have just looked at, there are speed boxes indicated for each of the vessels. The speeds that are indicated there come from what source, and what is the nature of the speed that's reflected there?

10:38

**THE WITNESS:** Yes. That is the speed over the ground. It's a GPS-derived speed. So, again, that came from either the voyage data recorder, AIS data, or from the electronic chart systems of the towing vessels.

**THE COURT:** That's the only question I had. Does anybody need to clean it up?

Thank you very much, Mr. Cunningham.

**THE WITNESS:** Thank you, Your Honor.

**MR. LETOURNEAU:** Your Honor, at this time we would have intended to introduce the depositions of Captain Kimon Baltas and Second Officer Dimitrios Bardouniotis. We don't have them, but that's what we would have intended to do at this juncture.

**THE COURT:** Okay. We will put a placeholder there. When all the parties have agreed upon the transcript with respect to the deposition, then I will allow you to introduce it at that point in time even if it's outside of the contours of your case at that point if all the parties agree.

Everybody agrees?

Okay. That's what we will do at that point in time rather than introduce something that doesn't even exist at this point in time.

**MR. LETOURNEAU:** Understood, Your Honor.

**THE COURT:** That doesn't make any sense.

**MR. LETOURNEAU:** We do not intend to read any of that

10:39 into the record. It's just for your edification, your prerogative.

**THE COURT:** So I can have something to do other than watch my favorite television show. I get that.

**MR. LETOURNEAU:** Your Honor, at this time we would call Captain Michael Leone to the stand.

**THE COURT:** Before we call him to the stand, this might be a good time to have a morning break. We have been going for a little while. Does anybody need more than 10 minutes?

Let's take a 10-minute break, and then we will call that witness.

Given the number of people in the room, we may need a 15-minute break for logistics purposes. I get that. 15-minutes. We will be back here at 10:55.

**THE DEPUTY CLERK:** All rise.

(Recess.)

**THE COURT:** Be seated.

**MICHAEL LEONE,**

having been duly sworn, testified as follows:

**THE DEPUTY CLERK:** State your full name and correct spelling for the record, please.

**THE WITNESS:** Michael P. Leone, M-I-C-H-A-E-L, P as in Paul for middle name, Leone, L-E-O-N-E.

**MR. MCSHANE:** Your Honor, on behalf of Cenac Marine,

10:58

we are waiving any objection we have to the *Aris T* going out of turn with this witness since we are in the case in chief of Valero right now.

**THE COURT:** Thank you. I'm assuming all parties are in agreement with this manner of proceeding.

**MR. MCLEOD:** No objection, Your Honor.

**THE COURT:** Thank you.

**DIRECT EXAMINATION**

**BY MR. TADROS:**

**Q.** Good morning, Captain Leone.

**A.** Good morning.

**Q.** Can you please tell the Court, what is your current position?

**A.** NOBRA pilot.

**Q.** What does NOBRA stand for?

**A.** NOBRA means New Orleans Baton Rouge Steamship Pilot Association.

**Q.** Would you please give us a very brief educational background.

**A.** Graduated Archbishop Rummel in 1996. Graduated Texas A&M at Galveston in 2000.

**Q.** When you graduated from Texas A&M Galveston, what degree did you have?

**A.** Marine transportation degree along with the third mate license, graduate with a U.S. Coast Guard license.

10:59

**Q.** Give us a very brief work history. Did you go straight to work after you graduated from Texas A&M?

**A.** I did. I went to work for Crescent Ship Service at Ama for about six months, then to E.N. Bisso & Sons for about a year and a half as a deckhand/wheelman. Then left E.N. Bisso and went to Hornbeck Offshore; took a mate's job with Hornbeck Offshore, worked there about eight years. Then left Hornbeck and went to work the ferries downtown as captain and also ran captain on the *Creole Queen*.

**Q.** Your work at Bisso, did that include working on tugs?

**A.** Yes. Harbor tugs, docking, undocking ships.

**Q.** What licenses do you hold?

**A.** I hold a second mate any gross ton license, 1600-ton master's license with a 6000-ton OSV endorsement on it. Also first class pilot license 88.0 Head of Passes on the Mississippi River to Mile 234 Head of Passes on the Mississippi River. Also first class pilot license from the sea buoy up to St. John's Island on the Calcasieu River.

**Q.** Captain Leone, has any action ever been taken against your pilot license?

**A.** No action has ever been taken against my pilot license.

**Q.** Was there was a Coast Guard investigation in this matter?

**A.** There was.

**Q.** Were you assessed a civil penalty?

**A.** I was.

11:01

**Q.** What was that civil penalty?

**A.** It was $6,000.

**Q.** Was there any action taken against your license by the pilot board of commissioners because of this incident?

**A.** No, but there is an investigation.

**Q.** Was that investigation concluded, as far as you know?

**A.** Not that I'm aware of.

**Q.** Did you have to take any remedial training?

**A.** I did. I took 80 hours of remedial training.

**Q.** Now, when did you first become a NOBRA pilot?

**A.** So I was elected into the pilots association in August of 2013.

**Q.** Explain to the Court, what is a NOBRA pilot?

**A.** A NOBRA pilot, he is part of the pilots association and takes over the ships -- navigates ships anywhere between New Orleans and Baton Rouge.

**Q.** Prior to New Orleans, where you take over, is there another pilot association that brings the vessel up?

**A.** There is. That is the Crescent River Port Pilots Association.

**Q.** Let's talk a little bit about your training to become a pilot. Can you explain to the Court what that entails.

**A.** For a year you're an apprentice, or at least up to a year. So you're an apprentice; you take a different vessel pretty much every day, different scenarios -- high river, low river,

11:02

buoy job, head down. These are different scenarios in which you may be faced with as a pilot of high river, low river, fog, high wind conditions, low wind conditions, any different scenarios that you may be faced with as a pilot.

**Q.** While you are an apprentice, are you allowed to pilot a vessel on your own?

**A.** Not on my own, under the supervision of a senior pilot or authorized pilot.

**Q.** During that apprenticeship, were there times where you were always observing the senior pilot, or were you able to actually pilot a vessel and he was observing you?

**A.** There was both. So we would go both ways with it. Some days -- if you were with a pilot for the entire week, he may ask you to observe him for a day or two; and then the other trips, the other four or five, whatever the case may be, you do the job and he watches you.

**Q.** Okay. Now, how many vessels would you say, roughly, you piloted during your apprenticeship or you were on board as a pilot?

**A.** Roughly between 250 and 300 ships during that year apprenticeship.

**Q.** What types of ships would that have included?

**A.** Any types of ships. I mean, it goes from chemical tankers, which are 12,000 to 15,000 gross tons; to Suezmax, which could be up to 160,000 deadweight tons, 900-foot,

11:04

anywhere between 450 feet to 900-foot.
**Q.** So the Court understands, when you say "Suezmax," what is that? Is that a type of a --
**A.** That's a class of a vessel, typically the larger size vessels that do come into the port.
**Q.** Is there a difference between a bulk carrier versus a container ship?
**A.** There is.
**Q.** What is that difference?
**A.** So a bulk carrier has holds on it that they load grain into or whatever the product may be, soybeans. They load the product into the holds. Whereas a container ship, she has containers up on her deck and down below her decks in order to carry her cargo.
**Q.** Just to be clear, what type of a ship was the *Aris T*?
**A.** The *Aris T* was a bulk carrier.
**Q.** Is it your experience -- are there more bulk carriers in the Mississippi River versus container ships?
**A.** It goes through phases where -- a harvest season where we will see more bulk carriers. It's a seasonal thing where we see different types of ships at different periods of the year.
**Q.** Once you completed your apprenticeship, explain to the Court, what do you do next as a pilot?
**A.** You get commissioned at that point by the State of Louisiana to become a commissioned pilot.

11:06

**Q.** Then do you start off immediately on any size of vessels?
**A.** No. We start with a restricted period. So your first restriction as a pilot is any vessel up to 700 feet.
**Q.** Okay. How long is that restricted period?
**A.** That restricted period is eight months.
**Q.** Did you do that restricted period? Did you accomplish it?
**A.** I did, yes, sir.
**Q.** During that first restricted period, how many vessels did you navigate in the Mississippi River?
**A.** Eight months, week on/week off, roughly, say, on average five to six ships a week for eight months. So whatever that equates to.
**Q.** That would have been during high river and low river conditions?
**A.** Yes.
**Q.** Then after you finished that first eight-month period, is there another restriction period?
**A.** There is.
**Q.** What is that?
**A.** So the second restriction period is 755.
**Q.** At the time of this incident, were you in that restricted period?
**A.** I was.
**Q.** How far into were you in that restricted period?
**A.** The second period of 755.

11:07

**Q.** When did that 755 start? Do you remember?

**A.** It's really kind of hard to recall exactly when, but typically it's eight months, roughly around eight months. It all depends on where the weeks kind of fall, etc.

**Q.** In January 2016, I guess what I'm trying to ask you, were you right at the beginning of your restricted period?

**A.** No. Oh, no. No, it wasn't then.

So I got commissioned in September of 2014, so eight months after that would be my first restriction period of 700 feet. So that would put it maybe around May, roughly. So then my second restriction period would be starting in May to June.

**Q.** 2015?

**A.** Yes, of 2015.

**Q.** Is that a normal thing? The restriction period, every pilot has to go through that in the NOBRA organization?

**A.** That's correct. Every pilot -- every group that gets commissioned has to go through a restricted period.

**Q.** I believe you said your restricted period in January 2016 was 755 feet. Is that right?

**A.** 755, that's correct.

**Q.** What was the *Aris T* length?

**A.** She was 753.

**Q.** Were you piloting her within your restriction?

**A.** I was.

11:09

**Q.** Do you recall, January of 2016, how long had the Mississippi River been high?

**A.** At that point I think she started coming up maybe in November, started gradually coming up, starting from maybe towards the end of November throughout December, continuing to rise at that point.

**Q.** That would have been November of 2015, what you are describing, continued to rise?

**A.** Yes.

**Q.** During that period from mid-November 2015 until the end of January when you took over the *Aris*, how many vessels did you pilot in the Mississippi River?

**A.** It's kind of hard to say. On average, we do anywhere between five to seven ships in a week. It all depends on how busy we are. So at that point it would be week on/week off at five to seven ships a week. 25, 28, 30, somewhere in that range. Between 25 and 30 ships.

**Q.** Were those all bulk carriers, or were they a combination of different vessels?

**A.** Combination of different vessels. We don't get assigned to a certain vessel per se, whether it's a tanker or bulker.

**Q.** From November through January 31, is it fair to say you piloted some type of vessel in high river past Hahnville Bar?

**A.** Yes.

**Q.** Could you tell the Court how many times? Do you have any

11:10

idea?

**A.** I don't roughly know how many times, but if I had to guess -- if I had 28 ships -- between 25 and 30 ships, it could be anywhere between five and ten ships. It's just kind of hard to say because the route is so long. To say how many ships I did through the Hahnville Bar at that point would be hard to say.

**Q.** Okay. Fair enough. Are we talking about taking ships upbound as well as downbound during that period of time?

**A.** That's correct. The job consists of wherever it is to wherever -- Point A to Point B and down. Up or down.

**Q.** During that same time period -- and I'm now focusing again mid-November, when the river started to rise, through the end of January 2016 -- did you have occasion to take vessels upbound through the Hahnville Bar at night?

**A.** Yes, sir.

**Q.** Did you face any difficulties piloting any of those vessels prior to January 31, 2016?

**A.** No, sir.

**Q.** Did you meet other vessels downbound during those times between November 2015 and January 2016?

**A.** Absolutely.

**Q.** Do you recall if you met two downbound vessels while you were upbound at Hahnville Bar between November 2015 and January 2016?

11:12

**A.** It definitely could have been a possibility.

**Q.** Have you piloted bulk carriers similar to the *Aris T* in high river, upbound, at night, with a slight fog?

**A.** Yes.

**Q.** How many times in your career would you say you faced that?

**A.** It's kind of really hard to put a number on it. Whatever the conditions are that day, I just go do my job.

**Q.** That isn't a unique situation, is it, the one I just described?

**A.** No, it's not. It's not a unique situation.

**Q.** Let's talk about some of the bends in the area of the river that the NOBRA pilots have jurisdiction over. Can you tell us some of the sharper bends in that part of the river.

**A.** For one, Algiers Point would be a very sharp bend. Upper 9 Mile right here by Ochsner is a pretty good turn there as well. You have St. Rose Point, 26 Mile Point, 35 Mile Point, 48 Mile Point, 50 Mile Point, St. Elmo, College Point, Point Houmas, Bringier Point, 81 Mile Point, Philadelphia, Point Claire, 100 Mile Point.

**Q.** So there's quite a few bends in this river that are, for lack of a better word, more severe?

**A.** Oh, yes.

**Q.** Compare some of the bends you just mentioned with the Hahnville Bar.

11:14

**A.** Well, the Hahnville Bar is an easy, easy, easy bend. It's not a sharp turn by any means. A comparison would be 81 Mile Point, which is like a 220-degree turn when you make the turn. This would be no comparison to 81 Mile Point, by any means. It's a very slight, easy turn here.
**Q.** Okay.
**A.** It's not even labeled a point.
**Q.** Let's turn our attention now to the *Aris T* and specifically January 31, 2016. Can you please tell the Court, when did you first board the vessel?
**A.** Around 1530.
**Q.** Do you remember, where was the vessel at that time?
**A.** We normally change pilots around General Anchorage, which is below Algiers Point, roughly around the Arabi area.
**Q.** Would the vessel have been moving at the time, or was she at an anchorage?
**A.** She was underway, meaning she was moving at that point.
**Q.** She was already upbound?
**A.** Yes.
**Q.** Who did you relieve?
**A.** I relieved Jack Anderson, a Crescent pilot.
**Q.** When you relieved Jack Anderson, did you have any discussion with him?
**A.** We always do a pilot-to-pilot exchange. It's normal. We will talk about draft, speed, air draft, any traffic in the

11:16

area.
**Q.** Explain for the Court, what does "draft" mean?
**A.** Draft is how much the vessel is actually in the water, how much she is in the water.
**Q.** For example, a loaded vessel has more draft or less draft?
**A.** Yes, a loaded vessel has more draft.
**Q.** Was the exchange you had with Crescent Pilot Jack Anderson typical of the exchanges you have every time you take over a vessel?
**A.** It is.
**Q.** Any other things you would have discussed with him other than the draft of the vessel, the conditions, etc.? Anything about the vessel?
**A.** If there was an issue with the vessel, he would have let me know at that point. Whatever the case it may be.
**Q.** Did Jack Anderson tell you there was any issue or problem with the vessel?
**A.** No problem with the vessel.
**Q.** Whether it was mechanical or with its crew?
**A.** No problem with either mechanical or crew.
**Q.** Where did that pilot-to-pilot exchange take place?
**A.** It took place on the bridge of the vessel.
**Q.** After you had the pilot-to-pilot exchange, did you have any other exchange with the crew of the vessel?
**A.** We do a master pilot exchange, which is with the captain

11:17

of the vessel.

**Q.** Explain to the Court what that means, a "master pilot exchange."

**A.** So a master pilot exchange is we basically speak to the captain and we make sure, for one, everything is in good working order, there's an anchor watch up forward, both anchors ready for emergency all the time, that they have a radio up forward with them, as well, to make sure there's a communication there.

Typically we will talk about if she has -- what type of propeller she has, is it right-handed; and that will tell me which way, if she is going astern, her bow is going to go.

So in this case she was a fixed right-handed propeller. Going astern, the bow would go to starboard. Sometimes they have different propellers, and the ships handle differently. So that's something good to go over, a maneuvering characteristic of the vessel.

Also type of rudder, normal rudder, Schilling rudder, Becker rudder, different types of rudders, in which case -- the ship would handle differently if it had a different type of rudder on it. In this case she had a semibalanced rudder, which is the normal, typical rudder.

Also we go over drafts and air drafts. Typically I will ask the captain, "Is this the first time in the Mississippi River?" I can kind of gauge from there if he

11:19

understands how things operate in the river.

Also, I will ask him where his whistle is located, and then we will test the whistle just to make sure we have a whistle for emergency use.

Then another one is, is the engine room manned at all times.

**Q.** Did you have that specific interaction that you have just described with Captain Baltas on board the *Aris T*?

**A.** I did.

**Q.** Did he tell you there was any problem with any of the navigation equipment?

**A.** He did not.

**Q.** Was there any problem with any of the other equipment of the vessel?

**A.** No problem with anything.

**Q.** Did he confirm to you that there was an anchor watch?

**A.** Yes, sir.

**Q.** That means there were people up front near the anchors?

**A.** People up forward, an anchor watch.

**Q.** Now, it sounds to me -- and correct me if I'm wrong -- that you have been a pilot, either as an apprentice or a restricted pilot, in probably over -- let's call it 300, 350 vessels, maybe more. Is that right?

**A.** Well, roughly, during my apprenticeship period, I did between 250 and 300 ships.

11:21

**Q.** Oh, wow.
**A.** At this time it's kind of hard to have a number on it, but I would have been a pilot over a year at this, a commissioned pilot.
**Q.** So would that have been closer to 500 ships?
**A.** On average we do maybe 150 ships a year as a pilot week on/week off.
**Q.** During that time have you ever had a master ask you about your experience level?
**A.** Never.
**Q.** Was it out of the ordinary that Captain Baltas in this instance didn't ask you about your experience level?
**A.** No. There was no reason for him to ask.
**Q.** After the master pilot exchange and all that information you elicited from and Captain Baltas gave you, did you have any concerns about your ability to navigate the *Aris T* safely in the Mississippi River?
**A.** No reason.
**Q.** Did you have any concerns about the vessel's fitness or its suitability for those conditions in January 2016?
**A.** Not at all.
**Q.** Did you have any concerns about any equipment that was missing or inoperable?
**A.** No.
**Q.** During this master pilot exchange, are you given any

11:22 document from the ship?
**A.** I am.
**Q.** What are you given?
**A.** It's called a pilot card.
**MR. TADROS:** Danny, can you please pull up -- I believe it's Exhibit 58. Within 58 it's *Aris* 1068-69.
That's perfect.
**BY MR. TADROS:**
**Q.** Is this the pilot card?
**A.** This is.
**Q.** Can you please explain to the Court, what type of information does this provide to you with regard to the vessel and its characteristics?
**A.** So it gives you its displacement, its deadweight, its length overall, its breadth, its drafts fore and aft, air draft. Then it gives you speeds in loaded conditions, ballast conditions. "Ballast condition" meaning they have to trim the vessel or -- she basically just has water on her to maintain her at a stable level. The ballast keeps her stable in order to maneuver.
**Q.** Okay. Can you flip to 1069. Is this the second page of this pilot card?
**A.** This is.
**Q.** At the very bottom there, do you see where it has your name?

11:24

**A.** Yes.
**Q.** Did you sign this pilot card?
**A.** I did not.
**Q.** Do you normally sign the pilot cards when you are aboard vessels?
**A.** I do.
**Q.** When do you normally sign the pilot card? When you first board the vessel?
**A.** No, I don't. When I board a vessel, there's a lot of things going on, MPX, the master pilot exchange. So I typically just tell them, "Just leave it in front of me, and I will look at it at some point during the voyage and I will sign it before I get off the vessel."
**Q.** In this case, though, do you recall signing this pilot card?
**A.** I did not sign the pilot card.
**Q.** Can you tell us why you didn't sign the pilot card.
**A.** I was relieved by another NOBRA pilot to bring the ship up to Grandview Anchorage, so at that time it was a little chaotic. It was basically just not on my mind at that point to sign the pilot card.
**Q.** You had just had an incident, so that was the last thing you were thinking about?
**A.** Yes. Right.
**Q.** Is the pilot card, these two pages, available to you

11:25

during the voyage?
**A.** Yes. All the time.
**Q.** Do you rely on this information, in addition to the information that the master has given you during the master pilot exchange, to navigate the vessel, to pilot the vessel?
**A.** Yes.
**Q.** Is this a typical pilot card that you get on all vessels, or does it matter if it's a bulk carrier versus a tanker?
**A.** This is pretty much cut-and-dry, a typical pilot card.
**Q.** Is there anything missing from this pilot card that you would expect to have seen on here?
**A.** Nothing. It has pretty much everything I would need to know to navigate the vessel safely.
**Q.** Following the master pilot exchange when you first boarded, did you take the conn?
**A.** I did take the conn.
**Q.** Explain to the Court, what does that mean, you took the conn?
**A.** Basically I take over the vessel. I take charge of it. I give the commands, rudder commands, engine commands, but ultimately the captain still is in charge of his vessel.
**Q.** So do you give helm commands?
**A.** I do.
**Q.** Do you give engine commands?
**A.** I do.

11:26

**Q.** Are those repeated by anybody?
**A.** They are repeated by either the helmsman or the officer of the watch.
**Q.** Can you tell us, why is that repetition necessary?
**A.** To make sure that he did the right thing, what I commanded him to.
**Q.** Did you have any problems with the crew of the *Aris T* following your helm commands?
**A.** No problem with any of the crew.
**Q.** Any problems following your engine commands?
**A.** Either/or, rudder commands or engine commands.
**Q.** Did you request an increase in revolutions when you took the conn?
**A.** I did.
**Q.** Why was that?
**A.** The vessel had such a trim on her, she had close to 15-foot of trim, so she was going to be -- her stern was going to be down in the water pretty good. I think she was around 37 feet on the stern, roughly, and then she had 15 feet of trim. So when I was going to steer her, she was going to be very stiff. So when I asked for the increase of revolutions, it would help compensate, help her steer better.
**Q.** How much of an increase did you ask for?
**A.** I asked for a couple of revolutions, maybe four to five.
**Q.** So that the judge understands, why did she have such a

11:28

trim?

**A.** She had such a trim to get clearance under the bridges, more specifically the Huey P. Long Bridge, which is one of the lowest ones on our route. So she had to clear the bridge. She had such a trim on her to clear underneath the bridge.

**Q.** Would a vessel have such a trim in low water?

**A.** No, it wouldn't.

**Q.** So was it because of the river conditions?

**A.** River conditions. The height of the river was high, so she had to ballast down to clear underneath the bridge.

**Q.** Is it fair to say you did not slow down until after the *Aris T's* contact with the Valero dock?

**A.** Yes, that's correct.

**MR. RIVIERE:** Object, Your Honor. I've been fairly lenient so far, but counsel is leading the witness. There's no adversity here.

**MR. TADROS:** No problem, Your Honor. I was just trying to get through it.

**THE COURT:** I understand.

**MR. TADROS:** We are all big boys.

**THE COURT:** He has already answered that question, so don't lead the witness.

**MR. TADROS:** Yes, sir.

**BY MR. TADROS:**

**Q.** Did you receive the requested increase in rpms?

11:29

**A.** I did.

**Q.** Now, did you experience any difficulties with the *Aris T's* handling after you took the conn?

**A.** None.

**Q.** Did you experience any difficulties with Captain Baltas, the master?

**A.** I did not.

**Q.** Did he speak pretty good English?

**A.** He did.

**Q.** Did you experience any issue with the navigation crew of the *Aris T*?

**A.** None.

**Q.** Captain Leone, did anything that occurred on January 31, 2016, lead you to believe that the master of the *Aris T* or its bridge crew were not properly trained?

**THE COURT:** Don't answer that. There's an objection.

**MR. RIVIERE:** You have asked him not to lead the witness, and he returns right to leading the witness.

**THE COURT:** I don't know that that was leading.

**MR. TADROS:** It wasn't.

**MR. RIVIERE:** Yes-or-no responses.

**THE COURT:** I'm going to overrule that objection.

**MR. MCSHANE:** I have an objection, Your Honor. It's lack of foundation.

**MR. TADROS:** I'm not sure I understand the lack of

11:30 foundation. I have asked him repeatedly about the equipment and how the crew responded to him and his interaction with the crew. I just asked him did he think they weren't properly trained. That was the basis for it.

**THE COURT:** Your response.

**MR. MCSHANE:** He doesn't have any information about the captain's training. He is asking about a guy he never spoke to and what he knows about his history and background.

**THE COURT:** I don't know that he is asking that. I think he is asking his impression of whether there was anything reflected in the incident itself that reflects to him a lack of training. It's an impression question, so I'm going to allow it.

**MR. MCSHANE:** Thank you.

**BY MR. TADROS:**

**Q.** How many members --

**THE COURT:** But he hasn't answered it.

**MR. TADROS:** Oh, I'm sorry. I thought he did, Your Honor. My apologies.

**THE WITNESS:** Could you ask it again, please?

**BY MR. TADROS:**

**Q.** Yes, sure. I said, did anything that occurred on the *Aris T* bridge on January 31, 2016, lead you to believe that Captain Baltas or his navigating crew were not properly trained?

11:31

**A.** There was nothing there that led me to believe that.

**Q.** Did Captain Baltas ask you any questions when you first boarded?

**A.** We do the MPX, master pilot exchange. Other than that, I don't recall.

**Q.** How many members of the *Aris T* crew were on the bridge?

**A.** Normally, typically there's a helmsman, there's an officer and captain. All three of them were on the bridge at the same time.

**Q.** At any point did that change?

**A.** It does change. Typically the way they work on ships is, like, 8:00 to 12:00 in the morning, works the same in the evening, and then 12:00 to 4:00 works at -- in the evening and the morning, and then 4:00 to 8:00. So at roughly 4:00 they would have changed officers and watch personnel.

**Q.** Is that the same for the helmsman?

**A.** Yes.

**Q.** They change every four hours?

**A.** A lot of helmsmen will change like every hour. They change just so people don't get burnt from steering a ship for four hours.

**Q.** In this specific case, do you remember whether the helmsman changed on the *Aris T* from the time you boarded?

**A.** I don't recall, but I do remember them changing every hour or so. I don't recall specifically.

11:34

**Q.** Was the interaction of the master and his crew that you observed when you got on board the *Aris T* typical of what you observed on other vessels?

**A.** Yes. There was nothing out of the ordinary.

**Q.** Was the master, Captain Baltas, distracted by anything once you started making meeting arrangements with the *Elizabeth Robinson* and the *Loretta Cenac*?

**MR. MCSHANE:** Objection. Lack of foundation.

**MR. TADROS:** I'm asking his impression, Your Honor.

**MR. MCLEOD:** We join in that objection. There's no foundation for what someone else was thinking.

**THE COURT:** Again, I think this is an impression question. He is asking whether Mr. Leone saw anything that would have distracted the captain. That's what I am hearing. Not that Captain Baltas was thinking about the next baseball game he has to attend with his son. I think it's looking subjectively through the eyes of Mr. Leone, so that's how I'm going to hear the question. The objection is overruled.

**THE WITNESS:** I'm sorry. Could you ask it again?

**BY MR. TADROS:**

**Q.** Sure, sure. The question was: Was there anything that you saw -- was Captain Baltas distracted by anything at the time you were making those passing agreements?

**A.** He was not distracted.

**Q.** He wasn't on his cell phone, was he?

11:35

A. No, he wasn't on his cell phone.
Q. He wasn't watching TV, was he?
A. He was not watching TV.
Q. First of all, are pilots compulsory in the Mississippi River?
A. They are.
Q. Why is that?
A. Basically it's a foreign vessel that comes into the Mississippi River, and they have no idea how to get from Point A to Point B navigationally, docking, different river currents, different conditions -- basically where to go. We take them from Point A to Point B safely and get them where they need to go.
Q. In your experience, do you expect the master of a foreign vessel to have as much knowledge as you, the pilot, as far as local custom?
A. No. That's why they hire a pilot.
Q. Do you expect the master of a foreign vessel to have as much knowledge about navigating his vessel around the bends in the Mississippi River?
A. No, he wouldn't have any knowledge of that.
Q. Is it normal practice for a pilot such as yourself to explain to the bridge team of a foreign-flagged vessel every time you make a meeting or overtaking agreement?
A. No. That wouldn't be efficient.

11:37

**MR. RIVIERE:** Objection, Your Honor. Counsel is just leading the witness, asking him yes/no questions the entire time. This is not proper direct for a nonadverse witness. That's the objection.

**THE COURT:** I hear the objection. I'm overruling the objection. When he gets to leading, I'll -- make your objection if you think it's leading, but I don't think this is leading.

**MR. RIVIERE:** Thank you, Your Honor.

**BY MR. TADROS:**

**Q.** Is it normal practice for you as a pilot to have to explain to the foreign master and his crew every time you make a meeting or overtaking arrangement?

**A.** No. I wouldn't typically tell the captain or crew.

**Q.** Why not?

**A.** It would be a distraction. It wouldn't be efficient. He trusts that I'm going to get the job done.

**Q.** Based on your experience on, let's call it, nearly 500 vessels, is it normal practice for foreign masters to engage in conversations with you about navigation as you're going through the area of the river that you cover?

**A.** They may ask you about the bridges because that's always a concern, but not typically.

**Q.** So it wasn't out of the ordinary that Captain Baltas may have not spoken to you for long periods of time during the time

11:39

you boarded the vessel?
**A.** Absolutely.
**Q.** How long had you been piloting the *Aris T* at the time of the allision, the first allision with the Valero dock?
**A.** Probable about 4 1/2 hours or so.
**Q.** Were there any incidents, close quarters situations, or anything during those 4 1/2 hours?
**A.** No issues in those 4 1/2 hours.
**Q.** Did you have discussions with Captain Baltas about bridge clearances?
**A.** Bridge clearances?
**Q.** Yes, sir.
**A.** Yes. We went over bridge clearances.
**Q.** Was that prudent, in your opinion, to have those discussions with Captain Baltas?
**A.** Absolutely. With the river in its condition, it's always a concern.
**Q.** Did you have any other discussions with Captain Baltas about where the berth was, where the vessel was going?
**A.** Yes. We spoke about his destination, and I may have had the conversation with him to get an extra tugboat just because of the river conditions that day, fairly large size vessel. So I requested an extra tugboat to help berth.
**Q.** Where was she going? Do you remember?
**A.** She was going to ADM Reserve.

11:40

**Q.** During your 4 1/2 hours that you were at the conn before this incident happened, was Captain Baltas attentive?
**A.** He was.
**Q.** Was his crew attentive?
**A.** They were.
**Q.** They followed your commands?
**A.** They followed every command.
**Q.** Were they checking their radars? Do you remember?
**A.** They could have been. Officers typically are very involved in the navigation, around the console area, on the bridge.

**MR. MCSHANE:** Your Honor, we move to strike the response as nonresponsive.

**THE COURT:** Response.

**MR. TADROS:** I don't know how that could be nonresponsive, Your Honor.

**MR. MCSHANE:** He asked if they were looking at their radar.

**THE COURT:** It's responsive, but it's speculative.

**MR. TADROS:** It's speculative. He said so himself.

**THE COURT:** I understand it to be speculative. I will let it go to the weight of the evidence. Noted, but that's how I'm treating it.

**MR. TADROS:** Thank you, Your Honor.

11:41

**BY MR. TADROS:**

**Q.** What navigation aid do you as a pilot use when you are aboard a vessel?

**A.** I have a PPU, which is a laptop computer.

**Q.** Is that typical? All pilots in the NOBRA organization have a PPU like that?

**A.** Yes. It's provided to all the pilots within the association.

**Q.** Explain what that PPU is. What is it?

**A.** It's a Panasonic Toughbook. It could take the weather or whatever. It's basically a computer, and it has Rose Point Navigation on it, which is a navigation tool/aid for us to navigate on the river.

**Q.** So does it have, like, electronic charts on it?

**A.** Yes, it has electronic charts of the river on the actual computer.

**Q.** Is that the only tool that you were using when you were aboard the *Aris T*, your PPU?

**A.** That's typically what I use.

**Q.** Anything else?

**A.** I'm using all available means, whether it's the radar, whether it's looking out the window. When you are piloting a ship, you're not just looking at one thing. It's visual, computer, radar. It's not just a computer I'm looking at the whole time.

11:43

**Q.** Do you know what navigational equipment the crew of the *Aris T* was using?

**A.** No, I don't recall.

**Q.** Do you recall how many radars the *Aris T* had on the bridge?

**A.** I don't recall, but typically the ships, when they come in the river, they have two working radars.

**Q.** Do you recall if they were ECDIS? Do you know what ECDIS is?

**A.** ECDIS is an electronic chart data information system.

**Q.** Do you recall if there was an ECDIS on the bridge?

**A.** I don't recall.

**Q.** So is it fair to say you don't recall what equipment the crew of the *Aris T* was using?

**A.** That's correct.

**Q.** Have you been trained on the use of Rose Point, which is in your PPU?

**A.** Yes.

**Q.** When did you complete that training?

**A.** It would be before I got commissioned in 2014, so maybe August, some point during -- prior to commissioning being a pilot, they trained us on Rose Point.

**Q.** You take that on board every vessel that you pilot in the river?

**A.** I do.

11:44

**Q.** Would you have preferred to use a ship's ECDIS over your PPU?
**A.** No.
**Q.** Why not?
**A.** My PPU, I'm used to using it. I use it every trip. I have it set up a certain way. I'm just used to using it. ECDISes, there's different brands of ECDISes. They are all different. So I'm used to using my computer every trip.
**Q.** Is it fair to say that you didn't look at the *Aris T's* ECDIS at all during the time you had the conn?
**A.** I don't ever look at an ECDIS, no ship I ever go on, because I'm used to my computer, which has the same thing that an ECDIS does. But I'm used to using my computer daily for every trip that I go on.
**Q.** Were you satisfied, Captain Leone, that you had all the information available to you to safely navigate the *Aris T* on January 31, 2016?
**A.** Absolutely.
**Q.** Let's talk about radar usage. I know you said you don't remember how many radars were on the *Aris T*.
This is a hypothetical. If the *Aris T's* crew had selected the *Elizabeth Robinson* or the *Loretta Cenac* as a target on its radar, would the information provided have made any difference to you as you were piloting the vessel?
**MR. RIVIERE:** I am going to object, Your Honor, to

11:46

the hypothetical nature of the question posed to this witness.

**THE COURT:** It is a hypothetical. This is not an expert witness.

**MR. TADROS:** He is a pilot, Your Honor. I was asking --

**MR. RIVIERE:** I can try with the answer, we can all try, but it's hypothetical.

**THE COURT:** The Court is more interested in what happened on the night of January 31, 2016.

Let me read the question.

I'm not sure you want an answer to that question. Anyway, I think it's a hypothetical that's not really directed to an expert witness --

**MR. TADROS:** Sure, Your Honor, I'll move on.

**THE COURT:** -- so I'm going to ask you to rephrase the question or move on.

**MR. TADROS:** I will withdraw it. It's immaterial. We will get to it through the experts. Thank you, your Honor.

Your Honor, I'm at that point where I'm going to be using that simulation. In order to do so, what I would like to do -- VRNO provided Your Honor with a binder of exhibits this morning. One of those -- and it is Exhibit 8 in the binder, which is Trial Exhibit 174-A -- is the transcript of the VDR of the *Aris T*.

May I approach the witness and put that in front

11:47

of him --

**THE COURT:** You may.

**MR. TADROS:** -- so he can follow along with the transcript as we go through the simulation?

Danny, can you please pull up the simulation.

**BY MR. TADROS:**

**Q.** Before we start playing this, Captain Leone, have you had an opportunity to review the video simulation prepared by Mr. Cunningham of London Offshore Consultants?

**A.** I have.

**Q.** Do you know if it includes all communications that were heard on the VDR?

**THE COURT:** On the *Aris T's* VDR?

**MR. TADROS:** Yes, sir.

**THE WITNESS:** I think so.

**MR. TADROS:** Your Honor, you heard the witness earlier. It doesn't include everything. So if I may ask a leading question to that? I'm going to ask about the accuracy.

**THE COURT:** Sure. We will see if there's an objection.

**BY MR. TADROS:**

**Q.** Even though it may not include every single communication that's heard on the VDR, Captain Leone, do you believe it to be otherwise an accurate reflection of things that happened that evening of January 31, 2016?

11:49

**A.** It's pretty fairly accurate, pretty accurate.

**MR. TADROS:** Let's hit play.

(Video played.)

**MR. TADROS:** Hit pause, please.

**BY MR. TADROS:**

**Q.** Just so the judge understands, was that your voice you just heard?

**A.** It was.

**Q.** What were you doing?

**A.** Giving them a command to starboard 10 rudder, right 10.

**Q.** Was that the helmsman responding?

**A.** That was him responding.

**Q.** Right here where we are, can you explain to the Court, where exactly is the *Aris T* located?

**A.** The *Aris T* is right at 26 Mile Point.

**Q.** You see where the two tows are?

**A.** I do.

**Q.** Do you understand the speeds that are exhibited here at this point? What speeds are those, as in speed over the ground, through the water?

**A.** Those are speed over ground.

**Q.** Do you see any problem with the speeds of the three vessels?

**A.** Not at this time.

**Q.** To be clear, who has the current following them?

11:51

**A.** So the two vessels, the *Elizabeth Robinson* and the *Loretta Cenac*, they have the current coming down astern of them, or behind them.

**Q.** What is the current with regard to the *Aris T*?

**A.** The current is ahead of her, in front of her; she is driving into the current.

**MR. TADROS:** Hit play, please.

(Video played.).

**MR. TADROS:** Stop.

**BY MR. TADROS:**

**Q.** Captain Leone, at this point what would be the speed of the current if you were to guess?

**A.** Probably between 4 and 5 knots.

**Q.** Have you already requested the increase in rpms for the *Aris T*?

**A.** I did.

**Q.** Any problem here with the speed of the three vessels?

**A.** I'm not concerned at this point.

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop.

**BY MR. TADROS:**

**Q.** Did you hear this exchange between the *Elizabeth Robinson* and the *Loretta Cenac*?

**A.** I did hear it.

MICHAEL LEONE - DIRECT

11:53

**Q.** Did you have any concerns at this point, having heard the agreement, the overtaking agreement that they are making?

**A.** I had no problem with it at this point. In my mind the *Elizabeth Robinson* would be out of the equation at this point. I kind of just took her out of the equation because she was going to be out of the way on her side of the river. I was not concerned.

**Q.** What made you believe that she would be out of the way?

**A.** She was going to back into Bayou Fleet. She was going to stop and back into Bayou Fleet.

**Q.** Based on your experience -- well, strike that.

Let me ask you this: How many tows have you witnessed backing into any fleet on the Mississippi River?

**A.** All the time. Almost every trip out there, I see a tow backing into a fleet.

**Q.** What does that mean to you as a pilot when a tow says, "I'm backing in"?

**A.** What he is going to do at this point is try and get his tow at current speed of the river and point his stern towards the direction in which he wants to go to. So in this case he would point his stern towards Bayou Fleet, towards the west bank, towards the right descending bank, and use the current to his advantage to back his tow into the fleet. He is going to be going astern on his engines and pointing his stern towards that bank in the direction in which he wants to go to.

11:55

Q. Captain Leone, you have a stylus right there in front of you. Can you draw on here where you would have expected his stern to be pointed to.
A. (Complies.)
Q. When he said, "I'll be backing into Bayou Fleet," which way did you expect the front of his tow would be aiming to?
A. It would be out maybe towards the middle, at least roughly in the middle of the river, but he would have the back of his boat pointing towards Bayou Fleet.
Q. That's why you believed he would be getting out of your way, correct?
A. He would be out of my way. I took him out of the equation.
Q. Were you at all concerned that he said that "Oh, I don't see anyone else coming up"?
A. No, because I still thought he was going to be out of my way. He was going to be on his side of the river, backing into his fleet. He was going to be -- not going to be part of equation.
Q. Did you see any reason to have to respond to that when you heard the *Elizabeth Robinson* say, "I don't really see anything else coming up this way"?
A. No. He is backing -- he's going into his fleet. I just assume and trust him that that's what -- he is going into his fleet, so I just pull him out the equation.

11:57

**Q.** That's an interesting point that you bring up. In your experience navigating foreign vessels in the Mississippi River, when other mariners tell you they are doing something, do you expect them to do what they say?

**A.** I do. It's just how we do it on the river. You trust people. We work together. We try to accomplish the same goal. We all want to go home and see our families. So we want to try and make it as easy as possible out there.

**Q.** At any point did the *Elizabeth Robinson* shape up with her stern the way you explained backing in is?

**A.** I mean, looking at it now, she didn't -- she let her stern go the other way, toward the east bank, and let the current grab her so she would set. She would set down, she would fall -- her stern was pointed towards the east bank, not toward the right descending bank or the west bank or toward Bayou Fleet. She let her stern go the other way because the current got ahold of her.

**Q.** Could you see the *Loretta Cenac* and the *Elizabeth Robinson* on your PPU?

**A.** I could.

**Q.** At this point, once you have heard the arrangement they made, did you have any problems with coming upriver as you were?

**A.** I didn't have any problem. The *Elizabeth* was going to take her one-third. If we have three vessels, I would slice it

11:58

into three, one-third, one-third -- she was going to take her one-third; the *Loretta* was going to take the middle one-third; and I was going to take my one-third and come up the river. We do it all the time.

**MR. RIVIERE:** Your Honor, if we could get a print of this for counsel, this exhibit.

**THE COURT:** Sure. Do you want to offer it as an exhibit?

**MR. RIVIERE:** I will use it, and I can offer it at that time unless counsel --

**MR. TADROS:** Can I ask another question before I print it, Your Honor?

**THE COURT:** Sure.

**BY MR. TADROS:**

**Q.** Just to be clear, Captain Leone, the arrow you drew here -- all I asked you to draw was -- you expected her stern to be going toward that direction, correct?

**A.** That's correct.

**Q.** It doesn't depict where you expected her, that high, middle, low, where she was going to be backing in?

**A.** I didn't know exactly where she was going to be backing into Bayou Fleet. I'm just saying here which direction I expected her stern to go towards.

**Q.** Which never happened.

**THE COURT:** Can we print it now?

12:00

**MR. TADROS:** Yes, Your Honor.

Hit play, Danny.

(Video played.)

**MR. TADROS:** Stop.

**BY MR. TADROS:**

**Q.** Do you see here it looks like Mr. Cunningham added "*Elizabeth Robinson* starts to reduce speed. *Loretta Cenac* starts to increase speed and turns to port to overtake on the two, on port side of *Elizabeth Robinson*"?

Is that what you would have expected?

**A.** That's exactly what I expected. That's the agreement they made.

**MR. MCSHANE:** Your Honor, the questions that are being asked here are making no reference to the time that we are looking at. For the appellate record, what's happening here is going to be indecipherable. If we could ask that the questions relating to the simulation that relate to a temporal period in the sequence include some reference for the record as to what exactly we are looking at on the screen.

**THE COURT:** It's a good point. Whenever we stop the video, just refer to the time stamp, 7:41:24 p.m. --

**MR. MCSHANE:** Thank you.

**MR. TADROS:** Sure.

**THE COURT:** -- for this particular point in time.

**MR. TADROS:** Sure.

12:01

**BY MR. TADROS:**
**Q.** At this particular point in time, 7:41:24, what has been described here, is that what you would have expected to see?
**A.** Yes. That was the agreement they made.
**Q.** Let me ask you this: Based on your experience, when two vessels in the Mississippi River have agreed to an overtaking, what would you expect the vessel that is being overtaken to do?
**A.** I would expect her to slow down. When I pilot a ship and somebody is going to overtake me, I slow the ship down to let them get by so we can accomplish the overtaking as quick as possible.
**Q.** What would you expect the vessel that's doing the overtaking to do?
**A.** She would speed up or she would make it happen as fast as possible.
**Q.** At this point, then, you agree with what these two vessels started to do; one started to slow down, the other one started to speed up?
**A.** That's correct.
**MR. TADROS:** Hit play, please.
(Video played.)
**MR. TADROS:** Stop, please.
**BY MR. TADROS:**
**Q.** This one is at 7:41:46. Did you hear this communication from the *Elizabeth Robinson*?

12:03

**A.** I did.

**Q.** What did he just confirm to you and everybody else in the river that could hear him?

**A.** That he was going to be stopping on the west bank, right descending bank. He was going to be basically out the way.

**Q.** Okay.

**A.** He was going to be backing into the fleet. He is going to stop and back his tow into the fleet.

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop, please.

**BY MR. TADROS:**

**Q.** 7:41:51, look at the speeds of the three tows -- excuse me, of the three vessels. I want you to focus on the speed of the *Elizabeth Robinson* and the *Loretta Cenac* and tell me what your observation is as far as the *Elizabeth Robinson's* speed.

**A.** They are basically the same speed here. He doesn't look like he is starting to slow down at all to stop and back into a fleet.

**Q.** Relatively speaking, your speed, *the Aris T's* speed, and the speed of the other two vessels are pretty close to each other?

**A.** All about the same, roughly the same.

**Q.** The *Aris T* is going against the current, correct?

**A.** She is going against the current, that's correct.

12:04

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop.

**BY MR. TADROS:**

**Q.** Now we are at 7:45:50. Do you see any problems here with you meeting these two downbound tows?

**A.** No, not at all. I'm going to take the *Elizabeth Robinson* out of the equation. She is going to be on her side of the river, stopping and backing into the fleet. I trusted that's what she was going to do. She would have her one-third, the *Cenac* would have their one-third, and I would have my one-third.

**Q.** At this point, Captain Leone, at 7:45:50, did the *Elizabeth Robinson* still have sufficient space and time to do the backing in he told you he was going to be doing?

**A.** Yeah. He had plenty --

**MR. RIVIERE:** I object to the form, Your Honor. He is asking the witness to speculate about another vessel's navigation.

**MR. TADROS:** I am asking the witness to tell me what his observation was, Your Honor, of what that guy said backing in.

**MR. RIVIERE:** That wasn't the question.

**THE COURT:** He is asking an impression question, which I am going to allow him to ask, but I don't fully

12:06 understand the question as referenced to a point in time.

Are you asking is he going to have time to complete the maneuver before the *Aris T* gets there? Is he going to have time to complete the maneuver, as he has indicated he is going to, after the passing has occurred? You may want to rephrase the question.

**BY MR. TADROS:**

**Q.** Does he have sufficient time, Captain Leone, at this point to complete the backing-in maneuver and get out of your way, as you anticipated he would?

**THE COURT:** Insofar as you understood in that point in time.

**MR. TADROS:** Correct, Your Honor.

**THE WITNESS:** That's what she said she was going to do. I trusted her word. She was going to stop and back in. There's sufficient time and space for her to do her maneuver.

**MR. TADROS:** Thank you. Hit play.

(Video played.)

**MR. TADROS:** Stop, please.

Your Honor, just one minute. I need to clear that arrow so it doesn't confuse anyone.

It's cleared. Thank you.

**BY MR. TADROS:**

**Q.** Did you just hear this communication?

**A.** I did.

12:08

Q. Explain to the Court, who was calling you?
A. *Elizabeth Robinson* was calling me --
Q. Right, and this is at --
A. -- the northbound ship.
Q. -- 7:46:47?
A. That's correct.
Q. About, let's call it, 5 1/2, 6 minutes after he told *Loretta Cenac* that he didn't see anyone else coming up?
A. That's correct.
Q. Obviously he knew you were there. He called you, right?
A. I didn't call him, he called me.
Q. What other information did he tell you at that point? Something you already knew?
A. He was going to be stopping and backing into Bayou Fleet. So I thought she was going to be out of the way.
Q. What else did he tell you?
A. He also told me the *Loretta Cenac* was coming down astern of him, behind him.
Q. And that would be overtaking her?
A. Yes.
Q. Any problem with that, in your mind, with this arrangement?
A. Still I have no problem with this arrangement here at all. The *Robinson* was going to clear the path for the *Loretta*, and then I was going to come up my side, one-third, one-third,

12:09

one-third. Everybody would take their slice.

**MR. TADROS:** Hit play, please.

(Video played.)

**MR. TADROS:** Stop, please.

**BY MR. TADROS:**

**Q.** Is this a conversation that you had with the *Elizabeth Robinson*?

**A.** It is. This is our arrangements. It is a conversation I had with him.

**Q.** What arrangements are you making with the *Elizabeth Robinson*?

**A.** We are agreeing to meet on a one-whistle, which is port to port, or left to left.

**Q.** What else does he tell you now for the third time?

**A.** He announced to me that he was going to be stopping and backing into a fleet, that he was going to be out of the way, basically.

**Q.** At this point, with the speeds you see on your screen, do you have any problem as you are approaching the soft bend?

**A.** I have no problem with any of the speeds.

**MR. TADROS:** Hit play.

**MR. DIAZ:** Wait. Hold on just a second. Mr. McShane's point, this is at 7:47:05. We hadn't noted that.

**MR. TADROS:** Thank you. My apologies. I thought I had said that.

12:11

Hit play.

(Video played.)

**MR. TADROS:** Stop.

**BY MR. TADROS:**

**Q.** The time now is 7:47:33. Captain Leone, you just said you just spoke to the *Loretta*; is that correct?

**A.** Yes.

**Q.** Your answer to him was, "All right. I'll meet you on the one. Just try and get over there as far as you can with him." Can you please explain to the Court, what did you mean by that?

**A.** I kept both vessels on the same side, port to port, left to left, which is custom and practice. We like to do this.

So I instructed him for him to get over there with him, as close as he can to him, to make all of our arrangement work. That he was going to back into the fleet, stop and back into it, and he would take the middle -- *Loretta* would take the middle and I would take my side.

**Q.** When you say, "Get over there with him," just so we are clear for purposes of the record, over where? What are you talking about?

**A.** The *Elizabeth* is going into Bayou Fleet, so to get on that side of the river, to favor him, be over there with him.

**Q.** Why don't you take your stylus and explain to the Court on what side you expected the, A, *Elizabeth Robinson* to go to.

**A.** You want me to cut it into thirds or how do you --

12:13

**Q.** Yes. Yes, cut it into thirds.
**A.** One, two, three lengths.
**Q.** Where would you have expected the *Elizabeth Robinson* to start going into? Which lane? Put an R in that lane.
**A.** (Complies.)
**Q.** Where would you have expected the *Loretta Cenac* -- if the *Elizabeth Robinson* got out of her way, where would she be? Put a C there.
**A.** There you go.
**Q.** What lane would have been left for the *Aris*?
**A.** (Complies.)
**Q.** The bank where you have drawn the lane for the *Elizabeth Robinson*, what do we call that?
**A.** The west bank, or right descending bank.
**Q.** The bank across where the lane is for the *Aris* is which bank?
**A.** East bank, or left descending bank.
**Q.** In the little photograph of the two tows -- do you see this to the left, the photograph? Do you see that a little green patch?
**A.** Yeah.

**MR. TADROS:** I don't think anyone put that in there, Your Honor.

**BY MR. TADROS:**
**Q.** Is it fair, based on this drawing you just did, that's

12:15

toward where you expected the *Elizabeth Robinson* to go?

**MR. RIVIERE:** That would be leading, Your Honor.

**MR. TADROS:** He just drew it.

**THE COURT:** It is leading.

**MR. RIVIERE:** Could we also get a print at this point or when he is finished with it before we move on?

**THE COURT:** I assume you were going to get a printout.

**MR. TADROS:** I was, Your Honor.

**THE COURT:** You may have other things you are going to do, I don't know, but let's get a print of this while we are in the neighborhood.

The prior print that was made, do we want to go ahead and introduce that into evidence?

**MR. TADROS:** Sure. That would be, I think, 414.

So 413-C. Yes?

**MR. SHOEMAKER:** Yes.

**THE COURT:** It will be admitted as Exhibit 413-C. That's the prior copy. Then when we make this copy, I assume you will be introducing it as 413-D.

**MR. TADROS:** 413-D.

**BY MR. TADROS:**

**Q.** Using your stylus again, Captain Leone, so we can deal with the objection, where would you have expected in this indented picture the *Elizabeth Robinson* to go?

12:16

**A.** I would expect her to go in her lane.
**Q.** Very good. I'm going to print this.
**THE COURT:** I'm going to go ahead and admit the printout of this depiction as Exhibit 413-D unless there's any objection.
Hearing none, it will be admitted.
**MR. RIVIERE:** We would also like the next one as 413-E, Your Honor, if we can get a print of what he's just added.
**THE COURT:** I think the printout was after he added it.
**MR. TADROS:** It was, Your Honor.
**THE COURT:** I think that's going to be 413-D with everything that is shown on there right now.
**BY MR. TADROS:**
**Q.** Captain Leone, on your PPU unit can you see what vessels and/or barges or anything are on the right or left descending bank if they are docked there or berthed there?
**A.** If it has an AIS unit on it, then we can see if there's a boat there. But as far as barges and what -- if it has an AIS, meaning it has a transponder, then we can see if there's a ship or a tow, a boat. But for a barge, barges don't have AIS.
**Q.** You would see that on radar, correct?
**A.** Yes.
**Q.** Very good.

12:18

Did you have any doubt in your mind at this point that the *Elizabeth Robinson* would have started her backing in and going toward the right descending bank?

**A.** I was expecting her to do that the whole time. I trusted her word. That's what she told me she was going to do, stop and back into the fleet. At this point -- she said it a couple of times here that she was going to stop and back into the fleet.

**Q.** Let's look at the speeds of the vessels. The *Loretta Cenac*, at 11 knots, would you expect that of a vessel that's trying to do an overtaking?

**A.** Yes, I would.

**Q.** The *Elizabeth Robinson*, at 8.7 knots, would you expect that?

**A.** I would expect her speed to be a lot slower. If she was going to be stopping somewhere, especially with the current behind her, I would expect her speed to be a lot slower.

**Q.** I know you said you didn't have any concerns. But at this point, having heard the overtaking, making your meeting agreements, what would have happened right now, at 7:47:33, if you reduced speed to half ahead?

**A.** I'm not concerned at this point about my speed. The one vessel is going to be out of her way, out of the equation. The other one is going to overtake and just -- at this point I didn't see any reason to slow down. Everything was fine.

12:20

**Q.** Okay.
**A.** There was not a concern to me at this point.
**MR. TADROS:** Hit play, please.
(Video played.)
**MR. TADROS:** Hit pause.
**BY MR. TADROS:**
**Q.** You just advised the two tugs that there's another tow coming up behind you, right?
**A.** I kind of did what the *Robinson* did. He let me know the *Loretta* -- that's just a custom and practice, "Hey, there's somebody behind me coming up."
He was a large tow, probably 20, 25 barges coming up. So it's just a custom and practice to let the next guy know who is coming up behind you.
**Q.** If you read your screen, did you hear this communication between the *Elizabeth Robinson* and the *Loretta Cenac* on the bridge of the *Aris T*?
**MR. MCLEOD:** 47:40?
**MR. TADROS:** 47:40.
**THE WITNESS:** No, I did not hear this.
**BY MR. TADROS:**
**Q.** Do you know why you didn't hear it?
**MR. RIVIERE:** Object to form, Your Honor. It calls for speculation.
**THE COURT:** I think it does call for speculation. He

12:21 said he didn't hear it. Let's just leave it at that.

**MR. TADROS:** No problem, Your Honor.

**THE COURT:** Sustained.

**BY MR. TADROS:**

**Q.** If you had heard this communication or if the *Elizabeth Robinson* had called you and told you exactly what he is saying here, that the current is going to be pushing him, the *Elizabeth Robinson*, down in there, would that have been of concern to you?

**A.** Yes, it would have. It would have concerned me.

**Q.** At this point, at 7:47:40, you received no communication from the *Elizabeth Robinson* that that was happening; is that correct?

**A.** No. This communication wasn't to me; it was to the *Loretta*.

**Q.** The *Loretta* did not communicate to you that "Hey, the *Elizabeth Robinson* is falling down on me"?

**MR. MCSHANE:** Objection. Leading.

**MR. RIVIERE:** Objection. Leading.

**BY MR. TADROS:**

**Q.** Did the *Loretta Cenac* communicate any information to you about this communication?

**MR. MCSHANE:** Same objection.

**MR. RIVIERE:** Same objection, Your Honor.

**THE COURT:** That can't be leading, so I'm going to

12:22

overrule those objections. Go ahead.

**BY MR. TADROS:**

**Q.** Did the *Loretta Cenac* advise you?

**A.** No, the *Loretta Cenac* did not advise me of anything.

**Q.** At this point, had either of those two vessels advised you that the *Elizabeth Robinson* was getting pushed by the current down in there, what were your options?

**A.** At this point we had some options. I mean, I could have saw them on two whistles at this point, which means starboard to starboard, right to right.

We had options at this point. If they had asked me to, I would have slowed the vessel down, but neither vessel told me they were having any kind of issue; so there was no need to go for the two or slow down. Those were the options at this point. I didn't know anything --

**Q.** Prior --

**A.** -- because I didn't hear this conversation.

**Q.** I'm sorry. Are you finished?

**A.** Yes.

**Q.** Prior to this point did either the *Elizabeth Robinson* or the *Loretta Cenac* ask you to hold or slow down?

**A.** Neither vessel asked me to hold or slow down.

**Q.** Did they have that right to ask you that?

**A.** They sure did.

**Q.** Why is that?

12:24

**A.** They are the downbound vessel, so if they have the current behind them, they can propose the place of passage. If that's the case, they can say, "Hey, we need you to slow down. We don't like it." They can dictate that to me.

**MR. TADROS:** Hit play, please.

(Video played.)

**MR. TADROS:** Can you stop it a second.

We need to clear this, right, Your Honor?

**THE COURT:** Can you clear it?

**MR. TADROS:** Go ahead.

(Video played.)

**MR. TADROS:** Stop, please. Go back to that.

(Video played.)

**BY MR. TADROS:**

**Q.** Did you hear that communication while you were on the bridge of the *Aris T*?

**THE COURT:** We're at 7:48:22.

**MR. TADROS:** Sorry, Your Honor, 7:48.

**THE WITNESS:** Yes. I heard the *Elizabeth* say again she was going into Bayou Fleet and backing in there.

**BY MR. TADROS:**

**Q.** *Mike Weisend* was the larger tow behind you that you had warned them about?

**A.** Yes, that's correct.

**Q.** So this, once again, for the fourth time was reconfirming

12:26

to you your expectation of what they were going to do?

**A.** Trusted their word.

**MR. TADROS:** Hit play, please.

(Video played.)

**MR. TADROS:** Stop, please.

**BY MR. TADROS:**

**Q.** Let's talk about the three speeds.

**THE COURT:** This is 7:48:32.

**MR. TADROS:** My apologies, Your Honor.

**THE COURT:** That's all right.

**BY MR. TADROS:**

**Q.** 7:48:32, the three speeds. Tell me about the *Elizabeth Robinson's* speed. What would you have expected at this point?

**A.** I would have expected her speed to be a lot slower at this point if she was going to be going into a fleet, and expected her to be in her lane, on her side.

**Q.** As far as you were concerned on board the *Aris T*, was there still time at this point, at 7:48:32, for the *Elizabeth Robinson* to start her backing in?

**A.** Absolutely. There's plenty of time. There's plenty of space.

**Q.** For purposes of the Court and you, Captain Leone, I want you to make mental note of the speeds right now. *Loretta Cenac*, 10.7; *Elizabeth Robinson*, 8.8; and *Aris T* is at

12:27

8.9.

**MR. TADROS:** Hit play, please.

(Video played.)

**MR. TADROS:** Stop, please.

**BY MR. TADROS:**

**Q.** Did you receive that communication from the *Loretta Cenac*?

**A.** I did.

**THE COURT:** 7:48:54.

**BY MR. TADROS:**

**Q.** At 7:48:54.

**A.** I did receive that communication.

**Q.** When you heard "I will just try to back down, 91," what did you think he was telling you?

**A.** That he was going to abort the overtaking at that point. He was going -- he wasn't going to try and get by him.

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop. Time, 7:49:04.

**THE WITNESS:** Basically here, it's very risky at this point to go for the two, which means I would have to probably get both vessels on the right-hand side. But the *Elizabeth* said she was backing and stopping at Bayou Fleet.

So it's very risky at this point to do that, but I'm trying to accommodate these guys, to make it work. I'm trying to work with them.

12:29

**BY MR. TADROS:**

**Q.** Here is the question. Look at the speed of the *Loretta*. It's 10.3, right?

**A.** 10.3.

**Q.** The previous footage was seconds earlier. So 10.7, 10.3, what does that mean?

**A.** She probably pulled her engines back at that point. She started to kind of slow down.

**Q.** So has he changed the meeting agreement with you now that he is slowing down?

**A.** We are still going to meet port to port, although I offered it just to try and accommodate him in some kind of -- he said he would be all on the docks, down on the docks. So I offered -- very risky at this point, but I was trying to accommodate him as much as possible.

**Q.** Now, what is the effect, if you know, of the current on the *Loretta Cenac* if she is slowing down?

**A.** If she has the current coming down astern of her, behind her, she is going to be at the mercy of the current. So the current is going to take her where the current wants to go. It's just going to drag her. Where the current is going, that's the direction where she is going to go.

**Q.** Would that be deeper in the bend?

**A.** That would definitely be deeper in the bend. The current tends to shape the bends of the river. That's where your

12:31

current is, in the bends.

**Q.** Okay.

**A.** So on the river you have the points and bends, and typically the current is most strongest in the bends of the river.

**Q.** Now, Captain Leone, at 7:49:04 were you in what you considered to be your lane?

**A.** I was in the middle but I could shape over.

**Q.** Was that your intention, to shape over, to get into your lane?

**A.** Yes.

**Q.** That would have been to what side?

**A.** Towards my starboard side, or the east bank, towards the east bank.

**Q.** At this point did you believe that the *Elizabeth Robinson* still had time and space to do the backing in; and if she did, would that have allowed you and the *Loretta* to get by without a problem?

**MR. RIVIERE:** I object to the compound nature of the question. It's two questions.

**BY MR. TADROS:**

**Q.** Do you understand my question?

**THE COURT:** Let's break it down. I'm going to sustain the objection. Let's ask one question at a time.

**MR. TADROS:** Sure.

12:32

**BY MR. TADROS:**

**Q.** At this point do you believe there was enough space and time for the *Elizabeth Robinson* to back into Bayou Fleet, as she had announced?

**A.** I trusted her word. She said it, I don't know, three, four, five times, "I'm going to be stopping and backing into Bayou Fleet." So I expected her to be on her side of the river, going into Bayou Fleet.

**Q.** At this point could that still be accomplished?

**A.** It definitely could be accomplished.

**Q.** If he had accomplished that, would the *Loretta Cenac* be able to get around him?

**A.** He would have sufficient room to complete his maneuver. If the *Robinson* got on her side of the river, the *Loretta* wouldn't have any reason to -- she could still keep her original agreement to overtake him on two and to meet me on one.

**MR. TADROS:** Hit play, please, Danny.

(Video played.)

**MR. TADROS:** Stop, please. The time is 7:49:24, 20 seconds later.

**BY MR. TADROS:**

**Q.** What made you keep it on the one?

**A.** It just was really risky to kind of split the two of them at this point. It's just not something that would -- it's very

12:34

risky.

**Q.** In order to shape up for the two, explain to the Court what you, *Aris T*, would have had to have done to meet him on the two.

**A.** I would have had to pull the ship around pretty hard, like steer around pretty hard, and then I would have had to cross in front of him, both of them.

**Q.** Is that something you would have liked to do, cross in front of downbound ships?

**A.** No. I would have rather meet him on one. It's just not good practice to cross in front of somebody. I would have had to get them both on the same side at this point.

**MR. TADROS:** Hit play, please.

(Video played.)

**MR. TADROS:** I need that. I need it backed up. Stop it.

**BY MR. TADROS:**

**Q.** At 7:49:28 did you hear this communication from the *Loretta Cenac*?

**A.** I did. I heard it.

**Q.** What now did he tell you? What is he doing now?

**A.** He is going to be backing down. He is going to try and get behind him.

**Q.** Captain Leone, when he says, "I got it backing down," what does that mean to you?

12:36

**A.** He is going astern on his engines or he is going in reverse.

**Q.** What kind of barges were the *Loretta Cenac* and the *Elizabeth Robinson* pushing?

**A.** I really wasn't sure that night. But now knowing, she was pushing red flag barges, "red flag" meaning dangerous cargo, something nasty.

**Q.** So he has it backing down; is that correct?

**A.** That's correct.

**MR. TADROS:** Hit play, please.

(Video played.)

**MR. TADROS:** Pause it.

**BY MR. TADROS:**

**Q.** This is at 7:49:35. 30 seconds earlier the *Loretta Cenac's* speed was 10.3. Now she is at 9.6. What is that indicative of?

**A.** She is just kind of slowing down at this point. She is just slowing.

**MR. TADROS:** Danny, hit play so he can hear it, and then stop.

(Video played.)

**BY MR. TADROS:**

**Q.** What did you mean when you said to him, "You might want to keep some headway"?

**A.** So if he is going to try and stay behind him -- I just

12:37

want him to have control over his vessel. That's what I want him to have.

**Q.** So --

**A.** To keep driving ahead on it so he can control his vessel. Because if he is backing on it, he is going to be at the mercy of the current. So the current is going to take him. My intentions were -- if he is driving, he is going to have better control over his vessel.

**MR. TADROS:** Hit play, please.

**THE COURT:** Wait, wait, wait. That was 7:49:36, I think it was.

**MR. TADROS:** It was, Your Honor. That's what I said.

**THE COURT:** I didn't hear you.

**MR. TADROS:** I'm sorry.

Hit play.

(Video played.)

**MR. TADROS:** Stop.

**BY MR. TADROS:**

**Q.** This is at time 7:49:41. Did you hear Captain Sanamo of the *Loretta Cenac* tell you, "I won't fall down"?

**A.** I did.

**Q.** What does that mean to you?

**A.** He is not going to be in my way. He is not going to fall in front of the ship. He is going to give me enough room to complete the passage.

12:39

Q. Did he keep that promise to you?

MR. MCSHANE: Object to the form. Your Honor, objection. It's a mischaracterization of the prior testimony. He didn't say it was a promise.

MR. TADROS: Let me rephrase it, Your Honor.

THE COURT: Thank you.

BY MR. TADROS:

Q. Did Captain Sanamo represent to you that he won't fall down?

A. Did he represent?

Q. Did he tell you that, that he won't fall down?

A. He told me he was going to do that, but that's not what he did.

Q. Thank you. Again, this is 7:49:41.

MR. TADROS: Hit play.

(Video played.)

MR. TADROS: Stop it.

BY MR. TADROS:

Q. At 7:49:57, Captain Leone, you had just heard Captain Sanamo tell you that "I won't fall down on you"; and this was your response, "You have plenty of room."

What was that based on? Why did you believe there was plenty of room, "Come on with it"?

A. So at this point everything looks fine to me. We had enough room to complete the passage. There was enough room to

12:40

complete the passage. I was expecting, hoping, trusting that the *Robinson* was going to open up the situation all the time, that she was going to be stopping, backing into her fleet. So then it would open up the entire situation at this point.

**Q.** When you say "open up the entire situation," describe that to the judge. At this particular point, at 7:49:57, what would the *Elizabeth M. Robinson* have had to do to open up the situation?

**A.** She would have had to come towards Bayou Fleet, toward the west bank. She would have stopped and backed into her fleet like she instructed us on the river that night that she was going to do. So she would give the *Loretta* room to meet me on the one. So it would open up the whole situation.

**Q.** Does that mean it would open up the river for you?

**A.** Yes, it would open the river up.

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop.

**BY MR. TADROS:**

**Q.** This is the same *Mike Weisend* that now has had at least two or three other communications that you have overheard, right, on the *Aris T*?

**A.** That's correct.

**Q.** The *Loretta Cenac's* captain still had no idea who he was?

**A.** No. He wasn't sure who that was.

MICHAEL LEONE - DIRECT

12:42

**MR. TADROS:** Danny, can we back it up just a smidge to where the speeds of the vessels will show.

**THE COURT:** This is --

**MR. TADROS:** This was at 7:50:16 -- or 18, Your Honor. I think it looks like 18.

(Video played.)

**THE COURT:** So this is forward. We have gone 11 seconds now forward. Did you want it backed up?

**MR. TADROS:** I did. I wanted it backed up to the previous speeds. It would be 7:50:10, 11.

**THE COURT:** Before 7:50:18.

**MR. TADROS:** Yes.

(Video played.)

**MR. TADROS:** Stop.

**BY MR. TADROS:**

**Q.** At this time, at 7:50:01, again I would like for you to make a mental note of the speed of the *Loretta Cenac*, which now is down to 8.9 knots; and the *Elizabeth Robinson* is still at 8.5 knots. Keep that in mind.

**MR. TADROS:** Now hit play.

(Video played.)

**MR. TADROS:** Stop it here, please.

**BY MR. TADROS:**

**Q.** At 7:50:32 whose speed is starting to drop now?

**A.** The *Elizabeth Robinson* and the *Cenac*, they both are.

12:44

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop it there, please.

Actually let's hear this next, his response, and then we will stop it. Go ahead.

(Video played.)

**MR. TADROS:** Stop, please.

**BY MR. TADROS:**

**Q.** So this is 7:51:05. What made you think that the *Loretta Cenac* was backing on you?

**A.** She was falling down in front of the path of the ship.

**Q.** Can you see what's happening to the *Elizabeth Robinson*? What's happening to her speed?

**A.** She is dropping her speed. Her stern is pointed towards the east bank. Basically the current has her at this point.

**Q.** So if the *Elizabeth Robinson* had her engines in reverse at that point, going astern, which way would her stern be pointed?

**MR. RIVIERE:** Objection, Your Honor. It's calling for speculation from this witness about another vessel's characteristics and maneuvering, how it would respond.

**THE COURT:** I'm going to allow the question based on this pilot's experience in the river. I don't think it's speculation with respect to characteristics associated, particularly with a vessel as opposed to vessels in general. That's how I'm understanding, appreciating the question.

12:47

**THE WITNESS:** So I would expect her stern to be pointed towards the west bank, right descending bank, toward Bayou Fleet, the other direction. Her stern is pointing toward the east bank. The current has her at this point.

**BY MR. TADROS:**

**Q.** Since her stern is pointing toward the east bank, who is she getting in the way of?

**A.** She is getting in the way of the *Loretta*; she is sliding down further towards the east bank, in front of my path, in front of the *Aris T's* path.

**Q.** Your speed throughout has been consistent. You haven't changed anything with regard to your speed; is that correct?

**A.** I haven't changed anything.

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop.

**BY MR. TADROS:**

**Q.** This instruction, who is this instruction given to?

**A.** That's to the *Loretta Cenac*.

**Q.** This is at 7:51:10?

**A.** That's correct.

**Q.** Why are you instructing the *Loretta Cenac* to "just keep driving on her"?

**A.** So she can come ahead and have control of her vessel, so she is not falling down in front of my way, she is not falling

12:48

in front of the ship's way.

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Hit stop there.

**BY MR. TADROS:**

**Q.** Now, this is at 7:51:15. Can you tell me, Captain Leone, on the upper left-hand -- the little square picture, what does that depict to you? Is that the slowing down of the *Elizabeth Robinson*?

**A.** She is sliding.

**Q.** By her stern?

**A.** Oh, the current has got her at this point. That current is hitting her on the right side, her starboard side right there. It's got her at this point.

**Q.** Did Captain Sanamo, as the downbound vessel with the right-of-way, have the right to say to you, "Hey, I'm not going through with this. I'm going to back down. I'm getting behind him"?

**A.** Yeah. He could have aborted at any time. He could have aborted sooner. He could have -- absolutely.

**Q.** Did he ever call you to abort, to actually abort, not ask you?

**A.** He just said he was going to back down and try and get behind him.

**Q.** When he said, "I won't fall down on you," what did that

12:50

mean to you?

**A.** He reassured me that he was not going to be in my way.

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop, please.

**BY MR. TADROS:**

**Q.** At 7:51:32, Captain Leone, what is the speed of the *Elizabeth Robinson*?

**A.** 7.5 knots.

**Q.** That's dropped down now from -- I believe the last one was 8.7?

**A.** 8.7 -- mid 8s.

**Q.** What does that tell you, such a drop, as far as what she was doing?

**A.** He is just slowing down. He is not backing. He is not backing into Bayou Fleet. He is just slowing down.

**Q.** The more he slows down, what is that doing to his stern?

**A.** He is getting caught by the current. The current has got him -- the current has him at this point. He is just setting down, setting down, falling down towards the east bank.

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop, please.

**BY MR. TADROS:**

**Q.** This is 7:51:45. Do you see the *Loretta Cenac* and how she

12:52

and her tow are shaped?
**A.** Yes.
**Q.** Does that mean anything to you?
**A.** How she is made up?
**Q.** No, how she's in the river, her direction in the river.
**A.** She is kind of the same as the *Robinson*. The current has her. It's hitting her starboard side, or right side. She is at the mercy of the current at this point.
**Q.** At this point, Captain Leone, do you agree she is almost parallel with the *Elizabeth Robinson*?
**A.** She is almost parallel with it.
**Q.** At this point, if the *Loretta Cenac* had been able to control her tow and gun it like you had told them, would everyone have been able to get by without a problem?
**MR. MCSHANE:** Two objections, Your Honor. It's a mischaracterization of the prior testimony. Nobody has established anybody said, "Gun it." Secondly, it calls for speculation.
**THE COURT:** Mr. Tadros, I know you are just using that --
**MR. TADROS:** I will rephrase it, Your Honor.
**THE COURT:** Yes, if you would.
**BY MR. TADROS:**
**Q.** Did you tell the *Loretta Cenac* to keep headway?
**MR. MCSHANE:** Objection, Your Honor. It's vague

12:53

without a temporal reference to the question because these guys have been interacting for 15 minutes.

**THE COURT:** That's true too. I'm going to sustain the objection. Just provide some kind of temporal framework.

**MR. TADROS:** Okay.

**BY MR. TADROS:**

**Q.** Let's go back, then, to what you said. Actually, if you look at your transcript that you have there in front of you, in your transcript it's 01:51:05, page 4. Do you see that?

**A.** I do.

**Q.** What do you tell the *Loretta Cenac* at that point?

**A.** I say, "All right. Just keep driving on her, or you will fall on top of me if you don't."

**Q.** This portion of the video that we have stopped is at 7:51:45.

**MR. TADROS:** Your Honor, just so you understand, 7:51:45 is local time; 1:51 is the UTC, the VDR time.

**BY MR. TADROS:**

**Q.** You've just told *Loretta Cenac* to "keep driving on her." My question to you is: Had the *Loretta Cenac* been able to keep driving, right now as she is parallel, could she have gotten by and allowed you enough room to get by without this incident happening?

**MR. MCSHANE:** Objection, Your Honor. Speculative and lack of foundation.

12:54

**MR. TADROS:** Your Honor, the man is a pilot. He has piloted over 500 vessels, has come across tows. If he doesn't know what's going to happen -- the reason he told him to drive it is that very reason.

**MR. MCSHANE:** This is an *in extremis* situation. He has never been in one before. To imply that he has experience with that is incorrect.

**MR. TADROS:** That assumes facts not in evidence, Your Honor, that it's *in extremis*. We haven't even gotten there yet.

**THE COURT:** The way I think I'm going to handle this is to sustain the objection, but I believe you can ask this question if you ask what he would have expected from the exchange.

**MR. MCSHANE:** Thank you, Your Honor.

**BY MR. TADROS:**

**Q.** What did you expect, by telling the *Loretta Cenac* to "drive on it," would have happened?

**A.** To create a hole for me so I could drive the ship through it. I would expect it would open up. I would have a hole to drive through.

**Q.** Did he do that?

**A.** No, he didn't.

**Q.** Do you know why he didn't do that?

**MR. MCSHANE:** Objection, Your Honor. Lack of

12:56

foundation and speculative.

**THE COURT:** I have to sustain that.

**MR. TADROS:** I'm just curious if he knew.

**MR. MCSHANE:** Same objection, Your Honor.

**MR. TADROS:** No problem. I will withdraw it. It will come out clearly later.

Hit play.

(Video played.)

**MR. TADROS:** Stop now.

**BY MR. TADROS:**

**Q.** 7:51:55. Captain Leone, did you see how the *Loretta Cenac* started to slide?

**A.** It got even worse. At this point her point got even worse.

**Q.** What has now happened to you?

**A.** The door is closing. Closing a door on me at this point. My hole is shrinking.

**Q.** At this point what was your expectation -- even at this point, if he had driven on it like you told him, could you get by there?

**A.** At this point, if he would have driven on it and stayed parallel, I probably would have got through it. It would have been a small, small door, but I would have managed to get through it.

**THE COURT:** Wait. I think there's an objection.

12:57

**MR. RIVIERE:** Your Honor, he mentioned "if he would have." I would like to know the reference that he is making, to which tug, if he would have driven on it.

**THE WITNESS:** The *Loretta*. If he would have --

**MR. RIVIERE:** Who is "he"?

**THE COURT:** The *Loretta*.

**THE WITNESS:** The *Loretta*.

**MR. RIVIERE:** Gotcha.

**BY MR. TADROS:**

**Q.** Do you see the commands that you gave to the helmsman?

**A.** I do.

**Q.** Why were you doing that, "starboard 5"?

**A.** I'm trying to shape, trying to get closer towards the east bank and get -- I don't want to collide with this guy. I don't want to hit him. He has people on board. He has nasty cargo in those barges. I don't want to kill someone. So I'm shaping towards the east bank.

**Q.** Under the rules, what are you supposed to do at this point?

**MR. MCSHANE:** Objection, Your Honor. That's really vague. There are an awful lot of rules that are applicable here.

**MR. TADROS:** I'll withdraw, Your Honor.

**BY MR. TADROS:**

**Q.** As a prudent seaman, which way would you direct your

12:58

vessel to get out of the way?

**A.** To the starboard. I'm staying on my side of the river, starboard side.

**Q.** So, Captain Leone, you're still trying to accommodate them and give them room?

**MR. MCSHANE:** Objection, leading.

**THE COURT:** It is leading.

**MR. TADROS:** I will withdraw, Your Honor. I think the evidence is plain for everyone to see.

Hit play.

(Video played.)

**MR. TADROS:** Stop, please.

**BY MR. TADROS:**

**Q.** What's the *Loretta Cenac* doing now, Captain Leone?

**THE COURT:** It's 7:52:01.

**MR. TADROS:** 7:52:01, Your Honor.

**THE WITNESS:** Her angle is worse. Her tow is falling down even further in front of the ship. The stern of her boat, she is falling down. She has more of a point. She's just setting down in front of the ship.

**BY MR. TADROS:**

**Q.** Do you have any idea why that's happening?

**A.** At this point, no.

**Q.** What's going on with the *Elizabeth Robinson*?

**A.** Her speed is dropping. Maybe she is starting to back on

01:00

it at this point. It's kind of hard to speculate, but she -- her speed is dropping down. She may be backing.

**Q.** Well, let me ask you this: Which way is the bow of her tow pointed?

**A.** It's kind of pointed -- it's pointed towards the west bank.

**Q.** Is that what you would expect if she was backing?

**A.** If she is backing, she needs to get her stern toward the west bank, not her bow. The current has her at this point.

**Q.** You have made another adjustment to starboard; is that correct?

**A.** I'm trying to open the situation up. I'm trying to accommodate -- not to have a collision. I'm trying to give him as much room as I can.

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop, please.

**BY MR. TADROS:**

**Q.** Why did you ask *Cenac* to "drive on it"?

**A.** To give me a hole. The door is closing. I'm asking him to drive on it so I can -- if he drives on it at this point, he could create a hole there where I could drive through.

**MR. TADROS:** This, Your Honor, is at 7:52:08.

**BY MR. TADROS:**

**Q.** Did Cenac drive on it?

01:01

**A.** It's kind of hard to say. Looking at this now, it doesn't look like she did a whole lot. She's falling down in front of the ship. It's really hard to say.

**THE COURT:** Hit play.

(Video played.)

**MR. TADROS:** Stop, please.

Your Honor, this is at 7:52:15.

**BY MR. TADROS:**

**Q.** Captain Leone, was that you calling out "Hard left rudder"?

**A.** Yes.

**Q.** Who was that instruction to?

**A.** That was to the *Loretta Cenac*.

**Q.** Why was that not to your own helmsman?

**A.** If it was to my own helmsman, I would have said port, "hard port rudder." Whereas I was on my VHF. I said "hard left rudder." That was to the captain on the *Loretta Cenac*.

**Q.** Why would you give him that instruction?

**A.** I would give him that instruction so he could turn his boat -- so he would turn his boat, basically dodge the *Aris T*. He is going to kind of dance with it. At that point when they meet bow to bow, if he puts hard left rudder, we will kind of dance and miss each other.

**Q.** If he had been able to accomplish this hard left rudder, he could have gotten his stern out of your way?

01:03

**MR. MCSHANE:** Objection. Calls for speculation, lack of foundation.

**BY MR. TADROS:**

**Q.** Is that what you expected by making that command?

**A.** Yes.

**THE COURT:** I will allow that.

**THE WITNESS:** That's what I expected, him to put hard left rudder and lift that stern out of my way. He would have swung his stern and give me a hole.

**BY MR. TADROS:**

**Q.** Did he do that?

**A.** No.

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop, please.

**BY MR. TADROS:**

**Q.** So at 7:52:22, are you happy with the situation?

**A.** I'm not.

**Q.** Up until then, though, would you say you were pretty calm, thinking things might work?

**A.** I had no reason for them not to be. One tow said she was going to be stopping and backing. The other one was going to take the middle. I had no concern for any of this.

**Q.** When you voiced your displeasure here, who were you referring to?

01:04

**A.** *Loretta Cenac*.

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop, please.

**BY MR. TADROS:**

**Q.** This is at 7:52:28. Why would you order a port 10 on your rudder?

**A.** So I'm trying to swing around him and clear the berth, clear him, both. I'm trying to swing around his stern, clear his stern so I don't hit a dock at this point.

**Q.** Is he doing anything to help you at this point?

**A.** He didn't put any port rudder because if he did, he would have lifted his stern out of my way.

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop.

**BY MR. TADROS:**

**Q.** So this is at 7:52:33. Is the *Elizabeth Robinson* in any shape, way, or form backing into Bayou Fleet?

**A.** Her speed is dropping. She may be backing at this point. It's kind of hard to say. Her speed is dropping. Her stern is not pointing towards the west bank at this point like I would expect her to do if she was backing.

**Q.** In this photograph do you see the *Loretta Cenac* track line?

01:06

**A.** Yes.
**Q.** What color is that, for the Court?
**A.** It's like a green.
**Q.** From the point where it kind of angles out toward the bank, do you see that, where the green line --
**A.** Like where it goes through the ship?
**Q.** Where it goes around.
**A.** Oh, where it makes a little curve?
**Q.** Yes, sir.
**A.** Okay.
**Q.** Do you see that?
**A.** Yes.
**Q.** Okay. From that point until now, has the *Loretta's* orientation, her tow changed in any way? Has it remained constant?
**A.** At that curve, it's the same that whole time where she kind of looks like she doesn't have control over her vessel.

**MR. MCSHANE:** Objection. Move to strike. It's nonresponsive and it's speculative.

**THE COURT:** I'm going to allow it as far as what he saw.

**MR. TADROS:** Hit play, please.

(Video played.)

**MR. TADROS:** Stop, please.

01:07

**BY MR. TADROS:**

**Q.** At this point, 7:52:45, all these commands you are giving to the *Aris T* helmsman, what were you trying to accomplish?

**A.** I'm trying to swing around him and not collide with -- I'm trying to avoid a collision here with the *Loretta Cenac*. I don't want to hit the boat. I don't want to hit the tow. I don't want to kill people. I don't want oil in the river or whatever is in those barges.

**Q.** Did the crew of the *Aris T* follow your instructions?

**A.** They did.

**Q.** All your commands as far as rudder and engine?

**A.** They did.

**MR. TADROS:** Hit play, please.

(Video played.)

**MR. TADROS:** Stop, please.

**BY MR. TADROS:**

**Q.** At 7:53:09, all these commands you are giving, "midships," "hard to starboard," what was all this? What were you trying to do?

**A.** At this point I had the bow swinging to port, and then right now I'm trying to check the stern, trying to stop the stern from swinging in. So the bow was coming out. Now I needed to stop the stern from going towards the dock at this point.

**Q.** On a ship like the *Aris T*, where is the pivot point of the

01:09

ship?
**A.** The pivot point is roughly one-third from the bow, from the head of the ship.
**Q.** So those were commands -- knowing where the pivot point was, you were trying to -- what were you trying to do?
**A.** I was trying to stop the stern from swinging in at this point. That's why I put the starboard rudder on her.

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop, please.

**BY MR. TADROS:**
**Q.** At 7:53:24 did the captain ask you something, Captain Baltas?
**A.** He asked me to stop the engine.
**Q.** What was your command?
**A.** No.
**Q.** Why at that point did you say no?
**A.** I said no because my intention was to drive the ship away from any other berths ahead of me here, to not give the ship up, and to drive her away from causing any more damage ahead of me.

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop, please.

01:10

**BY MR. TADROS:**

**Q.** So at this point what were you able to accomplish, if anything, by giving those commands?

**A.** Try to keep the stern of the ship, the back of the ship -- I'm trying to mitigate damage from what we just hit by putting that right rudder on it, or starboard rudder, trying to -- then I instruct him to stop the engine.

It was, what, 10, 15 seconds past when he asked me to stop the engine. So my intention was to try and pull the ship away from the docks at that point.

**Q.** Take a look at the *Elizabeth Robinson*. Is she in any way, shape, or form backing into Bayou Fleet?

**A.** Her speed is dropping at this point. I wouldn't think she is backing at this point. She may be. It may take her some time to get it stopped, get her tow stopped. She is probably backing at this point.

**MR. DIAZ:** Could you note the time right here?

**MR. TADROS:** Yes. That was 7:53:40.

**MR. DIAZ:** Thank you.

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop, please.

**BY MR. TADROS:**

**Q.** At this point, 7:53:56, you saw the *Aris T* was going approximately 7-point something knots?

01:12

**A.** Yes.

**Q.** What was your thought process by asking for the drop of the port anchor?

**A.** So if you are going that fast -- it's not really good to drop an anchor going that fast. You could foul the anchor, you could rip the chain out, all of the above.

I really didn't have any other option at that point. I didn't have control because I had stopped the engine, instructed the engine to be stopped, so I had to do something. That was basically my only option, to try and steer -- if you drop the anchor, she will want to steer out, steer away from the docks. So that's why I instructed the port anchor. That was my only option at this point.

**Q.** Did you expect the *Aris T* at that speed to come to a screeching halt because you dropped the anchor?

**A.** That was almost impossible for her to get stopped. We are talking a 93,000-ton ship here. For it to stop on a dime is almost impossible. My intention was to try and steer her away from the berths even more.

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop here, please.

**BY MR. TADROS:**

**Q.** This is the second contact. The first was Valero. The second one was Motiva Dock 4. Do you have any idea what was

01:14 going on at the bow at that time when she was striking that dock?

**A.** I don't have any idea. I just instructed the captain to let go of the port anchor.

**MR. TADROS:** Hit play, please.

(Video played.)

**MR. TADROS:** Stop, please.

**BY MR. TADROS:**

**Q.** So this is at 7:54:29. Captain Leone, are you aware of how bulk carriers like the *Aris T*, how their engines go, how they stop, from forward motions to stop?

**A.** This is pretty much custom on all ships. You have dead slow, slow, half full. So when you drop her down, it's going to take some time for it to -- it's not like a car where you can just stop her. She takes some time for the propeller to stop spinning.

**Q.** When you ordered the stop engine and then a full astern, what was your intention?

**A.** That the engine and the propeller were stopped at that point and that I could give a full astern command at that point so we could try and slow her down, stop her.

**MR. TADROS:** Hit play.

(Video played.)

**MR. TADROS:** Stop it, please.

01:16

**BY MR. TADROS:**

**Q.** Do you see the speed of the *Aris* at 7.4? Do you have any idea how long it would take her to go astern, based on your experience?

**A.** Typically it's 10 to 15 minutes on ships. It takes them time for an engine to go from, say, full ahead to full astern. It takes a long time for it to stop the propeller spinning and then for it to go full astern. So it takes a bit of time.

**THE COURT:** Mr. Tadros, I hate --

**MR. TADROS:** I know what time it is, Your Honor. I think there's only a little left, but this is probably a good stopping point, if you will. It's up to you.

**THE COURT:** Well, I have already abused my court reporter and everybody else in the courtroom. Let's go ahead and have a lunch recess now.

You are under oath, so you are not to communicate with counsel during the lunch break. Be aware of that.

We will take an hour. Be back at 2:15. Does that give everybody enough time?

Court will be in recess.

**THE DEPUTY CLERK:** All rise.

(Lunch recess.)

* * *

**AFTERNOON SESSION**

**(April 29, 2019)**

**THE COURT:** Be seated.

You are still under oath.

You may proceed when ready.

**MR. TADROS:** Thank you, Your Honor.

**THE COURT:** Thank you.

**MICHAEL LEONE,**

having been duly sworn, testified as follows:

**MR. TADROS:** If you would, please continue to play the video.

(Video played.)

**MR. TADROS:** Would you stop it right there. Go back, please, and show that.

**DIRECT EXAMINATION**

**BY MR. TADROS:**

**Q.** Captain Leone, this is at time 7:54 -- looks like 48?

**A.** Yes.

**Q.** You communicated something to the *Loretta Cenac*; is that right?

**A.** That's correct.

**Q.** What was his response to you?

**A.** He said, "Yeah, I tried everything. I got a cable come undone."

**Q.** What did you understand from what he just told you?

02:21

**MR. MCSHANE:** Object to the form. Calls for speculation, lack of foundation.

**THE COURT:** It's asking for his understanding. The problem I'm having with it is his understanding then or his understanding now.

**MR. TADROS:** Fair enough, Your Honor.

**BY MR. TADROS:**

**Q.** At the time, what did you understand Captain Sanamo just told you?

**A.** When he said he had a cable undone, he lost control over his tow.

**MR. TADROS:** Please keep playing.

(Video played.)

**MR. TADROS:** Please stop.

**BY MR. TADROS:**

**Q.** He never told you when exactly his cable came undone, did he?

**A.** No, he never did, but he did tell me it did come undone.

**Q.** Take a look at this time, 7:54:54. Do you see the *Loretta Cenac* in this picture?

**A.** Yes.

**Q.** What is her shape in the river?

**A.** She is still pointing in the same direction when I met her.

**Q.** When you what?

02:22

**A.** When I met her. When we met, she has the same point, same direction to her.

**Q.** When you say when you "met her," are you talking about when she was in front of you, blocking your path?

**A.** That's correct, when we met, say, bow to bow.

**Q.** Right. At least 2 or 3 minutes later, she still hasn't changed in her orientation in the river; is that right?

**MR. MCSHANE:** Could we have a time reference, please.

**MR. TADROS:** This is 7:54:54.

**THE WITNESS:** She has still kind of that same direction to her, that same point to her.

**BY MR. TADROS:**

**Q.** Is that, in your experience, consistent with a broken face wire?

**MR. MCSHANE:** Objection. Lack of foundation, lack of expertise.

**THE COURT:** This one is sustained. If you can lay a foundation, I may allow the question, but we will see.

**MR. TADROS:** Yes, Your Honor.

**BY MR. TADROS:**

**Q.** Captain Leone, have you experienced tows in the Mississippi River when they get out of control because they have broken a face wire? Have you come across that in your career?

**A.** I haven't.

02:23

**MR. TADROS:** Then I will withdraw the question, Your Honor. Thank you.
Hit play.
(Video played.)
**MR. TADROS:** Stop here.
**BY MR. TADROS:**
**Q.** Is your ship now slowing down? I know the speeds were up there a few minutes, but is your ship now starting to slow down, the *Aris T*?
**A.** Yes, she is starting to slow down.
**Q.** Take a look at the *Elizabeth Robinson*. Is she in any shape, way, or form, at 7:55:07, backing into Bayou Fleet?
**A.** Looks to me she is smack in the middle of the river.
**Q.** Her stern is not toward the right descending bank, as you expected?
**A.** She shaped it a little bit, but it's not how I would think she would back into a fleet. She would point that stern over there, use that current to her advantage.
**Q.** That's not how you have seen other tows back into fleets, correct?
**A.** That's correct.
**MR. TADROS:** Hit play.
(Video played.)
**MR. TADROS:** Stop there, please.

02:25

BY MR. TADROS:

Q. Now, Captain Leone, you asked repeatedly for a full astern; is that correct?

A. That's correct.

Q. Can you tell the Court, was the telegraph full astern, but the propeller hadn't start kicking in yet?

**MR. MCSHANE:** Objection. Leading.

BY MR. TADROS:

Q. What do you interpret that to be, Captain Leone?

A. That may be what was going on here. Maybe the propeller was taking some time to gain her revolutions going astern. It does take some time for it, after the engines stop, to get that propeller moving astern. It's kind of like a heat of the moment where I'm just -- I want the ship to stop.

Q. Very good.

**MR. TADROS:** Hit play, please.

(Video played.)

**MR. TADROS:** Stop it there, please.

BY MR. TADROS:

Q. This is at 7:56:03. Previously I had asked you were you slowing down, and it was around 6.8, I believe. Now are you slowing down significantly?

A. We are.

Q. What is your conclusion from that?

A. When you kick a ship astern -- when you put her astern,

02:27

she is not just going to stop. It's still going to take some time for her to stop. It's not like a car where you can just stop her. It's going to take -- it's a lot of tonnage, a lot of weight there that's going to continue. It's going to take her some time to stop and also to slow down.

**MR. TADROS:** Hit play, please.

(Video played.)

**MR. TADROS:** Stop it here, please.

**BY MR. TADROS:**

**Q.** Do you hear that noise? What is that? Explain to the judge what that noise is.

**A.** That's the engine going astern. At that point it gets some vibration on the ship where she starts to kind of shake when that engine is going astern.

**Q.** And this is at 7:57:01, so it took approximately -- a very approximate -- 2 1/2 to 3 minutes before you heard that vibration; is that correct?

**A.** That's correct.

**Q.** Did you expect it to take 2 1/2 to 3 minutes?

**A.** I mean, that's extremely good considering on the pilot card it has a certain allotted time. Normally it's 10 to 15 minutes going from full ahead to full astern. This was 3 minutes. That's really good, in my opinion.

**MR. TADROS:** Hit play, please.

(Video played.)

02:30 **MR. TADROS:** Stop, please.

**BY MR. TADROS:**

**Q.** That's at 7:57:26. What is that sound now you hear other than the vibration?

**A.** That's the anchor going out, paying out, letting go.

**Q.** At that speed where it was approximately 4-point something knots, what did you expect the anchor to do?

**A.** She would probably hold -- she would take a strain on her pretty good, but if she was still paying out, she would be okay. If you held the brake, then she's going to want to stop.

**Q.** At that point, other than the stopping, what would the anchor -- would it do anything else? Would it have any other effect on the *Aris T*?

**A.** It's going to want to steer her away. That's why I used the port anchor. She is still going through the water with headway. So you drop that port anchor, and it's going to want to steer the vessel away from the berth.

**Q.** Captain Leone, from the minute that the *Aris T* was run into Valero Dock 1 and all this time that we have seen this, could you have dropped your starboard anchor?

**A.** I could have dropped the starboard anchor, but it would have probably caused more damage at that point to drop the one that was up against the berths. And at that, it would have steered the ship into the docks more, not away from it. So she would have went more into the dock.

02:31

**MR. TADROS:** Hit play, please.

(Video played.)

**MR. TADROS:** Can you stop it, please. Can you rewind that just a little bit.

**BY MR. TADROS:**

**Q.** Captain Leone, I want you to pay close attention to what is being said right now on the VDR.

(Video played.)

**MR. TADROS:** Stop, please.

**BY MR. TADROS:**

**Q.** This is at 7:54:54. I know it's not on this simulation, but what did *Loretta Cenac* just tell you?

**A.** She said she had no face wires and that she was holding her tow down with some soft lines. So she has cables that are holding the boat to the barge, and he said both of those had popped. He probably had some soft lines as a backup.

**Q.** Can you please look at the VDR transcript in front of you. If you go to page 7 at the time which is on there, 1:57:46, and here it's 7:57:54, a 6-second difference, do you see where the *Cenac* says, "Yeah, I don't have any face cables. They popped trying to get out of the ship's way. Trying to hold it down with some head line stopping it"?

**A.** That's correct.

**Q.** Is that what we just heard?

**A.** That's exactly what we just heard.

02:33

**Q.** Remember earlier when I asked you the question about the orientation of the *Cenac* and there was an objection to that? Can you now tell us why you think the *Cenac* was jackknifed like that in front of you?

**MR. MCSHANE:** Objection, Your Honor. Lack of foundation, and there's no temporal connection. What time is he supposed to be formulating these views about what happened, at 57:54 or here in the courtroom or before the Cenac vessel passed the *Aris T*?

**THE COURT:** I suspect you have an expert that's going to tell me all about this.

**MR. TADROS:** Fair enough, Your Honor.

**THE COURT:** I don't think we need to get this through this witness. I'm going to sustain the objection.

**MR. TADROS:** Fair enough. Thank you.

Hit play.

(Video played.)

**MR. TADROS:** Stop, please.

**BY MR. TADROS:**

**Q.** Just to be clear, at 7:58:01, this whole time we keep on hearing those vibrations, right?

**A.** Yes.

**Q.** That is what?

**A.** Full astern. The ship is going full astern.

**Q.** The speed of the *Aris T* is appreciably reducing by this

02:35 time?
**A.** Yes, she is slowing down.
**MR. TADROS:** Hit play, please.
(Video played.)
**MR. TADROS:** You can stop now.
**BY MR. TADROS:**
**Q.** Why would you order stop engine at that point?
**A.** Because at this point she was away from the berths or away -- she is coming away from the docks here at this point. My intention was to drive back ahead on her and drive her away from the berths anymore at this point.
**Q.** Captain Leone, can you describe to the Court, when the vessel *Aris T* struck the Valero and Motiva docks, did you hit them head-on?
**A.** I didn't hit them head-on. It was more of a sideswipe.
**Q.** Did you actually drive the *Aris T* into those terminals?
**A.** No. I had no intention to drive the *Aris T* into either of these. I avoided a collision.
**Q.** That was going to be my next question. You didn't have a collision, did you, with the *Loretta Cenac* or with the *Elizabeth Robinson*?
**A.** No. I avoided a collision, didn't have a collision. I didn't want to kill anybody.
**Q.** As we sit here today, Captain Leone, do you believe that you did everything in your power to avoid a much more serious

02:36

incident?
**A.** I do. It could have been a lot worse.
**Q.** Until those last 2 to 3 minutes when *Elizabeth Robinson* started the whole sequence and then *Loretta* had to cut in front of you, did you think everything was going to work out fine if they had done what they said they were going to do?
**A.** I trusted their word. I trusted what they were going to do, and neither vessel did.
**Q.** Did you ever communicate your expectations of what these two vessels were going to do to Captain Baltas of the *Aris T*?
**A.** No. No, I didn't.
**Q.** If you had communicated your expectation to Captain Baltas, do you expect a foreign master to have told you to steer otherwise?
**MR. MCSHANE:** Objection. Speculation, lack of foundation.
**BY MR. TADROS:**
**Q.** How many foreign vessels have you captained, Captain Leone? Almost 500?
**A.** To today?
**Q.** At the time of this incident.
**A.** Roughly around that.
**Q.** How many of those were American captains?
**A.** Zero.
**Q.** What nationalities are predominantly on these foreign

02:38

vessels in the Mississippi River?
**A.** We have Greeks, Filipinos, Indians, Russians.
**Q.** Did you build a certain expectation of how those foreign masters communicate to you about things they see in the river?
**A.** They really don't ask a whole lot of questions.
**Q.** Captain Leone, I'm going to ask my question again. Would you expect Captain Baltas, as a foreign captain, to have told you to do something different in this situation?
**MR. MCSHANE:** Objection. Speculation, incomplete hypothetical, and lack of foundation.
**THE COURT:** I think if you ask the question without specifically referring to Captain Baltas, it would have the same effect.
**MR. TADROS:** Yes, Your Honor.
**THE COURT:** I sustain the objection.
**MR. TADROS:** Thank you, Your Honor.
**BY MR. TADROS:**
**Q.** Would you have expected a foreign captain to have told you to do something different in this situation?
**MR. MCSHANE:** Objection. Speculative, vague, and overbroad.
**THE COURT:** I'm going to allow this one.
**MR. TADROS:** Thank you, Your Honor.
**THE WITNESS:** No, he wouldn't. A foreign captain wouldn't have instructed any different.

MICHAEL LEONE - DIRECT

02:39

**BY MR. TADROS:**

**Q.** Captain Leone, if you had told Captain Baltas of your expectations as far as the *Elizabeth Robinson* and the *Loretta Cenac* were concerned, would that have prevented those two tows from sliding in the bend?

**MR. MCSHANE:** Objection, Your Honor. Speculative, lack of foundation.

**MR. EMMETT:** Same objection, Your Honor.

**THE COURT:** It is speculative. So you're asking for a fact witness to kind of reconstruct things. I'm going to sustain these objections.

**MR. TADROS:** No problem, Your Honor. Thank you. We will move on.

**BY MR. TADROS:**

**Q.** Do you agree with me, Captain Leone, that based on your review of this simulation, your review of the VDR, the *Elizabeth Robinson* started her engines astern at the worst possible moment of this arrangement?

**A.** After reviewing this video, yes, she did.

**Q.** That started a string of events, didn't it?

**A.** Well, when he starts going astern or backing on his engines, he becomes even more at the mercy of the current at that point.

**Q.** Looking back on all of this, Captain Leone, what do you think you could have done differently to avoid this incident?

02:41

**A.** Not trust these two other vessels, not trust them.

**Q.** Based on your experience on foreign-flagged vessels, would you have expected Captain Baltas and his navigating crew to do anything different?

**MR. MCSHANE:** Objection. Speculation, lack of foundation.

**THE COURT:** It's a similar question that I sustained before. I think if you ask it without reference to Captain Baltas --

**MR. TADROS:** Sorry, Your Honor. I thought you were finished.

**THE COURT:** I was finished.

**BY MR. TADROS:**

**Q.** Would you have expected a foreign captain and his crew, faced with a situation like this, to do anything different?

**MR. MCSHANE:** Same objection, Your Honor.

**THE COURT:** I'm allowing this.

**THE WITNESS:** I wouldn't have.

**BY MR. TADROS:**

**Q.** Did Captain Baltas and his crew follow your instructions -- at that point when everything started to go bad with the *Elizabeth Robinson*, did they follow your instructions?

**A.** They did.

**Q.** Did they do everything that you asked them to do to minimize the damage?

02:42

**A.** They did.

**Q.** Do you have any complaints about Captain Baltas or his crew on the *Aris T*?

**A.** I have no complaints about them.

**MR. TADROS:** If you give me one minute, Your Honor.

**THE COURT:** Yes.

**MR. TADROS:** Thank you, Your Honor. I tender the witness.

**THE COURT:** Thank you.

Mr. Diaz.

**MR. DIAZ:** Yes, sir.

**CROSS-EXAMINATION**

**BY MR. DIAZ:**

**Q.** Captain Leone, my name is Tommy Diaz. We have never met before. I'm an attorney for Motiva and Shell, and I have a few questions for you. I will do my best not to go over some of the same topics that Mr. Tadros addressed with you.

What I would like to do is kind of frame the question-and-answer period that you and I are going to have in terms of a point in time. I think I've been able to discern from your answers in response to Mr. Tadros' questions some of the more significant moments in time.

Here I would like to address with you the first commands that you give to the helmsman to start steering toward the docks rather than getting around the *Loretta Cenac*.

02:44

**MR. DIAZ:** Danny, if you could go to Exhibit 383, page 93.

**BY MR. DIAZ:**

**Q.** Captain Leone, I may even ask you to look at the hard copy of this because this washes out a little bit on the screen. That is a bit better.

So this moment in time that's captured by the Coast Guard data is 19:51:55. This was a deposition exhibit that you had seen and drew on that reflects the tows of the two vessels -- I mean the two tugs. Correct?

**A.** That's correct.

**Q.** So at this 19:51:55 time, this Coast Guard data actually shows vectors of the vessels that are in front of you, correct?

**A.** That's correct.

**Q.** The vector for the *Loretta Cenac*, what direction does that vector have?

**A.** Pointing towards the east bank, left descending bank.

**Q.** That would be a vector -- actually, explain for me just for a moment what a vector is and what it's illustrating here on this Coast Guard data.

**A.** A vector is the direction in which the vessel is going. It takes into account everything: how she is turning, current, whatever, her speed. It's the direction in which the vessel is going.

**Q.** She could be pointing in a different direction, but that's

02:45

the direction she is ultimately heading, correct?

**A.** That's correct.

**Q.** Does this vector appear on your Rose Point data you have on your PPU?

**A.** Yes.

**Q.** Likewise, the vector data for the *Elizabeth Robinson* would be appearing on your PPU as well?

**A.** Yes.

**Q.** The vector for the *Elizabeth Robinson*, let's address that for a moment. Does this illustrate that the *Elizabeth Robinson* is doing any type of maneuver to suggest she is backing into Bayou Fleet?

**A.** No. Her vector is still coming ahead. She is past -- her vector is past the *Aris T*, but her vector line is still showing that she is moving ahead.

**MR. DIAZ:** Danny, if you could go to Leone 1 at this point, and this is the same moment in time. If you can maximize that for me, please.

**BY MR. DIAZ:**

**Q.** Now, in response to Mr. Tadros' questions --

**THE COURT:** Mr. Diaz --

**MR. TADROS:** Yes, sir.

**THE COURT:** -- you referred to this as --

**MR. DIAZ:** I'm sorry. This is Exhibit-- hold on just a second. This is a snapshot in time of the Cunningham

MICHAEL LEONE - CROSS

02:47

re-creation, which I believe is 3:14; and the moment in time that this is captured is 7:51:55. It's 4:13. I'm sorry.

**BY MR. DIAZ:**

**Q.** Captain Leone, in order to perhaps save a little time, I've taken some screenshots from that reconstruction that you have seen earlier. This is simply a moment in time that reflects the respective locations of the vessels and occasionally speed. This is at the same moment in time we saw the Coast Guard data, 7:51:55.

I believe, in response to Mr. Tadros' questions, you said at this very moment in time there is a small, small window in which you potentially could accomplish the passing. Correct?

**A.** That's correct.

**MR. RIVIERE:** Object to the form, Your Honor. He didn't say "small, small."

**MR. DIAZ:** I have those written verbatim, Your Honor, in my notes.

**THE COURT:** Whatever he said I will be able to place in context. I will understand the question that way.

**BY MR. DIAZ:**

**Q.** Captain Leone, this is a far smaller window than you were anticipating in order to conduct a safe passage past these tugs, correct?

**A.** That's correct.

02:48

**Q.** At this point in time, is there a risk of collision?
**A.** Yes, there is a risk of collision at this point.
**Q.** I do note, though, that the helm instruction that you are giving the helmsman on the *Aris T* is "midships." Can you describe for the Court what the instruction "midships" means.
**A.** That means to put the rudder straight and to not give any commands, just basically straight.
**Q.** So at this point in time when you have given that command of midships, are you, based on what you see here and the configurations of the vessels at this moment in time, believing that you can make that small window and accomplish that passing by simply driving straight?
**A.** I mean, I'm still going to probably have to pull the ship to starboard because he is still falling down at this point.
**Q.** Correct. I will get to that in my next question.
You haven't yet made the command to the helmsman to turn to starboard, correct?
**A.** At this point she is midships.
**Q.** Yes, sir. So your best assessment, in terms of making as safe a passage as you can, is to have a command of midships for the *Aris T* at this point, correct?
**A.** I'm not sure what my last command was. To bring the rudder back midships.
**Q.** I can get back to that in a second, but let me go on to what you are anticipating in terms of my next question.

02:50

**MR. DIAZ:** Danny, if you go to Exhibit 383, page 94.

Actually, Danny, if you can capture the command that Captain Leone gave, which is just a little bit lower to the left-hand side. We will just be a moment on this.

It's fine as it is, Danny. Thank you.

**BY MR. DIAZ:**

**Q.** This is your next command. I'm using Exhibit 383 at 19:51:56, and it's what you were thinking. You gave a starboard 5 command, correct?

**A.** That's correct.

**Q.** This is the first moment in time, Captain Leone, where you are actually giving a command to the helmsman to turn toward the docks and the left descending bank, correct?

**A.** I'm not sure why the rudder was midships, the prior one. So if I had port rudder, I wanted -- then I went back to midships, that's usually the norm. You bring the rudder back midships before you swing it one way or the other.

**Q.** Understood.

**MR. DIAZ:** If we could go, Danny, next to Exhibit 383-96.

**BY MR. DIAZ:**

**Q.** This is a harder starboard command, correct?

**A.** It says starboard 10.

**Q.** Yes, sir. Do you know whether, in undertaking this starboard 10 command, you are now attempting to drive toward

02:51

the docks because the *Loretta Cenac* is now coming close to your path?

**A.** Are you saying is this going to be enough rudder to accomplish this?

**Q.** I'm wondering, Captain Leone -- this is based on your recollection -- whether the starboard 10 command is being undertaken at this point -- we can play the video if need be -- first with the starboard 5 command, then with the starboard 10 command, that that is an effort to start steering your vessel toward the docks and away from the *Loretta Cenac*.

**A.** That's correct.

So when we give rudder commands, we do more like 5, 10, 20, and hard over is like 30 to 35 degrees. Some ships will give you 30, some will give you 35. Sometimes you may have to request for 35 degrees. You have to tell them, "I need 35," not just 30. They will just go to 30.

**MR. DIAZ:** Danny, can we have Leone 3, please.

**BY MR. DIAZ:**

**Q.** Captain Leone, this is going to be a snapshot of Exhibit 413 at 7:52:03. It reflects the starboard 5 command, correct?

**A.** On the screen it shows starboard 10.

**Q.** I'm sorry, starboard 10 command, my error. That's the same starboard 10 command we saw on the Coast Guard data just a moment ago?

02:53

A. Yes.

Q. This is the same starboard 10 command you confirmed to me is a command given to the helmsman to steer toward the docks in order to not be in a collision course with the *Loretta Cenac*, correct?

A. That's correct.

Q. Now, at this point in time, if we were to look at this depiction, is the *Loretta Cenac* starting to increasingly close that window in front of you?

A. He is.

Q. Likewise, the *Elizabeth Robinson* is not taking -- or it doesn't appear at any time to be backing into the Bayou Fleet, correct?

A. No, she is not backing into the fleet.

Q. The next thing I would like to show you is going to be two radar images to see whether these radar images are reflective of exactly what we have been seeing here.

**MR. DIAZ:** Danny, if you can go to Leone 4 and Leone 5.

**THE COURT:** Which are exhibits what?

**MR. DIAZ:** Hold on. 7, Your Honor. Thank you.

**BY MR. DIAZ:**

Q. This is a screen capture of the *Aris T's* radar at 19:51:49. Does that roughly reflect what you have been seeing earlier around your starboard 5 command of the configuration of

02:55

the two tugs in front of you?
**A.** Yes, that's correct.
**MR. DIAZ:** If you could go to Leone 5, please.
**BY MR. DIAZ:**
**Q.** Did you see a shift in the *Loretta Cenac* at that point, sir?
**A.** I did.
**Q.** Is that reflective of your recollection of the *Loretta Cenac* increasingly closing the window in front of you?
**A.** It is.
**Q.** Do you recall at this point in time, this is when you are giving the starboard 10 command toward the docks?
**A.** That's correct.
**Q.** So this is a point in time I would like to capture, which is 19:52 when you are making that evasive action towards the docks, and then move back in time to see what actions were taken either by your vessel or by others as the situation progressed toward this evasive action.
**MR. DIAZ:** Danny, if you could go to Exhibit 383-32, please.
**BY MR. DIAZ:**
**Q.** Captain Leone, at this point in time, this is the Coast Guard data. This is Exhibit 383. We have a time of 19:42:35, so this is approximately 12 minutes before you have taken that evasive action turning toward the docks.

02:56 I believe you discussed this with Mr. Tadros, where you hear over the VHF that the *Elizabeth Robinson* is telling the *Loretta Cenac* that she doesn't see anyone coming up, and they are offering for the *Loretta Cenac* to overtake her, correct?

**A.** That's correct.

**Q.** You heard that on the VHF radio, correct?

**A.** Yes.

**Q.** It was captured on the VDR data for the *Aris T*?

**A.** That's correct.

**Q.** Do you know where those tugs were and their tows when this broadcast was made?

**A.** At this particular time?

**Q.** Yes, sir.

**A.** I mean, I don't recall.

**Q.** Just for the moment let's go into a couple details in terms of your PPU. It's a laptop with a screen, correct?

**A.** That's correct.

**Q.** You have Rose Point data that is loaded onto that PPU?

**A.** Right.

**Q.** What type of data does Rose Point give to you, and how far out does it extend in terms of the vessels that are encompassed by your screen?

**A.** Can we do one question at a time?

**Q.** Oh, I'm sorry. Absolutely. What type of data is

02:58

reflected on your --

**THE COURT:** Sustained.

(Laughter.)

**THE WITNESS:** What type of data?

**BY MR. DIAZ:**

**Q.** Yes, sir.

**A.** It shows speed, course; it has maybe the size of the boat. But it's not going to show a length of a tow in there; whereas, in the case of a ship, it's going to show the length of a ship. It's going to show position as far as latitude and longitude. It's not going to show -- at this point it's not going to say I'm at Bonnet Carré Anchorage. It's going to show a latitude/longitude, speed, and course --

**Q.** It will certainly show that data for your vessel, correct?

**A.** Yes.

**Q.** There has to be a certain range within which it's providing the same data for other vessels?

**A.** Sometimes you can zoom out and see further out, sometimes -- it all depends. There's no set range on how far away you can see vessels.

**Q.** I'm just wondering -- and again, I'm ignorant on Rose Point -- can you set that range?

**A.** You can zoom in to very close; you can zoom out very far.

**Q.** Do you know at this point in time, at 19:40:35, whether your Rose Point was set so that it would also encompass the

02:59 *Loretta Cenac* and the *Elizabeth Robinson*?
**A.** I don't recall.
**Q.** If it were, assume for me just for the moment, would it likewise show the same data that is reflected here on the Coast Guard VTS? And that is that the *Elizabeth Robinson* is traveling at 9.5 knots, the *Loretta Cenac* is at 8.8, and you were traveling at 10?
**A.** That's correct. It would be fairly similar.
**THE COURT:** Do you mind if I ask a question?
**MR. DIAZ:** Not at all.
**THE COURT:** So in terms of the speed that's indicated, that changes in real time with respect to the vessels that appear on the Rose Point so that a second later it's indicating a different speed over the ground?
**THE WITNESS:** It may not be in terms of seconds. It goes up to a GPS and then comes back down, and then they correct it. So it's accurate within maybe 6 feet. It takes some time for it to go up, come back down, get corrected, then get back to each other's Rose Point.
**THE COURT:** The Rose Point data is all relative in the sense it's a relative speed over the ground, a relative motion of the vessel with respect to the vector over ground rather than the heading of the ship or the points on the compass on the ship; is that correct?
**THE WITNESS:** You can set your vectors either at true

03:01

or relative. If it's a true vector, then she is going to point like where you were talking about. She is going to show -- relative is going to be actually what she is doing as far as her speed and direction.

**THE COURT:** Okay. Sorry.

**BY MR. DIAZ:**

**Q.** Captain Leone, if your PPU and Rose Point was set within approximately 4 miles -- it appears that all of the vessels are approximately 4 miles from one another so that it's capturing both tugs and their data -- would it likewise show the vector we have here displayed on the Coast Guard imagery?

**A.** It would be similar.

**Q.** You don't recall whether you looked at your PPU when you heard the *Elizabeth Robinson* calling out and saying, "I see nothing coming up"? You simply don't recall whether you looked to see where those two tugs were located?

**A.** When I'm piloting a ship, I can't just focus on my PPU the whole time. I'm looking out the windows. I'm looking into radars. There's a whole lot of things to pay attention to. So for me to just sit there and look at my PPU, that's a distraction to me.

**Q.** Understood. It is one of the tools that you use, in addition to others, in piloting a vessel, correct?

**A.** Yes.

**Q.** So you're not sitting there staring at it the entire time.

03:03

I don't think that would be advisable. Right?
**A.** Correct.
**Q.** How often are you glancing at it? In addition to looking out the windows, going out to the wings, how do you use your PPU? Let's just use this point in time where you are heading up straight north on the Mississippi River. How often do you look at it in terms of the proper pilotage of a vessel?
**A.** It's a constant just glance at it, listening to the radio, looking out the window, radars. There's no time frame to make a pass at it. If I hear somebody, I may glance at it. Listening to the radios -- there's no time frame to it.
**Q.** But it's something that you constantly refer to because it's one of the sources of information that you have, correct?
**A.** That's correct. It's an aid. It's a tool.
**Q.** So just looking at this data here that's up on the screen for 19:40:35, the Coast Guard data, it appears you're about 4 miles from the other two tugs, correct?
**A.** That's correct.
**Q.** You are all traveling at about the same speed, correct?
**A.** That's correct.
**Q.** So if you were to simply look at this Coast Guard data to figure out where you would likely meet those tugs, where would that be?
**A.** It shows it on the Rose Point. It's going to show you -- it has a line where vessels will pass each other. It has a

03:04

little line behind it from the direction in which it is coming.
**Q.** I want to get to that in just a second.
I'm asking you, Captain Leone, if we were to simply look at what's on the screen here, which is Exhibit 383-32, with the vessels traveling at approximately the same speed, with their respective locations, your view of this data would put a meeting point, based on the data as it exists right here, where?
**A.** Is it a rough guess?
**Q.** Yes, sir.
**A.** Just speculating.
**Q.** Actually it's more than speculation. I'm talking about --
**A.** Are you talking about for me to refer to the Rose Point, or is it more kind of just do the math in your head and guess where we are going to meet?
**Q.** No, I don't want you to guess. I don't want you to speculate. I want you to look at the information that is available. If you can't do it, please don't. But look at the information that is available from the Coast Guard on this page and give me an estimate rather than a guess of approximately where a meeting point would be.
**A.** Maybe around Valero.
**Q.** That would be in the bend, correct?
**A.** That would be in the bend.
**Q.** In response to Mr. Tadros' questions, you talked about the

03:06

Hahnville Bar as being "easy" by comparison to more severe bends in the river, correct?
**A.** That's correct.
**Q.** By "easy," I gather you do not mean that this bend should be treated lightly. Right?
**A.** It's just not a point in a bend. Even on the chart it's not labeled a point. So it's just a casual, easy bend.
**Q.** It's a casual, easy bend where tugs and tows can get caught in the current, correct?
**A.** We do this all the time.
**Q.** Captain Leone, to answer my question, please pay attention to it. I understand you have a lot of experience. But it is a bend in the river where tugs and tows can get caught in the current, correct?
**A.** If they subject themself to it.
**Q.** That happened here, didn't it?
**A.** That's correct.
**Q.** You mentioned just a moment ago your Rose Point data and that it does display or can display meeting points.

**MR. DIAZ:** Danny, if you could go to Leone 7.

**BY MR. DIAZ:**
**Q.** Captain Leone, this is --

**THE COURT:** What exhibit is that?

**MR. DIAZ:** I was just about to say, Your Honor. This is Exhibit 7, which is -- actually, I need to confirm that just

03:07

in case.

This is the Rose Point? I need to get the exhibit number for that.

(Off the record.)

**MR. DIAZ:** It should be one of the first ones. Exhibit 6 is Pilot Leone's Rose Point data and the screenshots.

**BY MR. DIAZ:**

**Q.** Captain Leone, can you confirm whether this is an example of your Rose Point data illustrating an anticipated meeting point of the *Aris T* and the two tugs?

**A.** I don't know if this is mine per se.

**Q.** This was gathered actually from your PPU data.

**A.** Okay.

**Q.** Let me back up for a second. What's reflected here that's on the screen from Exhibit 6 -- what's turned on here is called a predicted passing point, isn't it?

**A.** That's correct.

**Q.** There are other things you can turn on in Rose Point, certain safety features, correct?

**A.** That's correct.

**Q.** Describe for the Court the type of safety features you can turn on on your Rose Point being run on the PPU.

**A.** For instance, you could set where maybe there is a shoaling or it's shallow; you could set where anchorages are; you can kind of outline them where they are different colors.

03:09

Things of that nature.

**Q.** Are there also functions -- and maybe you just described it and I didn't appreciate the distinction -- where within a certain time period or within a certain distance, vessels will start to appear red on the display?

**A.** I think you can set something like that, but I'm not sure. Mine is not set like that.

**Q.** You just never -- do you know whether your -- I don't know if there are versions out there, but whether your Rose Point program has that function?

**A.** It does. I think it does. I don't use that, so it's not something that I use.

**Q.** Okay. What I first started out at is the function called predicted passing points. Is that something that you use?

**A.** It is.

**Q.** Is that something that you use on every voyage?

**A.** It is.

**Q.** It would be a feature that you had turned on for this voyage, correct?

**A.** That's correct.

**Q.** This is a snapshot at 19:40:30. Again, this is about 12 minutes before that critical starboard 10 turn that has a predicted passing point for the *Elizabeth Robinson* and the *Loretta Cenac*, correct?

**A.** That's correct.

03:11

**Q.** There are some boxes up to the upper right-hand side. Is that typically what is displayed when a predicted passing point is turned on?

**A.** Those boxes, you have to click on the vessel in order to get the box.

**Q.** Is that something you do when you have your predicted passing points function on?

**A.** From time to time I do, yes.

**Q.** I didn't mean to interrupt. Describe for the Court what's reflected in the boxes up here.

**A.** So this shows where they are at and distance, and it shows the meeting time. 11 minutes 55 seconds we will meet the *Loretta Cenac* at 125.8.

**Q.** For the *Elizabeth Robinson* it has a meeting in approximately 3.45 nautical miles, correct?

**A.** That's correct, in 10 minutes 36 seconds at Mile 125.5.

**Q.** Do you know whether, at the time the *Elizabeth Robinson* was saying she didn't see anybody coming upbound, you had either of these points so that the data appears to you in terms of when you were going to be meeting either vessel?

**A.** Are you talking about the little boxes?

**Q.** Yes.

**A.** I probably didn't because she said she was stopping at Bayou Fleet. I'm not going to put something, a tow like this, on a box. I would put a large tow -- 25, 35, 40 barges --

03:12

maybe in a box or maybe a heavy loaded ship coming down, something -- I wouldn't put these guys with the little box thing.

**Q.** You wouldn't do it for the *Loretta Cenac* either?

**A.** I wouldn't do it for either of them.

**Q.** You are going to be at least anticipating at some time -- and we will get to that in a moment -- passing the *Loretta Cenac* because she is going down to Magnolia Fleet, correct?

**A.** That's correct.

**Q.** How about ECDIS? Does ECDIS have a function like this, where you can have predicted passing points?

**A.** No. I don't use an ECDIS.

**Q.** I should have asked it differently, then. Do you know whether ECDIS has a function that is similar to the predicted passing points you have on Rose Point?

**A.** I don't use an ECDIS. I use my PPU, so I rely on that.

**MR. RIVIERE:** Your Honor, could we ask for a printed screen on this? I wanted to wait until Tommy got to a point where it would be appropriate.

**THE COURT:** This is not an exhibit?

**MR. DIAZ:** It is.

**MR. RIVIERE:** It's a certain point in time within Leone 7.

**MR. DIAZ:** This is Exhibit 6, but it is a screenshot.

I'm about to move on from it, Bill. So I will

03:14

print it now. What we can do is identify this as 6-A.

**THE COURT:** Is there any objection to admission of this exhibit?

**MR. MCSHANE:** No.

**MR. TADROS:** None, Your Honor.

**THE COURT:** It will be admitted as 6-A.

**BY MR. DIAZ:**

**Q.** As we have discussed before, at this point in time when the *Elizabeth Robinson* is calling out to the *Loretta Cenac*, do you know whether anybody with the crew of the *Aris T* is looking on ECDIS to determine what the location of these two tugs are?

**A.** I'm not sure what they were doing.

**Q.** Next I would like to go to your first communication with the *Elizabeth Robinson*.

**MR. DIAZ:** Danny, that's Exhibit 383-43.

**BY MR. DIAZ:**

**Q.** This moment in time, Captain Leone, is 46:39. So this is approximately 5 to 6 minutes before your starboard 10 turn, correct?

**A.** That's correct.

**MR. DIAZ:** If you could go to page 45, please, Danny.

**BY MR. DIAZ:**

**Q.** This is the first indication where the *Elizabeth Robinson* has seen you, right?

**A.** It's kind of hard to say. He called me.

03:16

**Q.** Obviously he somehow knew that you were upbound, correct? Because otherwise he wouldn't call out to you.

**A.** That's correct.

**Q.** Do you know whether you could see the *Elizabeth Robinson* at this point visually?

**A.** I don't recall, but I'm looking at it right now. I think it would be extremely hard to see at this point.

**Q.** So it's about 2 miles away, correct?

**A.** That's correct.

**Q.** And it's nighttime.

**A.** It's nighttime.

**Q.** Do you know whether the *Elizabeth Robinson* at this point actually appears on the *Aris T's* radar?

**A.** Well, the radar is set at .75. She wouldn't be on the radar.

**Q.** So the farthest point in terms of radar settings was three-quarters of a mile away?

**A.** That's correct.

**Q.** How about your PPU? Do you know whether or not at that point you could see -- or did you see the location of the *Elizabeth Robinson* on your Rose Point?

**A.** I knew they were both coming down. Maybe I'm just missing your question here. I don't recall, but I knew they were both coming.

**Q.** Understood. If you had looked on your PPU to verify the

03:17

location of the *Elizabeth Robinson*, would you have seen the vector that appears here at 19:46:46?
**A.** It would be similar.
**Q.** What does that vector suggest to you in terms of her backing into Bayou Fleet?
**A.** She is still going ahead. But vectors change by the minute. Vectors are constantly changing.
**Q.** When I started my questioning of you, Captain Leone, which was when you were making your starboard 10 turn, *Elizabeth Robinson* still didn't have a vector suggesting she was going into the Bayou Fleet, correct?
**A.** That's correct.
**Q.** Is it fair at this point in time to say, whether it's 5 to 6 minutes before that critical moment or whether it was at that critical moment, the *Elizabeth Robinson* never had a vector to suggest that she was backing into Bayou Fleet?
**A.** Her vector right now is not suggesting she is heading towards Bayou Fleet, or backing or stopping.
**Q.** At this point in time, though, the vectors between the two tugs are roughly similar in terms of their direction?
**A.** They are about the same vector line.
**MR. DIAZ:** Danny, if you could go to Exhibit 383-45. Oops. I'm sorry.
**BY MR. DIAZ:**
**Q.** Similar vectors at this point, Captain Leone, both for the

03:19

*Elizabeth Robinson* as well as the *Loretta Cenac*?

**A.** About the same direction, correct.

**Q.** At this point in time, would you think, given the location of Bayou Fleet, that the *Elizabeth Robinson* would be somewhere different than in the middle of the river?

**A.** Yes. She would be well on her side if she was going to be stopping and backing into there, and she is in the middle of the river.

**Q.** Captain Leone, did you reach out at this time, when the *Elizabeth Robinson* is saying she is backing into Bayou Fleet, and say, "You don't look like you're positioned to back into Bayou Fleet"?

**A.** I mean, I trusted her that she was going to stop and back into the fleet here and be out the way, be out the equation. You put trust and confidence in guys out there that they are going to do it.

**Q.** You would agree with me that at no point in time -- all the way through your starboard 10 turn, she never was put into a position that you would have anticipated to be backing into Bayou Fleet, correct?

**A.** Right here she is not backing into Bayou Fleet, not starting her back. She still has a forward vector to her. Does that answer your question?

**Q.** It does, although my question looked a little forward trying to take care of some future questions.

03:21

Because her vector never changed in a direction that you would expect to be backing into Bayou Fleet and her position in the river never changed, she was always in the middle, at what point in time did you ever think, I can't trust the *Elizabeth Robinson* because my eyes see that she is not backing in?

**A.** It's kind of hard to say exactly what time that would be, but I'm just expecting her to get over there. The whole time I'm coming up the river, I'm expecting her to stop and back into the fleet and be out of the way for the whole situation. It's really hard to speculate a time there.

**MR. DIAZ:** Danny, if you could go to Exhibit 383-49.

**BY MR. DIAZ:**

**Q.** Captain Leone, this is at 19:47:12. This is when you confirm with the *Elizabeth Robinson* that you're going to be meeting her on the one, correct?

**A.** This is the arrangements, yeah. We made arrangements right here to meet on one whistle.

**MR. DIAZ:** If you could go, Danny, next to page 50 of Exhibit 383.

**BY MR. DIAZ:**

**Q.** Several seconds later, Captain Leone, the *Loretta Cenac* says what over the VHF?

**A.** He says he is kind of out in the middle. "I don't know what you want me to do for you. I'm all the way out in the

03:23

middle right now trying to overtake him. Just let me know how you want me to shape up for you."

**Q.** Captain Leone, does that sound like a doubt in one of the tug's minds?

**A.** It does.

**Q.** That all of you -- or at least the two tugs are not in the appropriate location for a one-whistle passing?

**A.** It does. But as stated before, she is going to be stopping and backing into her fleet. Between now and then, it should happen. That's what I was trusting her to do.

**Q.** We are now on the order of about 4 to 5 minutes before your starboard 10 passing, correct?

**A.** That's correct.

**Q.** She, meaning the *Elizabeth Robinson*, is still in the middle of the river?

**A.** According to this, she looks like she's pretty much in the middle.

**Q.** Her vector is pointing to the left descending bank?

**A.** That's correct.

**Q.** That vector and location would be on your Rose Point data, correct?

**A.** Yes.

**Q.** Captain Leone, at this point in time, did you consider reaching out to the *Elizabeth Robinson* to ask, "What are you doing? You don't look like you're backing into Bayou Fleet"?

03:24

**A.** I could have, but I'm anticipating -- I'm trusting that she is just going to go that way, she's just going to start stopping and backing. I'm just trusting the guy that he is going to do it.
**Q.** Even though several minutes have passed and she is still out in the middle, correct?
**A.** Visually this is kind of really hard to kind of make it out from here, to see what's going on.
**Q.** Her vector for the last several minutes has been pointing to the left descending bank, "her" meaning the *Elizabeth Robinson*, correct?
**A.** That's correct.
**MR. DIAZ:** Danny, if you could pull up Leone 9, which is going to be a screen capture which I will print.
**BY MR. DIAZ:**
**Q.** From Exhibit 6, your Rose Point data at 19:47:15, it's the exact same moment in time as the Coast Guard data we were just reviewing. Where does the predicted passing point appear here on your Rose Point data?
**A.** It's roughly around Valero.
Are you talking about the vessels together?
**Q.** First is simply the location, and you answered my question, right around Valero.
Is there much, at least in terms of the way these lines are drawn here, in terms of the difference in time that

03:26

you are going to be meeting both of these vessels?

**A.** They are pretty much together.

**Q.** Do you know whether at this point in time, at 19:47:15, you saw something like this in terms of the predicted passing point on your Rose Point?

**A.** Like I said before, I knew they were coming down the river. I knew one was going to be stopping and backing into Bayou Fleet. So I expected and trusted her that she would do that. The *Loretta* would have the middle, and I would take my side.

I can't pilot my ship according to this computer. You can't just sit there and look at a computer the whole time I'm doing a thousand different things at one time, focusing on the helmsman, the radar. Just because there's a line there, lines meet, it's just -- it could change in a minute.

**Q.** Understood that this is just one data point, but it's a data point showing that you are going to be meeting both of the tugs and their tows at Valero, correct?

**A.** That's correct.

**Q.** Do you recall whether, as one of the means available to you, that this is information that you looked at in order to figure out your best course of action?

**A.** I don't recall.

**Q.** As far as I can tell, Captain Leone, from this point forward and actually some minutes before, you never reached out

03:28

to the *Elizabeth Robinson* in terms of her location in the middle of the river, correct?
**A.** You're correct. She was going to back into the fleet. I just didn't see any -- I trusted her word.
**Q.** I understand. You never reached out to the *Elizabeth Robinson* in terms of her vector as she continued to point to the left descending bank, correct?
**A.** I anticipated they were going to get over there.
**Q.** Captain Leone, as we sit here today, in a situation like this where you have a vessel whose vector is pointing to the west descending bank, who is sitting in the middle of the river and having no indication that she is backing into the Bayou Fleet, would you reach out today to that vessel to figure out what's going on?
**A.** It all depends. I couldn't see at this point what was going on with her. If something doesn't look right, yeah, I'm going to call her.
**Q.** At this point in time the vector doesn't look right, does it, for backing into Bayou Fleet?
**A.** That's correct.
**Q.** Her location doesn't look right for backing into Bayou Fleet?
**A.** That's correct.
**Q.** So chances are you would probably reach out today to a vessel like the *Elizabeth Robinson* to figure out what her

03:30 intentions are rather than assuming what they are?

**A.** I didn't assume anything. I trusted.

**Q.** Mine was a poor question. As we sit here today, based on the vector and location on the river, is it fair to say that you would likely reach out to discuss with the *Elizabeth Robinson* to make sure everybody understood what she was going to do?

**A.** She said what she was going to do. She said it three to four times. "I'm stopping, backing into the fleet." She said it time and time again. I just don't see the point in -- if something doesn't look right, I'm going to call, yes.

**MR. DIAZ:** Danny, could you please pull up Exhibit 383-64.

**THE COURT:** Before you move on, were you going to take a screenshot of this?

**MR. DIAZ:** I'm sorry, Your Honor. I am.

**THE COURT:** We were going to admit it.

**MR. MCLEOD:** Exhibit 6-B?

**THE COURT:** Yes. Is it B or C at this point?

**MR. DIAZ:** That would be B, I believe.

**THE DEPUTY CLERK:** Who is offering the exhibit?

**MR. DIAZ:** They were jointly submitted.

**THE COURT:** Mr. Diaz is offering it, I think.

**MR. DIAZ:** For these specific ones? Absolutely, yes.

**THE DEPUTY CLERK:** Okay.

03:31

**THE COURT:** Unless there's an objection to it, Exhibit 6-B will be entered into evidence.

**MR. SHOEMAKER:** None, Your Honor.

**MR. TADROS:** No objection, Your Honor.

**THE COURT:** Thank you.

I interrupted you. You were about to move to something else.

**MR. DIAZ:** I was, sir.

Exhibit 383-64.

**BY MR. DIAZ:**

**Q.** Captain Leone, this is the Coast Guard data at 19:48:50. This is now about a little over 3 minutes before your starboard 10 turn. This is the first time, perhaps the only time -- I'm sorry, the first where the *Loretta Cenac* mentions potentially being all up in the docks, correct?

**A.** Correct.

**Q.** Did that set off a warning in your mind when you have another vessel telling you you may be meeting in the docks?

**A.** It is.

**Q.** What was going through your mind at that point in terms of what you need to do?

**A.** Make sure I give him enough room.

**Q.** Did it ever cross your mind at that point you should come off of full ahead?

**A.** I mean, it was risky.

03:33

**Q.** What would have been risky?
**A.** It was risky because I would have lost steerage of the vessel. I would have lost control of my own vessel.
**Q.** That wouldn't happen immediately, though, going to half ahead, for example?
**A.** I would have lost some control over her.
**Q.** Would going to half ahead have permitted more time for the tugs or at least the *Loretta Cenac*, who said she was going around the bend, to accomplish that maneuver before you met her?
**A.** I'm sorry. Say it again.
**Q.** By going full ahead, would that have allowed more time for the *Loretta Cenac* to continue through the bend before you met her?
**A.** You said full ahead?
**Q.** Half ahead, sir.
**A.** Okay. So would it have given her more time? If he is backing down so he starts to become at the mercy of the current, he is going to be falling down into the bend. If I slow her down, I take his tow out, I take him out, because where we are going to meet is at a lower, lower point. If you look at that video, where he fell into is right in the direct path of the ship. So if I slow her down, he is going to be lower into that bend. He is going to be on my side even more as I slow her down.

03:34

**Q.** Did you consider at this point in time where you are over approximately or about a mile away -- because we need to consider the length of the tows and the length of your vessel -- whether you could pull a two-whistle passing for both of the tugs?

**A.** It was very risky. It's risky at this point because -- it could be done, but I would have to -- as stated before, I would have to see both of them on the two-whistle. I couldn't split.

**Q.** Understood.

**A.** I couldn't see one on two and one on one because of how they were positioned.

**Q.** So it's still possible at this point for you to have a two-whistle passing for both the *Elizabeth Robinson* and the *Loretta Cenac*, correct?

**A.** I mean, it's definitely possible, but it's risky because I have to cross in front of him.

**Q.** Tell me this. You said the *Loretta Cenac* is in the current through the bend, correct?

**A.** That's correct.

**Q.** How about the *Elizabeth Robinson*? The same? Is she starting to become impacted -- as far as you can tell from your data, being impacted by the current going through the Hahnville Bend?

**A.** That's correct.

**Q.** So their natural movement that they may be fighting

03:36

against right now is something that would push them off to your starboard?
**A.** You mean off to my port.
**Q.** No, I'm sorry. I thought -- if they were to fall down and you were to do a two-whistle, wouldn't they be falling off to your starboard?
**A.** Off to my starboard, correct.
**Q.** Yes, sir.
**A.** Yes. I thought you meant from their perspective. But from my perspective, to starboard.
**Q.** So the current would be working to your favor, meaning decreasing the risk of cutting in front of them, because they would be pushed out of your way and you would be going up against the current to their starboard?
**A.** Yeah, you're correct, but it's risky.
**Q.** How small or large of a window do you think it would be at this point in time in order to accomplish that?
**A.** That's just total speculation there, to speculate how big of a window.
**Q.** I don't mean for you to speculate.
Which direction are the vectors going for the vessels at this point, 3 minutes before your starboard 10-degree turn?
**A.** They are going toward the east bank.
**Q.** Have they changed at all over the course of the last 6 or 7 minutes?

03:37

**A.** They have not.

**Q.** That would have been displayed on your Rose Point data, correct?

**A.** That's correct.

**MR. DIAZ:** Can we go to Leone 10, please, Danny.

**BY MR. DIAZ:**

**Q.** Captain Leone, this is going to be a screenshot which I'll go ahead and -- oops. I don't know what I just did. I'll print it in just a second.

This is your Rose Point data at 19:48:50, the same moment in time. Where is the predicted passing point now on your Rose Point?

**A.** Roughly still around Valero.

**Q.** Just a little below the *SCF Vision*, correct?

**A.** That's correct.

**Q.** Has, at least in terms of the relative time of meeting, either vessel changed based on your Rose Point data?

**A.** No, it hasn't.

**Q.** It has a meeting time with the *Loretta Cenac* of what?

**A.** 3 minutes.

**Q.** I believe it's --

**A.** Meeting in 3 minutes 39 seconds.

**Q.** The meeting for the *Elizabeth Robinson* is at what?

**A.** 3 minutes 38 seconds.

**Q.** The location for the meeting of both of them is what?

03:39

**A.** It shows 125.5.

**Q.** That's the exact same location, at least based on the data that's provided here, with only 3 seconds apart, correct?

**A.** It's showing 1 second apart.

**Q.** Ah, correct. You just don't know whether you are seeing this data on your PPU at this moment in time and assessing the risk of doing a two-whistle change to the meeting arrangement?

**A.** I may have, but we were all in agreement at this point to meet on one whistle.

**Q.** Do you have the authority as a pilot on the Mississippi River, even though you have a prediscussed agreement in terms of meeting a vessel, to insist on a change in that meeting agreement if you perceive a risk of collision that is too great?

**MR. RIVIERE:** Your Honor, if I could ask for a clarification.

Do you mean in this instance or in general?

**MR. DIAZ:** That was a general question.

**MR. RIVIERE:** Can I ask what direction he would be traveling at the time? Would he be upbound or downbound?

**MR. DIAZ:** You can ask him that when you get up.

**MR. RIVIERE:** Then I object to the question, Your Honor.

**THE COURT:** It's vague.

**MR. RIVIERE:** It's vague. We don't know which Rule

03:40

of the Road he would be applying, upbound or downbound.

**THE COURT:** It makes a difference.

**MR. DIAZ:** That is appropriate, and I will certainly change it for that.

**BY MR. DIAZ:**

**Q.** When you are proceeding in a situation similar to here, where you are an upbound vessel and you have two downbound tows, one of which is privileged, with prior meeting arrangements on a one-whistle, do you as a compulsory pilot on the Mississippi River have the authority to change that meeting arrangement if you personally assess a risk of collision as too great?

**A.** You do.

**Q.** Have you ever done that before?

**A.** I have.

**Q.** Can you describe for me a circumstance where you in fact exercised that authority even though you had a privileged vessel that was coming downbound?

**A.** I can't exactly remember a particular story, but if something doesn't look right, you can change it.

**Q.** So far what we have been talking about, Captain Leone, is a few things that didn't look right, which is the vector for the *Elizabeth Robinson*, correct?

**A.** That's correct.

**Q.** Her location in the river?

03:42

A. That's correct.

Q. We are now 3 minutes away from your starboard 10 turn, and those two factors haven't changed, correct?

A. That's correct.

**MR. DIAZ:** I will print this now, and it will be 6-C.

**THE COURT:** Any objection to the admission of 6-C?

**MR. TADROS:** No objection, Your Honor.

**THE COURT:** It will be admitted.

**MR. DIAZ:** Danny, can you please go to Exhibit 383, page 66.

**BY MR. DIAZ:**

Q. Captain Leone, this is the Coast Guard data at 19:49:08. This is at least a discussion that you were raising in terms of a two-whistle passing, correct?

A. That's correct.

Q. But it was only with the *Elizabeth Robinson*?

A. This was with the *Loretta Cenac*.

Q. I'm sorry, the *Loretta Cenac*, correct.

What was your thought process at this point?

A. I'm trying to accommodate the situation. I'm trying to make this happen safely. So I'm trying to accommodate them, suggest something, let's do what we have to do to make this work.

Q. Why didn't you communicate with the *Elizabeth Robinson* at this point?

03:44

**A.** I thought she was going to be out the way. I trusted that she was going to be well out the way on her side, on her right descending bank.

**Q.** With only 3 minutes before your starboard turn -- strike that.

**A.** I mean, it's risky. I would have to get them both on the two here.

**Q.** Well, it would be risky to do a two-whistle with just the *Loretta Cenac*, correct?

**A.** It would be very risky.

**Q.** Would it perhaps be even riskier to do a two-whistle for the *Loretta Cenac* and shoot the gap with the *Elizabeth Robinson* than trying to do a two-whistle to both?

**A.** It would be super risky.

**Q.** I guess it has to be a compound question. Which would be riskier of the two?

**A.** To split them.

**Q.** To split them rather --

**A.** To split both vessels would be more riskier than to, say, give both of them on the two.

**Q.** It would be less risky for a two-whistle arrangement for both the tugs because the current would be taking them toward the left descending bank, correct?

**A.** That's your speculation. We agreed to the one here.

**Q.** No, no. I'm sorry, Captain Leone. Let me go back to your

03:45

earlier answer. Forgive me for assuming what may have been part of your thought process.

You said to do a two-whistle arrangement with both of the vessels would be riskier than keeping the one-whistle with the *Elizabeth Robinson* and the two-whistle with the *Loretta Cenac*, correct?

**A.** The more riskier scenario would be to split the vessels.

**Q.** Correct. Why would a two-whistle arrangement with both of the vessels be less risky?

**A.** Because they would both be on the same side of the *Aris T*.

**Q.** Does the fact that these two tugs and their tows are in the bend with the current off their starboard side help in keeping both of those vessels off to your starboard?

**A.** Could you ask that again? It was a little confusing.

**Q.** Absolutely. I'm wondering whether the current would be helping to make a two-whistle passing with both tugs less risky.

**A.** It would, but as I stated, she was going to stop and back and go into the fleet.

**Q.** Understood. Just as a follow-up to my question, in terms of the current helping that two-whistle passing of both, the vectors would suggest on this page, at 19:49:08, that both of those tugs were being pushed down to the left descending bank, correct?

**A.** At this time both of them were being pushed. Their

03:47

vectors were towards the east bank.

**Q.** At the point in time when you are discussing a potential change in meeting arrangement -- a risky change in meeting arrangement with the *Loretta Cenac*, to split the tugs -- is Captain Baltas saying anything at this point?

**A.** He didn't question me.

**Q.** What is he doing at this point? Is he on the bridge with binoculars? Is he looking at a radar? Explain to me what --

**A.** He is on the bridge. It's kind of hard to say what the captain is doing at this point.

**Q.** How about the officer of the watch? Same answer?

**A.** He is on the bridge as well.

**Q.** But you don't know specifically what they are doing?

**A.** Don't know specifically.

**Q.** Is ECDIS on at this point? Do you know?

**A.** I'm not sure.

**Q.** Do you know whether anybody is viewing ECDIS and whatever functions it may have available to determine or assess the risk of collision?

**A.** I'm not sure what's going on with ECDIS.

**MR. DIAZ:** Danny, could you please go to Exhibit 383-71.

**BY MR. DIAZ:**

**Q.** Captain Leone, this is a moment in time. At 19:49:54 we are now 2 minutes before your starboard 10 turn. What do you

MICHAEL LEONE - CROSS

03:49

tell the *Loretta Cenac*?

**A.** "You got plenty of room. Come on. Come on with it."

**Q.** What does that assume? What is going on in your mind in terms of what should happen for plenty of room to continue to exist in order to accomplish a one-whistle passing?

**A.** I mean, at this time there's room. We can accomplish the one-whistle at this time. Port to port, left to left, we can accomplish at this screenshot right here.

**Q.** So does that assume --

**A.** If he doesn't fall down on me.

**Q.** That was my next question. If the *Loretta Cenac* doesn't fall down any further?

**A.** If he does not fall down on me any further, we have plenty of room.

**Q.** If the *Elizabeth Robinson* doesn't fall down any further?

**A.** We have plenty of room.

**Q.** Do the vectors suggest here that they are going to continue to fall, with both being in a bend at the Hahnville Bar?

**A.** At this screenshot here their vectors are pointed that way; but when the *Robinson* was going to stop and back, her vector was going to change totally.

**Q.** Right. I'm just asking based on this. When you said there's plenty of room, these vectors don't suggest that they are somehow going to maintain their relative position in the

03:50 river and they are going to continue to fall, aren't they?

**A.** She is going to stop and back. She is going to go to her side, to her starboard side, and that vector -- the vectors are going to change. Her vector is going to change. It's going to get shorter and it's going to go towards the west bank. The *Loretta Cenac* vector is going to change as I'm meeting her. The vectors are going to constantly change.

**Q.** In a way that they haven't changed yet, correct?

**A.** They haven't changed.

**MR. DIAZ:** Danny, Exhibit 383-84.

**BY MR. DIAZ:**

**Q.** Captain Leone, this is at 19:50:56. We are now 1 minute before your starboard 10 turn toward the docks.

You ask the *Loretta Cenac* what?

**A.** "What you -- you backing on her?"

**Q.** What did you see when you said this over the VHF radio?

**A.** She is falling down into the bend. She is letting the current push her down toward the east bank. If she is backing on her, she is going to become at the mercy of the current and let her take her down into the bend.

**Q.** Is the window through which you need to drive your vessel getting smaller at this point?

**A.** It is.

**Q.** At this point do you believe in your mind, the way that you are analyzing the situation, you have any choice but to

03:52

come and continue at full ahead?

**A.** As stated before, if I would have slowed down -- she was falling down further into the bend. I would have took the boat and the tow out. I would have just took them out. We would have dead people right now and nasty stuff in the water.

**Q.** Captain Leone, I appreciate that response, and this is why I ask it of you. There is an naval architect by another defendant in this case who says at 1950 you should have gone to engine stop. He doesn't say you should have; he simply creates a computer model of what would have happened.

In your mind, piloting this vessel, with the *Loretta Cenac* falling in front of you, tell me your response to somebody who says, "He should have gone full stop."

**A.** I would have took the tow out. I still would have had way through the water. The ship would have continued going. She wouldn't have just stopped by stopping the engine. She would have kept going. He would have fell. He was falling down into the bend. It would have took the boat and the tow out. I would have took them out.

**MR. DIAZ:** Thank you, Captain. That's all I have.

**THE COURT:** Thank you, Mr. Diaz.

Anyone else?

**MR. MCSHANE:** Your Honor, would you mind a bathroom break?

**THE COURT:** No. I think that's a great idea. Let's

03:54

be in recess for 15 minutes. Come back at 10 after 4:00.

**THE DEPUTY CLERK:** All rise.

(Recess.)

**THE COURT:** We are back on the record.

**CROSS-EXAMINATION**

**BY MR. MCSHANE:**

**Q.** Good afternoon, Captain Leone. I'm Pat McShane. I represent the Cenac Interests through their insurers. I'm going to do the cross-examination of you on behalf of the Cenac Interests so you don't have to have another Cenac lawyer come up here after that.

**A.** Gotcha.

**Q.** There's been a lot of jumping around on the times of what we are looking at on the electronic screen. I am going to question you about different events in the sequence, but there are four critical markers I want to see if we can reach an agreement with. We can kind of use a cheat sheet over here on the board to appreciate where these four critical events are in relation to whatever it is I have on the electronic screen.

I'm going to ask you if we can have a broad agreement -- I'm not asking you about minutes and seconds right now -- based on your familiarity with what happened and your preparation for trial.

You would agree that the overtaking is an agreement reached between the two tows at about 19:40. The minute is

04:18

19:40.

**THE COURT:** I may ask you to move the board a little bit this way so counsel can see and the witness can see.

**MR. MCSHANE:** Can you see that, Captain, still?

**THE WITNESS:** I can see it.

**MR. MCSHANE:** Judge, can you see it?

**THE COURT:** Yes.

**BY MR. MCSHANE:**

**Q.** 19:40 is the minute in which the overtaking agreement is reached on the VHF Channel 67?

**A.** That's correct.

**Q.** Do you agree that it's 19:46 where your passing agreement is reached with the *Elizabeth*?

**A.** I would say maybe closer to 47.

**Q.** It's in the 46 minute, isn't it, toward the end, 46:40, something like that?

**A.** 46-something.

**Q.** The reason I said 46 is because really in the next minute -- do you agree -- we know this is in the 46 minute, toward the end, the passing agreement between the *Elizabeth* and your ship.

**A.** 46, 47.

**Q.** It's 19:47 when you have the passing agreement between your ship and the *Loretta Cenac*?

**A.** It's towards the middle of 47.

04:19

**Q.** Then the first impact, what minute do you want to call that? It's around 19:52, 19:53. This is going to help me with context as I question you, Captain. 52 or 53, first impact with the dock?

**A.** It's kind of hard to determine from the transcript, but it's somewhere at 52, 53.

**Q.** Since we went on the low end on 46 and 47, how about we call that 52?

**A.** Fair enough.

**Q.** That will be the impact time. Now we have four benchmarks we can think about when we are talking about all of these little electronic clips and charts and so forth.

Before we do that, I would like to take a step back and cover something from the very beginning of your deposition I would like to elaborate on a little bit.

We went through your educational background, your training, your seasoning, your knowledge, and your employment as a NOBRA pilot. Do you remember that?

**A.** That's correct.

**Q.** I would like to ask you some questions about that really in terms of the duty and scope of your undertaking as a pilot on the Lower Mississippi River. Okay?

**A.** Okay.

**Q.** On the day of this accident, you were the NOBRA pilot on the Motor Vessel *Aris T* proceeding upriver under your guidance

04:20

and under the command of the vessel's master and navigation watch. Agreed?

**A.** That's correct.

**Q.** Your association is the NOBRA pilots association. And you as a NOBRA pilot are tasked with having localized knowledge, specific knowledge of navigational risks and issues presented to oceangoing vessels in a specific, discrete area on the Mississippi River. Isn't that true?

**A.** That's correct.

**Q.** Basically that area is the NOBRA jurisdiction, right?

**A.** Yes, sir.

**Q.** Broadly speaking, that runs from New Orleans to Baton Rouge, doesn't it?

**A.** Mile 88.0 Head of Passes to Mile 234 Head of Passes on the Mississippi River.

**Q.** Those two mile markers are, broadly speaking, New Orleans to Baton Rouge?

**A.** That's correct.

**Q.** Your mission, as published on your website, is to protect the public welfare and the environment of the State of Louisiana by enhancing the safe and efficient navigation of oceangoing vessels. Isn't that true?

**A.** That's correct.

**Q.** Your area -- well, I got it covered where your area runs. On your website NOBRA represents that the work that you do

04:22

involves piloting on "one of the most treacherous rivers in the world," correct?

**A.** That's correct.

**Q.** What makes it treacherous is we have to face on our river here high water conditions; for instance, in January after the snow melt each year. Correct? One thing that makes it treacherous?

**A.** It's more like springtime, but it goes up and down.

**Q.** Eddies, currents, sandbars, shoaling, tight turns, and bends all add to what makes it a potentially calamitous situation to operate on our river. Isn't that true?

**A.** That's true.

**Q.** As Mark Twain wrote about piloting on the river, "The whole river is bristling with exigencies in a moment." That's what can happen, and that's why we have local-knowledge pilots get on the blue-water ships on the river in our community. Right?

**A.** That's correct.

**Q.** So bringing your expertise and local knowledge to protect the public welfare against these risks is something that you and your piloting association view as a solemn undertaking to the people of this state?

**A.** That's correct.

**Q.** In order to fulfill that undertaking, folks like you have to pass tests and establish, to the satisfaction of your

MICHAEL LEONE - CROSS

04:23

examiners and your association, that you have a high level of skill and proficiency. Right?

**A.** That's correct.

**Q.** And that you have a rock-solid familiarity with your jurisdiction and the potential risks facing blue-water ships from Mile 88 up to Baton Rouge?

**A.** That's correct.

**Q.** As for the area near Norco, there are additional concerns that you have to face besides the natural aspects that we have covered. Norco, as we know from looking at the various electronic charts and some of the fixed charts so far, is an area where in the bend at the vicinity where this incident occurred, there are two oil refineries. Correct?

**A.** That's correct.

**Q.** With associated docks, which were the subject of a claim for damage in this case approaching $60 million, correct?

**A.** That's correct.

**Q.** Those docks, you are aware from your familiarity and the knowledge that you're tasked with having by NOBRA, involve loading and unloading of dangerous cargoes on the banks of the Mississippi River, on the east side at Norco?

**A.** That's correct.

**Q.** In order for those barges to be brought in and taken away, heavy traffic of red flag barges in this area, that's something that you as a NOBRA pilot are tasked with understanding and

04:25

learning how to work with. Correct?

**A.** I mean, you could meet any kind of different tows around there. Sometimes they have hopper barges, red flags -- "hopper barge" meaning it could have some type of bulk product in it, whether it's grain or soybeans, etc.

**Q.** So we have the grain elevators and so forth that get serviced there. But one thing you know is, to service the refineries at Norco, there is heavy traffic of red-flagged barges. Correct?

**A.** There is plenty of traffic.

**Q.** When I said that you have to familiarize yourself with eddies and currents -- we have seen the chart with the bend here. What we know is that in a 15-or-so-foot high water condition -- that's what we had on January 31, 2016, right?

**A.** That's correct.

**Q.** We know that tows heading downbound in the Mississippi River in this bend are confronted with a current which, as they come around the bend downbound, has a tendency to push the tow to the east bank. Isn't that right?

**A.** That's where the current is going to take it.

**Q.** We talked earlier, and Judge Ashe heard you talk about, as we got close to a calamity here, both of them, I think you said, caught the current. Right?

**A.** That's right.

**Q.** What you mean by that, there is a prevailing current. If

04:26

you are coming downbound and you show the starboard side of your tow to the current and you get caught in it, it is going to push you to the east bank. Correct?

**A.** As I stated earlier, she is going to be at the mercy of the current.

**Q.** At the mercy of the current. That is a well-known tendency that a NOBRA pilot tasked with having localized knowledge knows and works with every day?

**A.** That's correct.

**Q.** Now, before we get to the weeds of what I want to ask you about, let's get to the heart of the matter here. You testified earlier -- I'm not going to go through each one of these, but five times you heard the *Elizabeth Robinson* say, "I'm going to be backing in here at Bayou Fleet," correct?

**A.** That's correct.

**Q.** You had a working understanding, based upon your seasoning and your skill sets and the knowledge you're tasked with having as a NOBRA pilot, that when a tow in this vicinity says they are going to be backing in, stopping and backing in, that means that they are going to veer the stern of their towboat into the place where they are proceeding to dock?

**A.** She is going to point the stern of her tow, the back of her tow towards the bank of what she is going to back into.

**Q.** From the minute you heard the overtaking agreement at 19:40 until 19:52 impact, that never happened in respect of the

04:27 navigation of the *Elizabeth Robinson*, correct?
**A.** Never did.
**Q.** Based on your real-time assessment, your experience, and the knowledge you're tasked with having as a NOBRA pilot operating in this vicinity, you think if the *Elizabeth Robinson* would have performed this navigation maneuver as announced on the VHF radio five times, this event never would have happened?
**A.** That's correct.
**Q.** All right. I'm going to ask you some questions about what the *Robinson* did. All right? These questions are going to start out about Rule 5 of the Rules of the Road. I'm going to call them the Rules of the Road. We haven't heard much about these from the other lawyers questioning you today.
For inland operations on the Mississippi River -- you know, sometimes people call these the collision regs or the COLREGS or the Inland Rules of the Road. The judge will know from the papers in the case that it is a mixed question of law and fact how to apply these rules to a set of facts.
For these rules, what's your phraseology? Rules of the Road?
**A.** That's fine, Rules of the Road.
**Q.** I'm going to ask you some questions about the operation of the *Elizabeth Robinson* in the context of Rule 5. This is a short rule but an important one, right?
**MR. MCSHANE:** Your Honor, this is Exhibit 463 in the

04:29

benchbook, page 2.

**BY MR. MCSHANE:**

**Q.** Do you see that the Rules of the Road for inland operations applicable to the Norco vicinity --

**MR. MCLEOD:** Your Honor, I'm sorry to interrupt, but he is talking about an objected exhibit. The Inland Rules of the Road, we think the Court can take judicial notice of them. We don't think they need to be admitted in evidence. If you would like to have them in evidence, we will withdraw our objection, but we think it's unnecessary.

**THE COURT:** I haven't admitted it into evidence. I will take counsel's reference to it as a reference to the exhibit just for purposes of illustration. I know where to find the Rules of the Road.

**MR. MCSHANE:** I'm happy to use them demonstrably.

**THE COURT:** I'm okay with you referring to them by exhibit number and even page number. That may help me find it later on.

I appreciate, if that was an objection, the objection to perhaps admission.

**MR. MCSHANE:** Let me apologize to counsel, Your Honor. I wasn't trying to move forward with an objected-to exhibit. I actually forgot that was the case.

**BY MR. MCSHANE:**

**Q.** Rule 5, this is a rule you have to learn, understand, and

MICHAEL LEONE - CROSS

04:30 abide by as a pilot, right, and every -- sir, was that a "yes"?
**A.** Yes.
**Q.** Every navigator on a commercial vessel in the Lower Mississippi is duty-bound to abide by this rule and all of the Inland Rules; is that right?
**A.** Yes.
**Q.** So this rule requires that every vessel shall maintain a proper lookout by sight and hearing as well as by all available means, doesn't it?
**A.** That's correct.
**Q.** You are supposed to consider the prevailing circumstances and conditions and make a full appraisal of the situation and of the risk of collision. Do you see that?
**A.** I do.
**Q.** That's consistent with your understanding of that rule; is that right?
**A.** Yes, sir.
**MR. MCSHANE:** May I please have Exhibit 383-231.
**BY MR. MCSHANE:**
**Q.** This is a typed summary of the exchange of one of our first of the four benchmarks I put on the board there. This is the overtaking agreement between the two vessels, the *Elizabeth Robinson* and *Loretta Cenac*; is that right?
**A.** That's correct.
**Q.** Do you see where the *Elizabeth Robinson* says in the third

04:32

entry down, "I don't really see anything else coming up this way," and then invites the overtaking? Do you see that?
**A.** That's correct.
**Q.** In real time, at 19:40:27, you heard that, didn't you?
**A.** I did hear it.
**Q.** What you know when you heard this about the operator of the Genesis vessel, Captain Christiansen, is that at the inception of this event, the first critical point, Captain Christiansen invited the overtaking in the face of oncoming traffic; namely, your ongoing ship. You knew that, right?
**A.** That's correct.
**Q.** You knew that the overtaking invitation was at 19:40 because you could watch your clocks and your data on your laptop?
**A.** That's correct.
**Q.** You knew the invitation to overtake was made and accepted without any awareness of your position below the bend?
**A.** That's correct.
**Q.** Without any awareness of a closing ship proceeding full ahead?
**A.** That's correct.
**Q.** You know the *Elizabeth Robinson's* advice "there is nothing ahead" played a critical role in this event, didn't it?
**A.** You could say that.

04:34

**Q.** You had reason to believe, reason to be concerned as early as the initial critical invitation to overtake that the operator of the *Elizabeth Robinson* may be inattentive or incompetent?

**A.** It's kind of hard to say what he was thinking or what he was doing.

**Q.** You agree, based on your experience and the knowledge you're tasked with having as a NOBRA pilot, that before announcing "there is nothing ahead," any prudent mariner in Captain Christiansen's position would have used his VHF and available electronic charts or radar to be certain there was nothing ahead before making such an announcement and representation to the *Loretta Cenac* or the *Aris T*?

**MR. RIVIERE:** I'm going to object to the form of the question. It does not put the full quote of what was stated over the radio by Captain Christiansen. He didn't include the last part, as far as I can tell. I'm objecting to the form.

**THE COURT:** Okay. Your response to that?

**MR. MCSHANE:** That's for redirect, Your Honor. He can point to any text he wants.

**THE COURT:** I'm going to allow the question.

**THE WITNESS:** Can we ask it again?

**BY MR. MCSHANE:**

**Q.** I'll try to get it the same. You agree, based on your experience and the knowledge you're tasked with having as a

04:35

NOBRA pilot, that before announcing "there is nothing ahead that I can tell," any prudent mariner in Captain Christiansen's position would have used his VHF and available electronic charts or radar to be certain there was nothing ahead before making such an announcement?

**MR. RIVIERE:** Your Honor, let me object. He is now asking for opinion as well from this fact witness.

**MR. MCSHANE:** I'm asking for his impression, Your Honor, based on his experience and knowledge as a NOBRA pilot.

**THE COURT:** I have allowed the impression questions of this pilot, so I'm going to allow the question.

**THE WITNESS:** I would think he would look and use his VHF.

**BY MR. MCSHANE:**

**Q.** When you heard this comment, you did not get on your VHS and respond, "Hey, I'm here with my 800-foot-long oceangoing ship weighing 50,000 tons," did you?

**MR. TADROS:** Object, Your Honor. That mischaracterizes the length of the *Aris T*.

**MR. MCSHANE:** Oh, let me rephrase it.

**MR. TADROS:** It's all right. I'm sure he didn't mean to do that.

**MR. MCSHANE:** Let me rephrase it.

MICHAEL LEONE - CROSS

04:36

**BY MR. MCSHANE:**

**Q.** You didn't announce that you were present below the bend with your oceangoing vessel with a length in excess of 790 feet, did you?

**MR. TADROS:** Same objection, Your Honor.

**THE COURT:** That's sustained. Get the length correct, and you can ask the question.

**BY MR. MCSHANE:**

**Q.** You didn't announce your position below the bend when you heard the *Elizabeth Robinson* say there's nothing ahead or inform anyone that your vessel, measured in length at approximately 753 feet, was present below the bend?

**A.** No, I didn't.

**Q.** I pulled that number out of one of the expert reports. I'm going to figure out who to blame.

The bottom line on Rule 5 and its application to the Genesis vessel and the decision-making of Captain Christiansen is you agree Captain Christiansen as the privileged vessel proposed and initiated an overtaking agreement based on inaccurate information and allowed the *Loretta Cenac* to attempt an overtaking without making a full appraisal of the situation and the risk of collision, as required by Rule 5?

**A.** That's what I perceived it to be.

**Q.** You agree that a full and complete assessment of the risk of collision would have resulted in your presence being made

04:38 known?

**A.** I mean, it could have, but we were pretty far away from each other.

**Q.** I want to ask you now about questions related to Inland Rule 2. Let's have a look at Inland Rule 2, and then we'll discuss it. I'm specifically going to ask you about the application of this rule to the activities of the *Elizabeth Robinson*.

Do you see that in Inland Rule 2 the rules provide in Section A: "Nothing in these rules shall exonerate any vessel or the owner, master, or crew thereof from the consequences of any neglect to comply with these rules or of the neglect of any precaution which may be required by the ordinary practice of seamen or by the special circumstances of the case."

That's Section A?

**A.** That's correct.

**Q.** Section B: "In construing and complying with these rules, due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved which may make a departure from these rules necessary to avoid immediate danger."

**A.** That's correct.

**Q.** This is the rule that basically mandates for all navigators on the Lower Mississippi River, you can't cite some rigid rule to trump your own common sense as an explanation for

04:39

a tragedy?
**A.** This is what I know as the rule of good seamanship. If you say you are going to do something, do it.
**Q.** Here the *Elizabeth Robinson* was the privileged vessel both with respect to the overtaking as well as with respect to the passing of the upbound *Aris T*, correct?
**A.** That's correct.
**Q.** Do you agree with the concept one of the experts in the back of the room has said, which is that with this privilege comes responsibility?
**A.** Absolutely.
**Q.** Here the *Elizabeth Robinson* needed to have situational awareness to understand that by attempting to slow and back into Bayou Fleet, that created a risk that he would slide down on the *Loretta Cenac*?
**A.** If he would have backed his tow like I talked about earlier, pointing his stern, then he would have kept his responsibility, his good seamanship, and kept out of the way of the ship.
**Q.** That's a great answer, and I understand it. What you are saying is if he got over to the west bank lickity-split, he would never have caught the current and then he doesn't have to account for the risk of current. Am I saying that right?
**A.** He probably should have shaped that side if that's where he was going.

04:41

**Q.** What we know from the examination by the other lawyers and all the data you have looked at on the screen with Judge Ashe is that right up until this collision, he was nowhere near the west bank and indeed had been caught up in the current. Correct?

**A.** That's what it appears.

**Q.** What I'm asking you is whether you agree Rule 2 mandates that a guy who is trying to back in on the west bank at this particular bend, with its known propensity to push vessels to the east bank, has got to get over there and cannot be hanging around in the middle of the river during an overtaking and simultaneous passing with a blue-water ship.

**A.** That's correct. I mean, like I stated earlier, the rule of good seamanship, he is still responsible even though he is privileged. He needs to do what he said he is going to do.

**Q.** By staying out in the middle of the river and catching the current -- is that the right way to say it? You said something else I thought was even better, but now it's escaping me. Ruled by the current or something like that.

**A.** He is at the mercy of the current.

**Q.** He is at the mercy of the current. In this case once the *Elizabeth Robinson* neglected to get far enough to the west to stay out of the current and ended up being ruled by the current, the knock-on effect of this was he was sliding down on the *Loretta Cenac* and shrinking the available sea space for you

04:42

to make a safe pass between you and the *Loretta Cenac*?
**A.** That's correct.
**Q.** What we know from the vectors Mr. Diaz went through with you, this sea space available to you and the *Loretta Cenac* was ever-shrinking from the moment this passing agreement was reached at 19:46 with the *Elizabeth Robinson*. The available space for you to pass the next vessel was ever-shrinking by a constant and unchanging drift to the east by the *Elizabeth Robinson*. That's what happened, right?
**A.** That's correct.
**Q.** Based on your experience and seasoning and the knowledge you are required to have as a NOBRA pilot, you know a downbound tow in a high river state at Hahnville Bend, attempting to back at Bayou Fleet, if it doesn't get over to the west early enough is at considerable risk of sliding to the east bank?
**A.** That's correct.
**Q.** That's something that every mariner worth their salt operating tows and ships at the Hahnville Bar must be aware of in order to meet the Rule 2 requirements of good seamanship?
**A.** That's correct.
**Q.** You know that the risk of being at the mercy of the current when you have a tow that looks like the *Loretta Cenac's* tow, two barges aft, one barge forward, and then a towboat versus three strung out -- let me ask you whether I have this right. Am I right that the configuration of the barge tows for

04:44

the *Loretta Cenac* at the Hahnville Bar situation was two and one: two made up to the tow and one out forward?

**MR. RIVIERE:** Your Honor, I think that question may be proper, what was the configuration. But if he gets into where he was going with the effect of the current on the barges and the tows, this witness has never piloted tugs with towage of barges and would have no basis for that opinion.

**THE COURT:** Understood.

**MR. RIVIERE:** If it's just a configuration, that's fine.

**THE COURT:** Understood. He hasn't asked that question yet.

**MR. MCSHANE:** I understand his point. I will work around it as best I can.

**THE COURT:** He hasn't answered your last question.

**MR. MCSHANE:** I beg your pardon. That's right.

**BY MR. MCSHANE:**

**Q.** You know that the tow for the *Loretta Cenac* was two aft and one forward, right?

**A.** Yes.

**Q.** Am I saying that right, Captain?

**A.** It would be two breasted up, so they would be side by side, and then one ahead.

**Q.** These are standard barges in terms of their length, aren't they?

04:45

**A.** That's correct.
**Q.** What's the length?
**A.** It would be 190.
**Q.** 190. For the *Elizabeth Robinson*, describe for Judge Ashe how that configuration for their three barges was made up.
**MR. RIVIERE:** Your Honor, I must object. The sizes he is giving this witness are contrary to the stipulated facts.
**MR. MCSHANE:** I will stipulate they are 300s. Is that what you want to do?
**MR. RIVIERE:** Instead of 197?
**MR. MCSHANE:** It helps my case.
**MR. RIVIERE:** Let's just stipulate to the facts.
**THE WITNESS:** I'm not sure how long they are. I just know how --
**BY MR. MCSHANE:**
**Q.** Let's talk about standard barges. An inland river hopper barge's standard length is 190, right?
**A.** 190.
**Q.** These big liquid barges sometimes are bigger, right? Just for your information, the parties in this courtroom have stipulated they are 300 long.
**A.** Okay.
**Q.** I wasn't trying to trick you, and I apologize for getting the wrong information in the record.
Would you kindly explain to Judge Ashe the

04:46

configuration of the tow for the *Elizabeth Robinson* at the time of the Hahnville Bar episode.

**A.** She is strung out, so it's three long. When we say strung out, they are like this, and the boat is here. She is breasted like this but strung out like that.

**Q.** Just so it shows up right on the court record, are you saying the *Loretta Cenac's* towboat would have been made up to two barges abreast and then a third barge forward of that?

**A.** Yeah. He may call it "I have two breasted up and one strung out."

**Q.** The *Elizabeth Robinson* basically has three 300-foot barges, so it has a 900-foot tow?

**A.** She would probably say, "I have three strung out."

**Q.** In terms of a tow being ruled by the current at Hahnville Bar, coming downriver, a tow which has three barges strung out versus two abreast and one strung out in front of it faces a 50 percent increase in impact from the current versus the Cenac vessel, correct?

**MR. RIVIERE:** Objection, Your Honor. Now we are at the question he said he would work around. He didn't work around it.

**MR. MCSHANE:** Let me rephrase it, Your Honor.

**MR. RIVIERE:** Again, this witness has no expertise in towages, by admission.

**THE COURT:** He is going to work around it.

04:47

**BY MR. MCSHANE:**

**Q.** Based upon your knowledge and seasoning, the skill sets that you developed as a pilot, you have to understand when you enter into a bend what impact current might have on vessels that you are navigating around, whether you're overtaking them or whether you are passing them, correct?

**A.** That's correct.

**Q.** So although you have never been a towboat captain, you have to know about the characteristics of a tow coming around a bend if you are going to get near it with your ship, don't you?

**A.** That's correct.

**Q.** Is that part of your experience and the knowledge you're tasked with having as a NOBRA pilot?

**A.** That's correct.

**Q.** Based upon your experience and the knowledge you are tasked with having as a NOBRA pilot, explain to the judge the impact of being ruled by the current if you are catching a current on your side -- for instance, on the starboard side -- if you are configured like *Loretta Cenac* versus figured like *Elizabeth Robinson*.

**A.** She would be at the mercy of the current even more because she was longer. She is going to have more current hitting the entire length of her vessel, including the tow. She is going to be at the mercy of it, of the current.

**Q.** Mr. Diaz asked you some questions about your

04:49

computer-based imagery, your Rose Point data, and he put up some information that showed where you would be meeting each of these towboats. It showed you would be meeting each of them in pretty close proximity in the bend. Is that a fair characterization?

**A.** That's fair.

**Q.** You knew you would be passing the two of them in close proximity in the bend around about the time the overtaking would be done, as well, because of the *Elizabeth Robinson's* failure to get over to the west bank?

**A.** That's correct.

**Q.** In other words, before you got up far enough to get close to these guys, you knew it was all going to happen pretty much all at once because *Elizabeth Robinson* continuously and uninterruptedly slid to the east bank?

**A.** That's correct.

**Q.** You knew that the three-vessel meeting was going to take place in a continuously shrinking width of the river because of the *Elizabeth Robinson's* constant and uninterrupted drift to the east bank?

**A.** Yeah, but we do it all the time. It's not something --

**Q.** So the precautions of the rule --

**MR. TADROS:** I appreciate his zeal, but --

**THE COURT:** Right. He needs to finish his answer.

04:50

**BY MR. MCSHANE:**

**Q.** Captain Leone, I apologize for interrupting you. I thought you were done.

**A.** Typically we meet here three all the time. It's not something that's out of the ordinary.

**Q.** Not out of the ordinary when in real time, every second of every minute, you see your space for passing the *Loretta Cenac* shrinking by the constant and uninterrupted drift of the *Elizabeth Robinson* to the east? Not out of the ordinary?

**A.** She is sliding towards the east bank, so the *Loretta* is sliding as well.

**Q.** Right.

**A.** I'm anticipating the *Elizabeth* to back in on the west bank.

**Q.** The precautions of ordinary seamanship would dictate that Christiansen refrain from initiating the overtaking and associated passing with you with all three of you in close quarters. Don't you agree with that?

**A.** The rule of good seamanship --

**Q.** Once you are in close quarters.

**A.** -- he is still responsible to do his job.

**Q.** As with any mariner, Rule 2 placed on Captain Christiansen the duty to assess the prevailing circumstances and exercise ordinary precautions. Agreed?

**A.** Agreed.

04:52

**Q.** I would like to ask you, sir, some questions about the *Elizabeth M. Robinson's* actions in the context of Rule 9 of the navigation rules.

Before I do, I want to just cover a preliminary point with you. Your position is you don't think that this area of the Hahnville Bar meets the test for a narrow channel; is that right?

**A.** This is not a narrow channel.

**Q.** You understand that it is the judge's task to make a decision about whether this is a narrow channel by the mixed question of law and fact about Rule 9?

**A.** Well, it's my understanding that a narrow channel is a crossing. So we have crossings on the river where they dredge out the river for certain depths, and it's a 500-foot channel there. That's considered a narrow channel.

**Q.** Do you have any narrow channels in the Mississippi River, a narrow channel anywhere in the NOBRA vicinity?

**A.** We have a bunch of them.

**Q.** How are they designated?

**A.** By crossings for -- different crossings. We have crossings up and down the river. On those crossings the channel is only 500 feet wide. In this particular place, either above Hahnville Bar or below it, there's no crossing. There's no crossing where it's a narrow channel, considered a 500-foot channel.

04:53

Q. Let me ask you about narrow channels, and then we will make a decision later about whether this is a narrow channel.

As a master mariner, are you aware that a vessel proceeding along the course of a narrow channel shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable?

A. Yes.

Q. In situations where the narrow channel rule arguably does not apply, is there a custom and practice in the Lower Mississippi to broadly follow that same principle?

MR. MCLEOD: Your Honor, this is the International Steering --

MR. MCSHANE: Yeah, I've switched it over. I had the wrong one up. Thank you, Marty.

MR. MCLEOD: Sure.

BY MR. MCSHANE:

Q. Do you agree that a vessel operating in a narrow channel in a passing situation has an obligation to keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable?

A. Yes.

Q. In a situation where it's questionable whether the channel is a narrow channel, this is a principle that navigators in the Lower Mississippi River generally adhere to as a matter of custom and practice, isn't it?

04:55

**A.** Yes, custom and practice, what it says here.
**Q.** That's a "yes," right?
**A.** Starboard, stay to the starboard side, just like driving a car.
**Q.** That's similar to what you have explained to the judge that your intention was here, where each one of these vessels would take up a third of the river, with *Elizabeth Robinson* on the west bank and you on the east bank and the Cenac vessel in the middle?
**A.** That's correct.
**Q.** You would stay all the way to the east bank, whether this was a narrow channel or not, because you would consider that to be in conformity with custom and practice?
**A.** That's correct.
**Q.** And then similarly, the last sentence of Section A(ii), the vessel proceeding upbound against the current shall hold as necessary to permit safe passing. That's part of the Rule 9 narrow channel obligations when you have a narrow channel, right?
**A.** That's correct.
**Q.** But it is also part of the custom and practice in the Lower Mississippi River that where necessary to permit safe passing, an upbound vessel shall hold as necessary?
**A.** That's correct.
**Q.** That's custom, isn't it?

MICHAEL LEONE - CROSS

04:56

**A.** It typically is in a point-in-a-bend situation; whereas this is an easy bend here. So there are certain places where we hold up. This isn't typically a place where we normally hold up for other vessels.

There's designated spots particularly when it goes to narrow channels. For instance, there's College Point, and then just below College Point we have a crossing called Belmont Crossing. At that particular place vessels hold up all the time, and the downbound vessel will instruct them to hold up below Chotin Light, which is a light on the river. They will tell them to hold up below Chotin before proceeding. So the downbound will come down, hold up, let them pass, and then the other one.

But at this particular place on Hahnville Bar, it's not a narrow channel and it's not particularly a place that we would hold up. But if either vessel had asked me to, I would have been glad to.

**Q.** So where it's necessary to hold up to permit safe passing, an upbound vessel in the Lower Mississippi River with a NOBRA pilot on there will do it as a matter of custom. Agreed?

**A.** That's correct.

**Q.** The rule that says you do that where it's necessary doesn't have any verbiage about saying only when somebody asks you to, does it, the text of the rule?

**A.** If they would have asked me to, sure, I would have.

04:58

**Q.** The rule speaks for itself.
Let me ask you about the custom. The custom in the Lower Mississippi doesn't dictate that an upbound vessel, who can insure against calamity by holding up, is excused from doing that if nobody asks them to. That's not part of the custom, is it?
**A.** This goes back to the rule of good seamanship. Everybody is supposed to do what they are supposed to do.
**Q.** Right. I'm asking about whether you would only ever hold up as the upbound vessel if you were asked. Is that what you are saying?
**A.** No, that's not what I'm saying.
**Q.** Based on this rule, when the *Elizabeth Robinson* suggested on the VHF that *Loretta Cenac* overtake on the two, you expected that the *Elizabeth Robinson* would remain, broadly speaking, over on the west bank?
**A.** That's correct.
**Q.** One, because you know where the Bayou Fleet is on the west bank, right?
**A.** That's correct.
**Q.** Two, because either by way of Rule 9 or custom, once the *Elizabeth Robinson* says she's going to do that, she is supposed to be, to state it broadly, over there and out of everybody's way. Correct?
**A.** That's correct.

04:59

**Q.** Even if she was not stopping, with your passing agreement with her, she would have been obliged under either Rule 9 or the custom in the Lower Mississippi River to be as far over to the starboard as possible?

**A.** That's correct.

**Q.** To be fair, the *Loretta Cenac* has the same obligations, right?

**A.** She does.

**Q.** Once the *Loretta Cenac* accepts the invitation to overtake, as she tries to get starboard, there is an impediment to that, isn't there?

**A.** She is constricted by what the *Elizabeth Robinson* is doing.

**Q.** She is hemmed in by the slide, isn't she?

**A.** She is at the mercy of the current.

**Q.** Mercy of the current, trapped by the slide, right? Sir?

**A.** Yes. That's correct.

**Q.** Because both the downbound vessels are obligated to stay as close to the starboard side as practicable, you expected the overtaking to be done before you got up to the bend, correct?

**A.** She said she was stopping and backing. I thought it was going to happen a lot sooner.

**MR. MCSHANE:** Danny, may I please have an exhibit, 383-46. I would like to have the text and the document, please.

05:01

**BY MR. MCSHANE:**

**Q.** First of all, these yellow sheets -- the judge has been presented with considerable electronic evidence. Sometimes it gets confusing about what's what. The yellow sheets here, explain to the judge where they come from.

**A.** These are AIS depictions from the Coast Guard.

**Q.** This is the government's recordation of the movements of the vessels over time, correct?

**A.** That's correct.

**Q.** Do you remember, sir, this is -- we asked you to draw on the government document the farthest to the middle of the river you had any expectation you would ever see the *Elizabeth Robinson*. You did that on this document, and you labeled it "ER." Do you remember doing that?

**A.** I do.

**Q.** Then we asked you how far is the farthest you would ever expect *Loretta Cenac* to be toward the east bank, crowding your space for a passing agreement; and you drew the blue line with the letters LC pointing to it. Do you remember that?

**A.** I do.

**Q.** This is still the position you take here in court today about your expectation about where these vessels -- the farthest to the east they would ever be during the maneuvering, including your passing of those vessels. That's what you meant to represent in Exhibit 383, page 46?

05:03

**A.** You said furthest to the east?

**Q.** Yes. Am I saying that right? The east bank is where the refineries are and where you are heading, right?

**A.** Yes. That line depicts the furthest east? Is that what you're saying?

**Q.** Do you remember providing an explanation to us the blue line represents the farthest you would ever expect to see the *Loretta Cenac* to the east?

**A.** That's correct.

**Q.** This is consistent with what you said, that it was your assumption you would have plenty of room because the *Robinson* was going to stay to the west?

**A.** That's correct.

**Q.** We asked you how far to the east would you have ever expected these two vessels to get, and these two lines represent your answer, correct?

**A.** That's correct.

**Q.** But the problem with that is -- two things about this exhibit. First of all, we are talking about 16:46:46. Going over here to these four benchmarks, that's right about when the passing agreement is made between the *Elizabeth Robinson* and the *Aris T*?

**A.** That's correct.

**Q.** You're looking at them and saying, "Oh, I don't expect you to ever be farther east than the red line"; but on the very

05:04

document you drew the line on, they are already farther east than that, aren't they?
**A.** That's correct.
**Q.** You are telling everybody in this courthouse you expect you are going to take the one-third on the east bank. You're dead center in the river when this passing agreement is made, aren't you?
**A.** That's correct.
**Q.** This positioning where the vessels are when you reach the passing agreement with the *Elizabeth Robinson*, what you can see on your laptop in front of you -- and I know that you have to look out your windows and you have a lot of -- you're multitasking, aren't you, as a pilot?
**A.** Yes.
**Q.** I understand that. But if you want to confirm that somebody is doing what they say they are going to do, you have available electronic data right in front of you on your laptop screen in the form of Rose Point electronics?
**A.** I do.
**Q.** You could see this positioning. This is not your Rose Point imagery; this is the government imagery. But you could see this type of positioning on your own electronic data, correct?
**A.** Yes.
**Q.** You knew when you agreed to the passing with the

05:05

*Elizabeth Robinson* that the *Elizabeth Robinson* was violating or deviating from either Rule 9 or the Lower Mississippi River customary requirement of staying as far starboard as is practicable. You knew that when you reached the agreement with them, didn't you?
**A.** I did because I thought she was going to be stopping and backing into that side.
**Q.** Assumed?
**A.** Trusted.
**Q.** Assumed, right?
**A.** I trusted her word.
**Q.** Did you assume? Did you make an assumption based on scant information?
**MR. TADROS:** Your Honor, we are getting argumentative. Objection. He would like for him to say that.
**THE COURT:** I am going to sustain it. He has answered it twice.
**BY MR. MCSHANE:**
**Q.** So based on the radio calls that you had and your experience maneuvering in this bend prior to January 31, when we asked you -- sorry. I'm asking you to admit that the reason you thought the Cenac boat would be farther to the east was you assumed that the *Robinson* was going in on the right descending bank.
**A.** Trusted that she was going in on the right descending

MICHAEL LEONE - CROSS

05:07

bank.

**Q.** You're aware that the rules prohibit you from making assumptions based on scant information. You know that, right?

**A.** I do.

**Q.** Have you testified previously that you assumed that the *Robinson* was going into the west bank?

**A.** You can say I assumed, I trusted. It's still the rule of good seamanship.

**Q.** Let me just see if I can refresh your recollection about whether you said you made an assumption here.

**MR. MCSHANE:** May I ask for page 128 of Captain Leone's deposition.

**BY MR. MCSHANE:**

**Q.** Do you see, sir -- first of all, do you remember giving your deposition, the first day of your deposition, on April 11, 2017, at Mr. Tadros' office?

**A.** Yes.

**Q.** Do you remember being asked the question by one of the lawyers that day, page 128, line 12:

"**QUESTION:** And where did you -- based on these radio calls and your experience maneuvering in this bend prior to January 31, where relative in the river did you expect the Cenac boat to be as she came around the bend?

"**ANSWER:** Well, I assumed that the *Robinson* was going in on the right descending bank. She was going to be well

MICHAEL LEONE - CROSS

05:09

on the right descending bank, west bank, if you will, that the *Loretta* would probably be in the middle of the river at that point, and I would have my side of the river."

Do you see that?

**A.** I do.

**Q.** Does that refresh your recollection that you were assuming that the *Elizabeth Robinson* was going to be on the west bank?

**MR. TADROS:** Your Honor, objection. He is saying the same thing.

**MR. MCLEOD:** I object. He is not.

**THE COURT:** I understand what your position is and what your position is. I think he handled this correctly, so I'm allowing the question.

**MR. TADROS:** Thank you, Your Honor.

**THE WITNESS:** You could say assumed, trusted, however you want to spin it. I trusted her word. It just goes back to the rule of good seamanship. He said he is going to do it, then do it.

**BY MR. MCSHANE:**

**Q.** Because the rules speak to forbidding assumptions based on scant information, it's important for me that you recognize and admit that under oath you previously said you made an assumption about what the *Elizabeth Robinson* was going to do.

That's what you did, right?

**A.** Assume, trust, in my eyes they are the same thing.

05:11

**MR. MCSHANE:** At this stage, Your Honor, I would like to offer, file, and introduce into evidence just the front page of the deposition along with page 128 as the next exhibit number in sequence.

**THE COURT:** Is there any objection to that?

**MR. TADROS:** None, Your Honor.

**MR. RIVIERE:** No objection. I just object to the responsiveness of the witness. He was asked directly if his testimony was that he stated he assumed, and the witness would not answer the question.

**THE COURT:** I think he answered the question.

**MR. MCSHANE:** That's why I'm offering the exhibit.

**THE COURT:** I think he answered the question. I think you have enough to use.

**MR. MCSHANE:** Thank you.

Can somebody tell me the next sequence in the exhibits?

**THE DEPUTY CLERK:** I don't know. I know --

**MR. MCSHANE:** I just need to assign a number to it. I think it's 414.

**THE DEPUTY CLERK:** 1 through 413 were admitted, but then 469 was admitted. So I don't know if we can go to 414.

**THE COURT:** They need to talk.

**MR. MCSHANE:** Your Honor, at this stage we would like to offer, file, and introduce into evidence the identified

05:12

deposition pages from Volume 1. There were two days of deposition of Captain Leone. It's page 128, plus the cover page, as Exhibit 482.

**THE COURT:** I have heard no objection to that. Any objection?

It will be -- I'm sorry?

**MR. MCLEOD:** Your Honor, is that the correct number?

**MR. DIAZ:** That is the last number so that we don't start stepping on other numbers that have already been listed.

**MR. MCLEOD:** Fair enough. Now I understand.

**THE COURT:** It will be admitted as Exhibit 482.

**BY MR. MCSHANE:**

**Q.** I'm going to move off this point in a minute, but I think what I understood you to say a moment ago, when I was asking you to acknowledge that you previously said that you made this assumption, you said "assumed, trusted."

Do you consider those words to be synonyms, basically you are describing the same thought process?

**A.** From my point of view, assume and trust, from my eyes, are the same thing.

**Q.** When you have said "trusted" in the courthouse today, each time you said that, that would be the same as saying you were making an assumption, right?

**A.** I trusted.

**Q.** To be clear about this, you trusted or you made an

05:13

assumption about what the *Elizabeth Robinson* was going to do without ever engaging in a VHF Channel 67 radio communication with Captain Christiansen. Isn't that true?

**MR. TADROS:** Objection, Your Honor. That assumes facts not in evidence, and it's an incorrect representation of the communications. We have already heard all the communications.

**MR. MCSHANE:** Let me rephrase the question. I'm not sure that's an objection.

**THE COURT:** Well, it was an objection. I'm not sure he would have liked my ruling, but you said you will rephrase.

**MR. MCSHANE:** I will let him off the hook, Your Honor.

I've lost my train of thought.

**THE COURT:** The question was: "To be clear about this, you trusted or you made an assumption about what the *Elizabeth Robinson* was going to do without ever engaging in a VHF Channel 67 radio communication with Captain Christiansen. Isn't that true?" You said you're going to rephrase.

**BY MR. MCSHANE:**

**Q.** After reaching your initial overtaking agreement on Channel 67 with Captain Christiansen at about 19:40, you made assumptions about what his movements --

**MR. TADROS:** Objection, Your Honor. That is incorrect. It's 19:46.

05:14

**MR. MCSHANE:** Let me rephrase it. I got it wrong a different way the first time.

**MR. TADROS:** You got it wrong consistently.

**MR. MCSHANE:** I'm getting there. Let me try one more time.

**THE COURT:** That's fine.

**BY MR. MCSHANE:**

**Q.** After discussing and negotiating a passing agreement with the *Elizabeth Robinson* at about 14:46, in the minute 14:46, you made ongoing --

**A.** 19:46.

**Q.** 19:46. Let me start over.

After reaching your passing agreement with the *Elizabeth Robinson* at 19:46, you made ongoing assumptions or continued to trust the *Elizabeth Robinson* in respect of its decision to go into Bayou Fleet based on your assumptions?

**A.** I trusted her word.

**Q.** Never had another radio communication after 19:46, after the 19:46 passing agreement, correct?

**A.** Rule of good seamanship.

**Q.** Rule of good seamanship is trust, but verify. Isn't that true?

**A.** She said she is going to do it, then do it. I have to trust him.

**Q.** The Coast Guard fined you $6,000 because you gave that

05:15

answer; isn't that true?

**MR. TADROS:** Your Honor, that was part of the rulings, the objections that we filed.

**MR. MCSHANE:** He opened to door to this.

**THE COURT:** Wait. Let me hear the objection.

**MR. TADROS:** I believe your order was that nothing can come in from the Coast Guard proceedings. He can ask him a question if he wants to impeach him.

I don't see any Coast Guard people here to testify to what was said. As to the ruling --

**MR. MCSHANE:** Let's see if we get to an impeachment point on this.

**BY MR. MCSHANE:**

**Q.** Have you ever been advised by anybody that trust, without trust, but verify is not adequate good seamanship?

**A.** That's just how we go about things on the river. You trust that people are going to do their job.

**Q.** I'm not sure you understood my question. Have you ever been told by anyone who assessed your conduct in this case that trusting the *Elizabeth Robinson* wasn't good enough and that you were obligated as a NOBRA pilot to trust, but verify?

**A.** She stated four, five times what she was going to do. I mean, what more do I need to verify? She is stopping, backing into Bayou Fleet.

**Q.** First of all, I'm just asking you about the postaccident

05:17

communications and whether anybody has ever told you trust ain't enough; trust, but verify is required.

**A.** I understand what you are saying, but she said four to five times what she was doing.

**MR. RIVIERE:** Your Honor, I object to the responsiveness. He asked if anyone has ever told him about trust and verifying. He is referencing some other fact unrelated to the question.

**THE COURT:** I'm going to sustain that objection. I think you're talking past each other.

You're going to need to answer his question. I understand you might want to explain your answer, but you need to answer his question.

**THE WITNESS:** Can you ask it again, please?

**BY MR. MCSHANE:**

**Q.** Has anybody, in assessing your conduct during this casualty, told you that trusting the *Elizabeth Robinson* is not good enough and that your behavior minimally required a trust, but verify approach?

**A.** No. No.

**Q.** Has anybody ever told you, in connection with assessing your conduct in this case, that you failed to timely recognize the *Elizabeth Robinson* was having issues making its expected move toward the west bank and that you failed to take appropriate and early action to avoid a near collision before

05:18

19:48:50?
**A.** No. But she didn't call me and tell me at any point anywhere that she was having a problem.
**Q.** Has anybody ever told you, in assessing your conduct and your contribution to this casualty, that your reliance on the Rule 5 radio representations, that it's fair to have trust and confidence in other captains, but you need to trust, but verify another captain's stated intentions, especially when your PPU or radar are showing a very different picture?
**A.** It's really kind of long. Can you maybe simplify it a little bit?
**Q.** In connection with evaluating your conduct involving this casualty, have you ever been told, "Hey, you can't just rely on what you're being told by another captain, although that is an important source of information. You have to verify"? Were you told that by people --
**A.** No.
**Q.** -- assessing your conduct?
**A.** No.
**Q.** Were you told that in particular you have to verify and not just rely on representations on the radio where the radio representations fly in direct conflict with what you are seeing on your own electronic data?
**A.** This goes back to trust and confidence. No one has ever told me anything. But, again, the guy said it four to five

05:20

times, what he was going to do.

**MR. MCSHANE:** At this stage, Your Honor, we would ask that the Court allow us to refresh the witness' recollection with the Coast Guard record and, depending on his answers, offer that record in evidence as impeachment evidence.

**MR. TADROS:** That's improper impeachment, Your Honor. They have to call the Coast Guard to come here and testify to that. They cannot bring it in. That's exactly what they and Genesis tried to do by introducing these documents.

If I read Your Honor's ruling, it was very clear. That case that Your Honor relied on, the Coast Guard came live and testified.

**THE COURT:** Does Genesis have a position on this point?

**MR. RIVIERE:** Yes, Your Honor. I think this is proper impeachment. He has asked the witness if he has ever been advised of these things; he has denied it; and now counsel has laid the foundation for impeachment.

Your Honor did say in his ruling that --

**THE COURT:** Impeachment is one of the bases for allowing the Coast Guard report to be used. I'm not admitting the Coast Guard report as yet. Counsel is suggesting it's a stepped process. I think that's correct.

I'm going to allow him to use the Coast Guard report to refresh the witness' recollection of the questions

05:21 that have just been asked. Depending upon the answers will dictate whether the Coast Guard report is admitted into evidence.

**MR. TADROS:** For purposes of the record, Your Honor, I would like to point out that Your Honor's ruling of April 19, 2019, was based on the *In re Complaint of Crosby Tugs*, in which it specifically said, "Coast Guard's post-accident measurement of water depth admissible if Coast Guard investigator taking measurements testified at trial and ruling on admissibility of Coast Guard report for impeachment purposes deferred until trial." There's no such --

**THE COURT:** I'm not going to get into an argument about this. The rationale of that is where there's an issue with respect to an underlying factual component of the question, then the Coast Guard representative was required to be present in order to validate the accuracy of that aspect of the potential impeachment testimony. I'm not sure I have heard anything that calls into question the factual predicate for the questions that have been posed by counsel.

My ruling would be to take this on a stepped process to allow the Coast Guard report to be used. I'm willing to hear counsel.

**MR. LETOURNEAU:** Your Honor, I guess the one comment that I would make is it seems to me that the questions that were asked of Captain Leone in the first instance were improper

05:23

because they drew from the Coast Guard report apparently, in the first instance, as the basis for the questions that were being asked of Captain Leone. Therefore, they are still seeking to elicit from him information concerning the Coast Guard action which you have said is not admissible into evidence.

**THE COURT:** I understand what you are saying, but the problem with that is that a Coast Guard report necessarily is predicated upon factual circumstances that are, in essence, objective to the incident and not created by measurements like were at issue in the *Crosby Tugs* case.

There's not, insofar as I have seen in connection with the questions that have been asked, the same kind of factual issues that are posed by the predicate for the questions.

I'm going to allow the Coast Guard report now to be used to refresh the witness' recollection. I'm not admitting the Coast Guard report at this point in time.

**MR. TADROS:** Your Honor, with all due respect -- and I understand you don't want to argue the point, but this is a back-door way of getting the Coast Guard report into evidence. I would like the Court to note my objection to preserve it.

**THE COURT:** So noted.

**MR. TADROS:** Thank you.

**MR. MCSHANE:** Could I ask you, Danny, to please bring

05:25 up Exhibit 480.

**MR. TADROS:** May we approach, Your Honor?

**THE COURT:** Sure. So you want to approach off the record or just --

**MR. TADROS:** There was no report from the Coast Guard that was sent to this witness.

**THE COURT:** Okay. All right.

**MR. TADROS:** So it's improper impeachment. And they are trying to get in by the back door something that is improper.

**THE COURT:** Okay. That's a point that has occurred to me. It's not been asked as a question. If this witness is testifying based upon his personal knowledge, and his personal knowledge doesn't encompass the Coast Guard report, that's a different issue. So perhaps we need to establish that in the first instance.

**MR. TADROS:** Thank you, Judge.

**MR. MCSHANE:** I'm so sorry, Your Honor. I was trying to get the exhibit up. Establish --

**THE COURT:** I understand. The point that has been raised is one that has occurred to me, which is this witness has answered these questions. I understand the context in which you have asked the questions in order to lay a foundation for using the Coast Guard report for impeachment purposes. But if this witness has never seen the Coast Guard report, then his

05:26

answers must be understood in that context, and it would be improper impeachment to utilize the Coast Guard report at that point for impeachment purposes.

It seems to me a necessary prerequisite to moving forward with using the Coast Guard report for impeachment purposes is to establish whether he has seen it or not.

**MR. MCSHANE:** All right. It may be his awareness of the report, as well, though, right?

**THE COURT:** It may be. Awareness is different in terms of the specific verbiage used in the report. You can understand how a witness response might not be predicated upon that particular verbiage.

**MR. MCSHANE:** Are you ready, Judge?

**THE COURT:** Yes.

**MR. MCSHANE:** Thank you.

**BY MR. MCSHANE:**

**Q.** You testified at the beginning of your day here today that you paid a civil fine to the United States Coast Guard; is that right?

**A.** That's correct.

**Q.** You were aware that they made findings of your behavior in connection with the fine?

**A.** I was aware of something.

**Q.** You were aware that the fine was higher, appealed, and

05:27

reduced down to six?
A. That's correct.
Q. That's through the very capable efforts of your lawyer, Mr. Pivach?
A. That's correct.
Q. So there was a ruling, a letter appeal by Mr. Pivach, and a final ruling; is that right?
A. That's correct.
Q. You saw all that, didn't you?
A. No, I didn't.
Q. You never read the ruling against yourself?
A. My lawyer instructed me that I received a fine, and I paid the fine.
Q. Do you know what findings there were about what you did wrong?
A. He just instructed me that there was a dollar amount, and I just paid the fine.

**MR. MCSHANE:** What we would like to do, Your Honor, is ask the witness some more foundation questions.

**BY MR. MCSHANE:**
Q. Did you know what any of the violations were for which you were fined?
A. I didn't see the report.
Q. No. Did you know what they were?
A. Did I know what they were? No. I didn't see anything. I

05:28

just paid the fine.

**Q.** You also told the judge early today that as part of the outcome of the Coast Guard assessment of your conduct in this case, that you were referred to 80 hours of continuing legal education.

**MR. TADROS:** Objection, Your Honor. That mischaracterizes his testimony. It had nothing to do with the Coast Guard.

**BY MR. MCSHANE:**

**Q.** Is that your testimony?

**MR. MCSHANE:** I beg your pardon, Judge.

**THE COURT:** The objection is to the way the question has been phrased. I think it does assume facts that aren't a part of the testimony as previously provided by this witness, so I would ask you to rephrase the question.

**BY MR. MCSHANE:**

**Q.** After the Coast Guard assessment and the fine of $6,000, did you have to get 80 hours of continuing legal education?

**THE COURT:** You don't mean continuing legal education, but I understand your using that phrase.

**MR. MCSHANE:** It's always hovering over me like a dark cloud.

**MR. TADROS:** That doesn't mean we have to suffer.

**BY MR. MCSHANE:**

**Q.** What do you call your 80 hours of education?

05:30

**A.** Remedial training.
**Q.** Remedial?
**A.** Yes, remedial training.
**Q.** What does that mean, "remedial training"?
**A.** Taking some classes to freshen myself up on some of the things we deal with on the river.
**Q.** Who ordered that you do that?
**A.** The Board of Examiners.
**Q.** What is the Board of Examiners?
**A.** The Board of Examiners is three appointed pilots within the NOBRA association appointed by the governor to oversee the association. They can make determinations, judgments on different things, whether it be accidents or whatever the case may be, whatever it may be.
**Q.** You were ordered by the Board of Examiners to contact the Maritime Pilots Institute to begin your training immediately, weren't you?
**A.** That's correct.
**Q.** You were sent for this training to be afforded an opportunity to review, practice, and demonstrate the basics of piloting and piloting practices, navigation safety, and responsibilities of a commissioned pilot, correct?
**A.** That's correct.
**Q.** You were advised that "most importantly" you were to receive instructions on river piloting techniques that

05:32

effectively provide reliable and safe results for the piloting of deep draft vessels on the Lower Mississippi River. Right?

**A.** That's correct.

**Q.** The topics you had to study for 80 hours included the role of the pilot?

**A.** That's correct.

**Q.** Communications?

**A.** That's correct.

**Q.** Risk management and pilot decision-making?

**A.** That's correct.

**Q.** Emergency ship handling procedures?

**A.** That's correct.

**Q.** Use of all available anchorages in an emergency?

**A.** That's correct.

**Q.** Use of tugs in an emergency?

**A.** That's correct.

**Q.** Ship behavior in currents?

**A.** That's correct.

**THE COURT:** Is this a good stopping point?

**MR. MCSHANE:** Yes, it is.

**THE COURT:** It's 5:30.

**MR. MCSHANE:** Yes.

**THE COURT:** Do you have an estimate about how much more time you would have?

**MR. MCSHANE:** 90 minutes, maybe a little more.

05:33

**THE COURT:** If we started tomorrow morning at 8:30 to try to gain some time, would that be amenable to all counsel?

**MR. LETOURNEAU:** Yes, Your Honor.

**MR. MCSHANE:** Yes, Your Honor.

**THE COURT:** Any witnesses that you need to have available?

**MR. TADROS:** Yes, Your Honor.

**MR. MCSHANE:** Yes, sir.

**THE COURT:** The Court will be in recess until 8:30. We will start trial at 8:30 in the morning. Thank you.

**THE DEPUTY CLERK:** All rise.

(Proceedings adjourned.)

* * *

**CERTIFICATE**

I, Toni Doyle Tusa, CCR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of proceedings in the above-entitled matter.

*/s/ Toni Doyle Tusa*
Toni Doyle Tusa, CCR, FCRR
Official Court Reporter